VICTOR A. VILAPLANA (CA BAR NO. 58535)
vavilaplana@foley.com
MARSHALL J. HOGAN (CA BAR NO. 286147)
mhogan@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE:  858.847.6700
FACSIMILE:  858.792.6773

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION

## UNITED STATES BANKRUPTCY COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>SOTERA WIRELESS, INC.,<br><br>DEBTOR. | LEAD CASE NO.  16-05968-LT11<br><br>CHAPTER 11<br><br>(JOINT ADMINISTRATION REQUESTED)<br><br>**FIRST DAY MOTION** |
| SOTERA WIRELESS, INC.,<br><br>DEBTOR. 16-05968-LT11<br><br>SOTERA RESEARCH, INC.,<br><br>DEBTOR. 16-05969-LT11 | **DECLARATION OF THOMAS WATLINGTON IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**<br><br>**DATE:      OCTOBER 4, 2016**<br>**TIME:       3:00 P.M.**<br>**DEPT:       3, ROOM 129**<br>**JUDGE:     HON. LAURA S. TAYLOR** |

I, Thomas Watlington, declare as follows:

1.      Under 28 U.S.C. §1764, Thomas Watlington declares as follows under the penalty of perjury:

2.      I am the Chief Executive Officer of Sotera Wireless, Inc., a California corporation ("Sotera"), which is the parent company of Sotera Research, Inc., a Delaware corporation ("Sotera Research" and together with Sotera, the "Debtors"). On the date hereof, the Debtors filed petitions for chapter 11 bankruptcy relief under title 11 of United States Code, 11 U.S.C. § 101 et. seq., as amended (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases").  I am authorized to

submit this declaration (the "First Day Declaration") on behalf of the Debtors.

3.     I have served as Chief Executive Officer of Sotera since January 30, 2006.  I have also served as Chief Executive Officer of Sotera Research since its incorporation on April 1, 2011.  In these roles I am responsible for the oversight of operations and financial activities of the Debtors, including but not limited to, raising capital, product development, sales and marketing operations, monitoring cash flow, workforce matters and financial planning.  As a result of my tenure with the Debtors, my review of documents and my discussions with other members of Debtors' management team, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  Reference to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in the First Day Declaration.

4.     On September 30, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of California (the "Court").  The Debtors will continue to operate their business and manage their properties as debtors in possession.

5.     Sotera Wireless Singapore Pte. Ltd., a Singaporean private limited company ("Sotera Singapore"), is a wholly owned subsidiary of Sotera.  Sotera Singapore is not a chapter 11 debtor and will not be subject to the requirements applicable to a debtor under the Bankruptcy Code.  Sotera Singapore serves as a sales office for the Asia Pacific region.

4838-2305-7719.8

6.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief, which were filed under chapter 11 of the Bankruptcy Code, and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "First Day Pleadings").  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business.  I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

7.     Part I of this First Day Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

### I.     COMPANY AND BUSINESS OVERVIEW

#### A.     Overview of Operations

##### 1.     Product Overview

8.     Sotera is a medical technology company that developed a new generation of vital signs surveillance monitoring via a proprietary technology platform, the ViSi Mobile System ("ViSi"). ViSi is a wearable, ICU-grade system that continuously monitors patient vital signs (including respiration, heart rate/pulse rate, ECG, skin temperature, blood oxygen, and blood pressure without the constant use of an inflatable cuff), wirelessly transmits real-time patient data to the patient care team and automatically integrates patient data into the electronic medical records system. Sotera's initial commercial focus has been on the general care hospital setting where the current standard of care for monitoring patients is to

3

4838-2305-7719.8

spot check the patient every four to five hours.  With ICU-grade continuous monitoring, ViSi enables the care team to detect deteriorations early and potentially intervene prior to a possible adverse event with better information.  As a result, Sotera's patented, FDA 510(k)-cleared ViSi significantly improves patient safety and satisfaction and simplifies the care teams' workflow, providing a compelling value proposition for the patient, nurse/physician, hospital and healthcare system.

9.    ViSi has received eight different FDA approvals since 2011, received its "CE" mark in 2012, which signifies conformity with certain European safety standards, and has since been implemented in over 45 hospitals and hospital systems in the U.S. and in Australia, Taiwan, Singapore and Saudi Arabia.

10.    The ViSi consists of wearable equipment, proprietary software, and securements and attachments which are disposable.  The primary components of equipment are the wrist transceiver, the ECG chest sensor, soft-wrap thumb sensor and the blood pressure cuff module which is used for initial calibration purposes.

## 2.    Commercial Promotion and Customer Support

11.    Sotera promotes the ViSi through a direct sales force of twelve sales representatives in the United States, and two sales representatives focused on international markets.  The sales effort is supported by a two-person sales operations team that assists with customer quotes and contracts, and processes sales orders.  Marketing efforts are provided by Sotera's head of marketing and a product manager.  Sotera has distributor agreements for Taiwan, Singapore, Australia, Saudi Arabia, China, South Korea and Japan.

12.    Installation, customer training and interoperability services (connecting the ViSi System to a hospital's systems) are accomplished by a nine person team of deployment techs, clinical specialists, project managers and interoperability engineers.

4838-2305-7719.8

13.     As of August 25, 2016, there were 45 hospitals utilizing the ViSi Mobile System, including hospitals in Australia, Singapore, Taiwan and Saudi Arabia.  Customer and technical support is provided to Sotera's customers by two additional technicians.

### 3.     Research and Product Development

14.     Sotera's 29-person R&D Team oversees the development of all aspects of the ViSi including its novel hardware designs and proprietary software, which includes numerous algorithms.  The R&D Team includes hardware engineers, system and embedded software engineers, and developers of quality systems and quality assurance functions.  Sotera's Science Team is responsible for conducting primary research and technical analysis and support.

15.     The ViSi provides the functionality of monitoring all key vital signs on a continuous basis, including non-invasive blood pressure readings without the repeated use an inflation cuff.  The system also features advanced alarm management, network integration and virtualization, remote alarming capability and enterprise software architecture.  Sotera has received FDA clearance for posture and motion alarms, and is currently working on features for detecting life-threatening arrhythmias and other features.

16.     Sotera's product pipeline includes the commercial development of sensing monitors for measuring oxygen saturation and pH in muscle tissue (both of which are FDA approved and valuable indicators of internal hemorrhage and septic shock), which were acquired through an acquisition of assets from Reflectance Medical, Inc. in early 2015.  Additionally, Sotera holds several patents through assignment for measuring cardiac output, but is not currently developing this technology.

///

///

///

### 4.  Intellectual Property

17.    Sotera intellectual property includes 47 issued and 2 allowed (i.e., the inventions have been determined to be patentable but patents have not yet issued) U.S. patents, along with 55 pending U.S. patent applications.  Outside the U.S., Sotera has 14 issued applications.

18.    Sotera's patents primarily relate to continuous non-invasive blood pressure monitoring, impedance pneumography, alarm management/motion thresholds, respiration monitoring and signal fusion, data synchronization and the ViSi Mobile System form factors.  The nominal patent term expirations on the U.S. patents range from 2028 – 2030.

19.    Sotera has been assigned patents related to measuring vital signs during hemodialysis, measuring cardiac output, and patient activity monitoring. Sotera also holds non-exclusive licenses on patents related to measuring oxygen saturation and pH in muscle tissue, body-worn sensors and blood pressure cuff technologies.

### 5.  Headquarters/Facilities/Employees

20.    Sotera's headquarters are located in San Diego, California, and consist of approximately 30,000 square feet of leased office, manufacturing and warehouse space.  As of the Petition Date, Sotera had 63 full time employees, the majority of which are located in San Diego.  None of Sotera's employees are represented by a labor union.

### 6.  Manufacturing

21.    Sotera has a manufacturing suite of approximately 10,000 square feet within its San Diego facility.  Final assembly, software loading and testing of the ViSi equipment components is performed in San Diego.  Equipment components and disposables are sourced from approximately 180 domestic and international suppliers.

4838-2305-7719.8

**B.**    **Corporate Structure**

22.    Sotera was originally incorporated in California on March 13, 2002 under the name Triage Data Networks, Inc.  On December 9, 2004, Sotera was re-incorporated in California for the purpose of changing its legal name to Triage Wireless, Inc.  On October 7, 2009, Sotera was re-incorporated in California for the purpose of changing its name to Sotera Wireless, Inc.

23.    As of July 31, 2016, Sotera had 5,084,116 shares of common stock outstanding, 5,050,000 shares of Series A Preferred Stock outstanding, 12,337,509 shares of Series B Preferred Stock outstanding, 5,590,223 shares of Series C Preferred Stock outstanding, 6,656,482 shares of Series D Preferred Stock outstanding, 8,986,035 shares of Series D-1 Preferred Stock outstanding, and 29,562,174 shares of Series E Preferred Stock outstanding.  As of July 31, 2016, Sotera had 2,181,628 warrants and 10,324,369 stock options outstanding.

24.    Sotera Research was incorporated in Delaware on April 1, 2011, and is wholly owned by Sotera.  Sotera Research is not an operating entity and does not have any employees, but holds title to the assets acquired from Reflectance Medical, Inc. on February 23, 2015.

**C.**    **Summary of Prepetition Debt**

25.    Sotera entered into an amended and restated loan and security agreement with Silicon Valley Bank  ("SVB") and Oxford Finance LLC ("Prepetition Lenders") on September 12, 2014 ("Prepetition Loan Agreement"), together with all other loan documents, security instruments and other documents related to, referenced in or executed in connection with the Prepetition Loan Agreement prior to the Petition Date, the ("Prepetition Loan Documents"), pursuant to which the Prepetition Lenders provided secured loans to Sotera in the amount of $20.0 million ("Prepetition Loans").

26.    As of the Petition Date, the principal amount outstanding under the Prepetition Loan Documents was just under $13.1 million (together with any

accrued and unpaid interest, the "Prepetition Obligations").

27.     To secure the Prepetition Obligations and pursuant to the Prepetition Loan Documents, Sotera granted to the Prepetition Lenders security interests in and liens on substantially all assets (the "Prepetition Liens") and all proceeds and products thereof, including but not limited to all goods, accounts receivables, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles as defined in the Uniform Commercial Code, cash, deposit accounts, certificates of deposit, fixtures, securities, all other investment property and financial assets (the "Prepetition Collateral").  Notwithstanding the foregoing, the Prepetition Collateral does not include, among other items, copyright rights, applications and registrations, patents, patent applications and like protections, trademarks, know-how, trade secret rights, clinical and non-clinical data and rights to unpatented inventions (the "Intellectual Property"); however, the Prepetition Collateral does include proceeds of the Intellectual Property.

## II.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

28.     There are significant risks and uncertainties associated with developing a medical device.  Even before a device can be submitted for regulatory review and approval, a medical device company must undergo a number of time-consuming, expensive, and financially risky activities, including accurately identifying unmet clinical/medical needs, designing and manufacturing a device which works accurately and dependably, developing system and embedded software to support the function of the device, and conducting clinical studies to obtain evidence of the device's satisfactory performance.

///

///

///

4838-2305-7719.8

29.     To achieve profitability, companies in the medical device industry must commercialize products with sufficient market acceptance to generate significant revenue.  This requires successful execution in marketing, manufacturing, customer training and support, and continued product development and support.

30.     Sotera began fully commercializing the ViSi in the second half of 2014 after a period in 2013 and early 2014 of installing ViSi in several hospitals as development sites.  As with many hi-tech medical devices, the ViSi experienced technical and performance issues that required Sotera to redirect resources and resulted in delays of new product features and enhancements and ultimately in the reduction of revenue.  In spite of these delays, as of August 31, 2016, 45 hospitals (40 in the United States) had purchased and installed the ViSi.

31.     During early 2015 Sotera's Board of Directors formed a Strategy Committee to identify sources to refinance the Prepetition Loans and to work with Sotera's management to secure sufficient funding for Sotera's commercial expansion.  During 2015 and early 2016 a total of $13.6 million of additional equity capital was raised, but this amount was not sufficient for either Sotera's long-term needs or to obtain refinancing of the Prepetition Loans.

32.     In early 2016 the Strategy Committee engaged the investment bank Piper Jaffray to attempt to consummate a transaction that would refinance Sotera's Prepetition Loans or sell its assets.

33.     Concurrently in 2015 and early 2016, Sotera began to incur significant legal costs associated with a civil lawsuit in which Masimo Corporation ("Masimo") alleged that Sotera, one current employee and one former employee misappropriated trade secrets.  At this time, Masimo has not quantified its claim for damages.  The increased legal costs, now aggregating over $3 million, have accelerated the cash consumption of Sotera.

4838-2305-7719.8

34.     Under the terms of the Prepetition Loans, the twelve-month interest only period expired in October 2015.  Beginning in November 2015, Sotera began to make required monthly principal repayments of approximately $630,000 per month.  The required repayments of the Prepetition Loans have further accelerated the cash consumption of Sotera.

35.     The efforts of Piper Jaffray to identify either a potential buyer or potential new lender to refinance the Prepetition Loans have resulted in the submission of two term sheets for the acquisition of all of Sotera's assets for consideration of up to $30-52 million, depending upon the level of contingent payouts.  Nevertheless, Sotera does not believe it will be able to conclude negotiations with either of these two potential buyers or other potentially interested parties and needs the "breathing spell" of chapter 11 to do so.

36.     In light of the accelerated cash consumption caused by significant and increasing litigation costs and the on-going principal repayments on the Prepetition Loans, as of the Petition Date Sotera has cash reserves that are sufficient to support approximately 90 days of operations as set out in the 90-day budget filed as Exhibit B in support of the Cash Collateral Motion (as defined below) . Maintaining certain minimum levels of the Sotera's operations are necessary to provide on-going support and supplies to the current customer base and insure that operations of the ViSi in over 45 hospitals are not adversely impacted or interrupted.  The filing of these Chapter 11 Cases will provide Sotera relief from interest and debt repayments on the Prepetition Loans and will halt or significantly reduce legal costs associated with the Masimo litigation (which will subject to the stay), and provide Sotera sufficient time to consummate a transaction.

## PART II

37.     In furtherance of the objective of achieving a value-maximizing transaction of the Debtors, the Debtors have sought approval of the First Day Pleadings and related orders (the "Proposed Orders"), and respectfully request that

4838-2305-7719.8

the Court consider entering the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

38.   I have reviewed each of the First Day Pleadings, Proposed Orders and attachments and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth herein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their hospital customers and their business or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able successfully maximize the value for the benefit of their estates.

## III.   ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.   Motion Of Debtors For Order Under Fed. R. Bankr. P. 1015 Authorizing Joint Administration Of Chapter 11 Cases (the "Joint Administration Motion")

39.   In the Joint Administration Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Rule 1015, directing joint administration of the Chapter 11 Cases for procedural purposes only.

40.   The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in the Chapter 11 Cases will affect both of the Debtors.  The Debtor believes joint administration of the Chapter 11 Cases will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed and (b) file the papers in one case rather than in multiple cases.

4838-2305-7719.8

**B.**     **Notice of Intended Action for the Setting of Insider Compensation (the "Insider Compensation Notice")**

41.     In the NOIA, the Debtors seek authorization to set insider compensation levels as to myself and Mark Spring and to pay compensation.

42.     As CEO, I have overall responsibility for all aspects of Sotera's operations and functions.  Currently my specific responsibilities include negotiating and structuring transactions for the sale of Sotera's assets and/or business, negotiating and structuring equity and/or debt re-financings, oversight of strategic and tactical decisions related to product enhancements and customer relations.  It is anticipated that these specific responsibilities will continue throughout the chapter 11 case and that I will play an active role in negotiating the reorganization of Sotera and/or the sale of its assets.  I believe any such reorganization and/or sale is likely also to benefit Sotera Research.  My current base annual salary is $325,000 and it has been since April 1, 2014.  Sotera and I propose that I be paid an annual salary of $275,000, a voluntary reduction of $50,000, in regular paychecks throughout this chapter 11 case.

43.     Mark Spring, CFO, has overall responsibility for Sotera's financial, human resources, information technology and legal functions.  His specific responsibilities include budgeting, financial reporting, managing Sotera's billing, collection and disbursement processes, overseeing the operation and maintenance of Sotera's information technology infrastructure and systems, overseeing human resources activities and serving as liaison with Sotera's legal services providers.  It is anticipated that these specific responsibilities will continue throughout this chapter 11 case and that Mr. Spring will play an active and critical role in the negotiation and structuring of the reorganized Debtor.  Mr. Spring's current base annual salary is $275,000 and it has been since February 1, 2016 (prior to that time it was $250,000).  Sotera proposes to continue paying Mr. Spring his current salary of $275,000 in regular paychecks throughout this chapter 11 case.

4838-2305-7719.8

## IV.   BUSINESS OPERATION MOTIONS

### A.   Motion For Order Authorizing Continued Use Of Existing Bank Account, Checks, And Business Forms And Continuation Of Existing Deposit Practices (the "Bank Account Motion")

44.     As of the Petition Date, the Debtors maintain a checking account, an asset management account, a money market collateral account, and a certificate of deposit with SVB and its affiliate.  Additionally a money market account is maintained at MUFG Union Bank, N.A. ("Union Bank", together with SVB, the "Banks") (all accounts in the aggregate "Debtor Bank Accounts"). Each of the Debtor Bank Accounts is held in the name of Sotera.

45.     The SVB checking account (Account 8676) ("Checking Account") is the primary account used for the Debtors' disbursements and deposit of receipts. As of the Petition Date, the SVB checking account had a balance of approximately $372,244.

46.     Sotera maintains an investment account (Account 1158) ("Investment Account") with Silicon Valley Bank Asset Management, an affiliate of SVB. Funds that are not required for current use are maintained in a money market fund within this account.  As of the Petition Date, the SVB investment account had a balance of approximately $49,093.

47.     Sotera maintains a money market collateral account (Account 4093) ("Landlord Collateral Account") at SVB that serves to collateralize a letter of credit issued by SVB whose beneficiary is the Debtors' landlord.  The letter of credit is designed to provide financial coverage to the landlord for tenant improvements funded by the landlord at the inception of the Debtors' leased facilities in San Diego.  The balance of the money market collateral account as of the Petition Date was $314, 244.

4838-2305-7719.8

48.     Sotera maintains a certificate of deposit with SVB (Account 3621) ("Credit Card Collateral Account") that collateralizes the corporate credit card accounts that are sponsored by SVB.  The balance of the certificate of deposit as of the Petition Date was $100,000.

49.     Sotera maintains a money market account (Account 3960) ("Money Market Account") with Union Bank.  The balance of the Union Bank money market account is approximately $2,004,507.

50.     The Debtors do not maintain a cash management system in the sense of a system of automatic sweeps from one account to another account, etc.

51.     I am informed and believe the Debtors' use of the Debtor Bank Accounts represent a customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the chapter 11 cases and their goal of maximizing value for the benefit of all parties in interest.  I am further informed and believe that both Union Bank and SVB are approved depositories by the U.S. Trustee.

52.     If the Bank Account Motion is granted, the Debtors will work with the Banks to implement appropriate controls and procedures to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.  The Debtors will work closely with the Banks, and SVB in particular as it holds the Checking Account, to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent the Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.

53.     The Debtors maintain a credit card account sponsored by SVB (the "Credit Card") and rely on it regularly in booking business travel, including flight and hotels, and other necessary supplies from time to time.  The Debtors' market and sell their products around the world and travel is a critical part of their

14

business.  As described in the Debtors' Employee Wages and Benefits Motion, certain employees of the Debtors rely on the Credit Cards while doing business travel and it is an integral part of the Debtors' expense reimbursement procedures. The Debtors' charge approximately $50,000-70,000 on the Credit Card per month, which is paid off each month.

54.    I believe changing the Debtors' existing checks, bank signature cards, and Credit Card would be expensive, unnecessary, and burdensome to the Debtors' estates.  Employees rely on the Credit Card for expenses during travel and if the Debtors are required to close the Credit Card, the Debtors' operations internationally would be severely disrupted.

55.    Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors. Complying with the U.S. Trustee's requirements as set forth in the Bank Account Motion would unduly burden the Debtors and impose unnecessary costs.

56.    It would be extremely onerous for the Debtors to close all existing bank accounts and open new debtor-in-possession accounts.  In addition, it would be unnecessary and inefficient to establish specific debtor-in-possession accounts for payroll and tax payments.  In my belief and opinion that the Debtors can pay their payroll and tax payments most efficiently from their existing accounts at SVB in accordance with their existing practices.  In addition, it is my informed opinion that it is unnecessary to require the Debtors to establish specific debtor in possession accounts for cash collateral. I submit that the Debtors have provided significant safeguards to ensure that the prepetition lenders with security interests in the Debtors' cash collateral are adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

57.    For this reason, the Debtors request that the Court waive certain operational requirements of the U.S. Trustee as set forth in the Bank Account Motion.

4838-2305-7719.8

**B.    Motion For Order Under 11 U.S.C. §§ 105 And 363 Authorizing: (A) Continuation Of, And Payment Of Prepetition Obligations Incurred In The Ordinary Course Of Business In Connection With, Various Insurance Policies, And (B) Banks To Honor And Process Checks And Electronic Transfer Requests Related Thereto (the "Insurance Motion")**

58.    In the Insurance Motion, the Debtors seek authorization to continue paying premiums and all other obligations, including prepetition obligations, necessary for continued coverage under the Insurance Policies, and to the extent necessary, to renew and/or modify the Insurance Policies in the ordinary course of business.

59.    The Debtors also seek entry of an order authorizing its banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with the Insurance Motion.

60.    As described in the Insurance Motion, in the ordinary course of their business, the Debtors maintain numerous insurance policies with various insurance providers (collectively, the "Insurers") that provide coverage for, among other things, general commercial liability, umbrella liability, automobile liability, workers' compensation liability, property & casualty liability, executive risk liability, special crime, director and officer liability, fiduciary liability, product liability, and marine cargo liability (the "Insurance Policies"). The Insurance Policies maintained by the Debtors are set forth on Exhibit B filed in support of the Insurance Motion.

61.    The total aggregate annual premiums for the Insurance Policies is approximately $190,524.  As of the Petition Date, the Debtors have paid in full the premiums for the current policy periods for all Insurance Policies and quarterly

premiums will soon be due for the Property Policy, the Products Liability Policy, and the E&O Policy (as all such terms are defined in the Insurance Motion).

62.    As detailed in the Insurance Motion, the Debtors maintain third-party Insurance Policies through various insurance companies. I have reviewed the Insurance Motion and hereby attest to the accuracy of the information therein.  The Insurance Policies are essential to the ongoing operation of the Debtors' business. In many cases, the coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.

63.    The Debtors have been represented in their negotiations with their various Insurers by insurance brokers Barney & Barney.  The employment of Barney & Barney as the Debtors' insurance broker has, on information and belief, allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies.  I believe it is in the best interests of the Debtors' creditors and estates to continue their business relationship with Barneys & Barneys.

64.    Accordingly, for the reasons set forth herein and in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in compliance with contractual and regulatory requirements and to safeguard the value of their estates.

65.    I submit the Insurance Motion should be heard on an emergency basis due to the possible detrimental impact a delay in hearing the Insurance Motion is likely to cause.  The Debtors maintain policies that provide critical insurance coverage without which the Debtors' business and the Debtors' estates may be

4838-2305-7719.8

exposed to unnecessary liability.  At this critical time, the relief sought herein will help ensure continued insurance coverage, which is necessary for uninterrupted operation of the Debtors' businesses and preservation of valuable estate assets.

### C.    Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A), 541(C), And 507(A)(8) Authorizing The Debtor To Pay Prepetition Sales And Use, Trust Fund And Other Taxes, Fees And Other Similar Charges And Related Obligations (the "Tax Motion")

66.    In the Tax Motion, the Debtors seek entry of an order authorizing them to pay, in their sole discretion, any prepetition tax and fee obligations including, without limitation, sales taxes; use taxes; medical device excise taxes; franchise taxes; personal property taxes; corporate income taxes; any other types of taxes, fees, or similar charges; and any penalty, interest, or similar charges in respect of such taxes (collectively, the "Taxes") owing to certain federal, state, provincial, and local governmental entities in the United States, including as listed on Exhibit B to the Tax Motion (the "Taxing Authorities").

67.    In addition, the Debtors request in the Tax Motion that the Court authorize the Debtors' banks to receive, process, honor, and pay all prepetition and post-petition checks and fund transfers on account of the Taxes that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

68.    I believe that by paying the Taxes in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes— over myriad issues that are typically raised by such units as they attempt to enforce

4838-2305-7719.8

their rights to collect Taxes.

69.    Prior to the Petition Date, the Debtors incurred obligations to federal, state and local governments in the United States. Although, as of the Petition Date, I believe the Debtors were current in the payment of assessed and undisputed Taxes, certain Taxes attributable to the prepetition period may not yet have become due. It is my understanding that certain prepetition Taxes may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year.  I have been informed that in 2015, the Debtors paid approximately $78,648 on account of Taxes.

70.    I believe that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process. It is my understanding that, if such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) the obligations are pro ratable or fully prepetition or post-petition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a post-petition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

71.    Moreover, I have been advised that certain of the Taxes may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, I believe that collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

4838-2305-7719.8

72.    I submit that the setting of this hearing on an emergency basis is warranted so as to ensure the Debtors can maximize value for their estates and their creditors by continuing to operate their business and engage successfully in their restructuring efforts without having to devote valuable resources to resolving unnecessary delays in paying timely taxes.

**D.    Motion of Debtors for Entry of Interim and Final Orders Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Setting Final Hearing (the "Cash Collateral Motion")**

73.    In the Cash Collateral Motion, the Debtors seek an order (i) authorizing Debtors to use funds that may constitute "cash collateral" as defined in Bankruptcy Code section 363(a) ("Cash Collateral") for payment of costs and expenses incurred in the ordinary course of Debtors' business and the management of their assets in accordance with the Budget (substantially in the form filed in support of the Cash Collateral as Exhibit B); (ii) providing adequate protection to the Prepetition Lenders (as defined in the Cash Collateral Motion) for any diminution in value of their interests in the Prepetition Collateral (as defined in the Cash Collateral Motion), including Cash Collateral; (iii) scheduling a final hearing ("Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and (iv) granting related relief.

74.    As stated in the Cash Collateral Motion, as of the Petition Date, the Cash Collateral is deposited in the following bank accounts held by Sotera (the "Cash Collateral Bank Accounts"): the Checking Account ($372,244), the Investment Account ($49,093), and the Money Market Account ($2,004,507).

75.    I am informed and believe that Oxford, as collateral agent and itself, and SVB claim security interests in the accounts held at SVB (the Checking Account and Investment Account) to secure the Prepetition Loans.  I am informed and believe that Oxford, as itself only, claims a security interest in the Money Market Account.  For purposes of the Cash Collateral Motion only, Debtors do not

20

dispute that SVB and/or Oxford have perfected and enforceable security interests in the Cash Collateral Accounts.

76.     If the Cash Collateral Motion is not approved and the Debtors do not obtain emergency authorization to use the Cash Collateral, I believe that the Debtors will suffer immediate and irreparable harm. Without the use of the Cash Collateral, the Debtors will not have the liquidity to continue to operate their business and successfully market and sell its assets. The Debtors urgently need funds to make payroll, capital expenditures and other expenditures that are critical to their continued viability and ability to sell their assets or recapitalize. In addition, as hospitals and patient care centers rely on the Debtors' products, if the Debtors are not permitted to use the Cash Collateral, patient care may be adversely affected to the harm of patients of the Debtors' customers who rely on the Debtors' products.

77.     As described above, it is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to Cash Collateral. The preservation of the Debtors' business and the Debtors' ability to successfully sell their assets or as a going concern depend heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes. Absent this Court's approval of the interim relief sought in the Cash Collateral Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

78.     The Debtors' request for use of Cash Collateral is limited to the Budget, which was filed in support of the Cash Collateral Motion as Exhibit B and shows, *inter alia*, the Debtors' forecasted receipts and disbursements from the Petition Date through December 23, 2016.

79.     Under the Budget, the Debtors intend to use Cash Collateral, among other things, (i) to pay (a) payroll expenses, (b) post-petition trade amounts and (c) various limited prepetition claims that are the subject of other motions filed

4838-2305-7719.8

concurrently herewith and as may be authorized by the Court; (ii) for working capital to fund critical business operations conducted by the Debtors; and (iii) for other general corporate purposes.

80.    The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described in the Cash Collateral Motion) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Budget.

81.    The majority of the Debtors' assets are encumbered by purported liens securing the Prepetition Loans. Therefore, it would be impossible to operate the Debtors' business and conduct the Chapter 11 Cases absent authorization to use the Cash Collateral. Unless this Court authorizes the use of the Cash Collateral, the Debtors' operations would likely cease, resulting in adverse effects on the value of the Debtors' estates to the severe detriment to all stakeholders, including the Debtors' hospital customers and their patients, and the Debtors' employees whose employment would be terminated in the event the Debtors are unable to use the Cash Collateral, as well as the Prepetition Lenders themselves.

82.    For the foregoing reasons, I believe that authorization to use Cash Collateral on an emergency basis is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

///

///

///

4838-2305-7719.8

**E.      Motion For Order Pursuant To 11 U.S.C. §§ 105(A) And 366: (I) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service, (Ii) Determining Adequate Assurance Of Payment For Future Utility Services, And (Iii) Establishing Procedures For Determining Adequate Assurance Of Payment (the "Utilities Motion")**

83.      In the Utilities Motion, the Debtors request entry of an order (a) prohibiting the utility providers utilized by the Debtor, including the utility providers set forth in the document filed in support of the Utility Motion as Exhibit B (collectively, the "Utility Companies" and each individually a "Utility Company") from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for post-petition utility services has been furnished to the Utility Providers providing services to the Debtors; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

84.      In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various utility providers (each, a "Utility Provider" and collectively, the "Utility Providers"), for, among other things, electricity, local and long-distance telecommunication services, data service, network services, cloud storage services, and other similar services (collectively, the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list filed in support of the Utilities Motion as Exhibit B (the "Utility Providers List").

85.      I have been informed that the Debtors paid an average of approximately $32,000 per month on account of all Utility Services during the first

half of 2016.

86.    I believe that the Debtors' receipt of uninterrupted Utility Services is vital to the Debtors' continued business operations and, consequently, to the success of these Chapter 11 Cases.  Disruption of the Utility Services could have a devastating impact on the Debtors' ability to continue to generate revenue and maintain their value as a going concerns.  Therefore, I believe that the relief requested in the Utilities Motion on an emergency basis is necessary and in the best interests of the Debtors, their estates, and creditors.

**F.    Motion Of Debtors For Entry Of An Order Authorizing (A) Payment Of Certain Prepetition Workforce Claims, Including Wages, Salaries, And Other Compensation, (B) Payment Of Certain Employee Benefits And Confirming Right To Continue Employee Benefits On Postpetition Basis, (C) Payment Of Reimbursement To Employees For Expenses Incurred Prepetition, (D) Payment Of Withholding And Payroll-Related Taxes, (E) Payment Of Workers' Compensation Obligations, And (F) Payment Of Prepetition Claims Owing To Administrators And Third-Party Providers (the "Employee Wage and Benefits Motion")**

87.    In the Employee Wage and Benefits Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs (including the Bonus Program and the Equity Incentive Plan), PTO and Vacation Time, the Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Administrative Fee Obligations) and (b) maintain, continue, and honor, in the

24

ordinary course of business, the Incentive Programs (including the Bonus Program and the Equity Incentive Plan), PTO, Vacation Time, and holiday pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and the Workers' Compensation Claims.

88.    The Employees are the lifeblood of the Debtors' business, and their value cannot be overstated. To a significant extent, the Debtors' success depends upon their ability to attract and retain qualified personnel. The loss of certain Employees could impede the Debtors' commercialization, product development and customer support efforts and seriously harm their ability to successfully implement their business strategy. Furthermore, replacing Employees can be tremendously difficult for the Debtors given the limited number of qualified individuals in the medical device industry. Many of the Debtors' employees possess unique skillsets, expertise, and education, which are required to successfully develop and commercialize the Debtors' product.

89.    If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere, potentially with the Debtors' competitors. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the prosecution of these Chapter 11 Cases.

90.    The Debtors also regularly utilize the services of contract workers to provide a variety of services. The Contract Workers are generally provided by TargetCW and Qualstaff, and the number of Contract Workers fluctuates depending on the Debtors' needs. At any given time, the Debtors may have approximately five to ten Contract Workers engaged. In 2015, the Debtors spent approximately $330,000 in connection with the engagement of certain Contract Workers.

4838-2305-7719.8

91.    In such capacity, the Contract Workers fill several types of roles for the Debtors, including providing temporary production and quality assurance resources, as needed. The Contract Workers are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

92.    In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce. The Debtors also provide other benefits to their Employees for the performance of services. These benefits and obligations are described in more detail in the Employee Wage and Benefits Motion and I hereby attest to the facts set forth therein.

93.    I believe that if the Debtors are unable to promptly satisfy the Employee Obligations, Employee morale and loyalty will suffer at a time when Employee support is critical. Furthermore, in the absence of such payments, I believe that the Employees may seek alternative employment opportunities, potentially with the Debtor's competitors. Such a development would deplete the Workforce, hinder the Debtors' ability to service the needs of their customers, and likely diminish creditor and counterparty confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors must focus on sustaining their operations. Accordingly, I believe that the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, as set forth in the Employee Wage and Benefits Motion.

4838-2305-7719.8

94.    Accordingly, for the reasons set forth herein and expanded on in the Employee Wage and Benefits Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage and Benefits Motion on an emergency basis is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in these Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**G.    Motion For An Order Authorizing The Debtors To Honor Their Equipment Warranty and to Continue Their Prepetition Warranty Practices In The Ordinary Course Of Business (the "Customer Warranty Motion")**

95.    In the Customer Warranty Motion, the Debtors request entry of an order granting them the authority, but not the direction, to: (a) perform, at their sole discretion and without further court order, any prepetition obligations related to the equipment warranty set forth below, including repairing and/or replacing defective equipment, and (b) continue, renew, replace, modify and/or terminate the equipment warranty in the ordinary course of business at the Debtors' sole discretion.

96.    The end users of the Debtors' products are typically hospitals and care units and the Debtors' equipment plays an important role in monitoring patients of the Debtors' customers and keeping them safe.

97.    To help ensure customer satisfaction and loyalty, the Debtors offer their end users an equipment warranty, which is restated below (the "Equipment Warranty"):

> Equipment Warranty: Sotera warrants to End User that the hardware equipment sold by Sotera will operate substantially in accordance with Sotera's published documentation in effect on the date of the hardware equipment shipment or Sotera will, at its discretion and

27

expense, repair or replace the equipment. Replacement parts may, at Sotera's option, be reconditioned parts, and will be warranted for the remainder of the warranty period in effect on the original Products purchased, unless otherwise mandated by applicable law. The warranty period for Products specified below and delivered prior to the Customer Acceptance Date shall commence upon the Customer Acceptance Date. Otherwise, the warranty period will commence on order ship date.

ViSi Mobile Monitor, Cuff Module, Battery Charger, Power Pack and Power Pack Cradle are warrantied for a period of three (3) years.

Chest Sensors are warrantied for a period of one (1) year. Extended Warranty is not available for this item.

Equipment warranty does not include disposables/consumables, software or third-party hardware.

98.     The Equipment Warranty is an important aspect of the Debtors' business.  Given the competitiveness of the medical device industry, I believe customer satisfaction and loyalty is critical to the success of the Debtors' operations.  The Equipment Warranty helps ensure this customer satisfaction and loyalty and it helps generate goodwill between the Debtors and their end users. This enables the Debtors to retain existing Customers, attract new ones, and ultimately, to enhance their revenue and profitability.

99.     I believe it is essential that the Debtors maintain a strong connection with our loyal customer base while also solidifying new business relationships critical to which is a warranty on the equipment we sell.  The Debtors' customers rely on the Debtors' equipment to preserve the safety and wellbeing of their patients, and they rely on the Equipment Warranty to ensure that any defective equipment is repaired and/or replaced with properly functioning equipment.  The Debtors routinely diagnose problems and repair or replace equipment pursuant to

4838-2305-7719.8

the Equipment Warranty.  I believe the Equipment Warranty is integral to the Debtors' positive reputation in the marketplace and it helps us generate and compete for significant business that is critical to the Debtors' profitability.

100.   I believe the relief requested in the Customer Warranty Motion should be granted on an emergency basis.  Without continued performance of Debtors' obligations under its warranty programs, hospitals, patient care centers, and other customers of the Debtors may be left without properly functioning equipment for the care of their patients.  In addition, delays in the Debtors' performance of their warranty obligations will only further shake customer confidence in the Debtors' ability to operate effectively throughout the bankruptcy case, which I believe will threaten the Debtors' ability to successfully reorganize.

///

///

///

4838-2305-7719.8

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3        Executed this __30__ day of ~~September~~2016 at _San Diego_, California.

4

5

6    _____

7    THOMAS WATLINGTON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28