VICTOR A. VILAPLANA (CA BAR NO. 58535)
vavilaplana@foley.com
MARSHALL J. HOGAN (CA BAR NO. 286147)
mhogan@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>SOTERA WIRELESS, INC.,<br><br>    DEBTOR.<br>_____<br><br>SOTERA WIRELESS, INC.,<br><br>   CASE NO. 16-05968-LT11<br><br>SOTERA RESEARCH, INC.,<br><br>   CASE NO. 16-05969-LT11 | LEAD CASE NO. 16-05968-LT11<br><br>CHAPTER 11<br><br>(JOINTLY ADMINISTERED)<br><br>**_EMERGENCY_ MOTION FOR INTERIM AND FINAL ORDERS APPROVING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(C); AND MEMORANDUM OF POINTS IN AUTHORITIES IN SUPPORT THEREOF**<br><br>**DATE:** **DECEMBER 1, 2016**<br>**TIME:** **9:30 A.M.**<br>**DEPT:** **3, RM. 129**<br>**JUDGE:** **HON. LAURA S. TAYLOR** |

  Sotera Wireless, Inc. ("Sotera Wireless") and Sotera Research, Inc. ("Sotera Research"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced Chapter 11 bankruptcy cases (the "Cases"), respectfully move this Court (this "Motion"), on an **_emergency_** basis, pursuant to sections 105(a), 363 and 364 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, as amended (the "Bankruptcy Rules"), and Rule 9013 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Southern District of California (the "Local Bankruptcy Rules") for entry of interim and final orders (respectively, the "Interim Order" and the "Final Order," collectively, the "Financing Orders").  Attached hereto as **Exhibit 1** is the Interim Order in substantially final form (i) authorizing the Debtors to obtain secured post-petition financing (the "DIP Loan") pursuant to the Sotera Wireless, Inc. Secured Note Purchase Agreement between the Sotera Wireless and Sanderling Ventures Partners VI, L.P. ("Sanderling") and Yonglin Biotech Corp. ("Yonglin") and other purchasers of notes pursuant thereto (collectively, together with Sanderling and Yonglin, the "DIP Lenders"); (ii) granting liens and super-priority administrative status, subject to certain limitations, to DIP Lenders; and (iii) granting related relief.  The Debtors' authorization to use their cash, all of which constitutes cash collateral of the Debtors' prepetition lender, expires on November 29, 2016 at 5:00 p.m. and so the Debtors request that an emergency interim hearing on this Motion be set for no later than December 1, 2016.  If the Debtors are not able to obtain prompt interim approval of the relief requested herein, the Debtors and their bankruptcy estates will suffer immediate and irreparable harm as discussed in greater detail in the accompanying Memorandum of Points and Authorities and Declaration of Mark Spring in Support of the Motion ("Spring Decl.").  A copy of the Secured Note Purchase Agreement (the "Note Purchase Agreement"), in substantially final form, is attached hereto as **Exhibit 2**.

## **MATERIAL TERMS OF THE DIP FINANCING**

In accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and the Guidelines for Motions to Use Cash Collateral or to Obtain Credit at Appendix D2 of the Local Bankruptcy Rules (the "Guidelines"), the Debtor provides the following statement of the post-petition financing under the terms of the Note Purchase Agreement[1]:

---

[1] This summary is qualified in its entirety by the terms of the Note Purchase Agreement, the Interim Order and the Final Order.  To the extent anything in this Motion is inconsistent with

- **Nature of DIP Loan**: Secured loan of up to $10 million provided by Sanderling Ventures Partners IV, L.P., Yonglin Biotech Corp. and various other possible lenders who purchase secured convertible notes pursuant to the Note Purchase Agreement.

- **Maturity Date:**  The earliest of: (i) the date after an Event of Default has occurred on which a noteholder gives written notice of such Event of Default; and (ii) December 31, 2017.

- **Events of Default:** All events of default usual and customary for credit facilities of this size, type, and purpose, including those set forth in the Note Purchase Agreement and each note as further specified in section 8.1 of the Note Purchase Agreement.

- **Interest Rate:** 10% per annum.

- **Liens**: The DIP Loan will be secured by a lien on all assets of the Debtors pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code and subordinate only to pre-existing, unavoidable, security interests in the collateral prior to the effective date of the Note Purchase Agreement, including all such liens of the Senior  Lenders (as defined below) and the Carve-Out (as defined below) (the "DIP Lien").  The amounts borrowed under the DIP Loan will also constitute allowed superpriority claims in the Cases under section 364(c)(1), with priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other claims of any kind, subject to the super-priority claims of the Senior Lenders under the Cash Collateral Order (as defined below) and the Carve-Out (the "Super-Priority Claims").

///

those documents, the Note Purchase Agreement shall control.

- **Borrowing Conditions:** All conditions that are usual and customary for credit facilities of this size, type, and purpose, including those set forth in the Interim Order.

- **Carve-Out**: the (a) unpaid fees of the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. 1930(a), (b) unpaid and allowed fees and expenses of Debtors' attorneys, Debtors' investment banker, and attorneys for the official committee of creditors (the "Committee") (collectively the "Estate Professionals") but only to the extent approved by the DIP Lenders in the Budget and only if incurred before the delivery of a Carve Out Termination Notice (as defined below), and (c) unpaid and allowed fees and expenses of Estate Professionals in an aggregate amount not to exceed $200,000 (the "Estate Professionals' Fee Cap") incurred after delivery of the notice by the DIP Lenders to the Debtors (and their bankruptcy counsel), the U.S. Trustee and counsel to the OCC, that an Event of Default (as defined in the Secured Note Purchase Agreement) has occurred and is continuing (a "Carve Out Termination Notice"). For avoidance of doubt, the Estate Professionals' Fee Cap applies only after delivery of the Carve Out Termination Notice.

- **Bankruptcy Case Milestones**: The Debtors shall have (i) on or before January 16, 2017, filed a plan of reorganization (the "Plan") that provides for the payment of the DIP Loan in full, conversion of the loans constituting the DIP Loan into equity, with warrants, and other terms as agreed by the DIP Lenders; (ii) on or before February 20, 2017, obtained approval of a form of disclosure statement of the Plan; (iii) on or before March 20, 2017, obtained Bankruptcy Court approval of the Plan; (iv) on or before April 5, 2017, caused the Plan

4

to become effective.

Pursuant to Bankruptcy Rule 4001, the Debtor hereby provides the following disclosures with respect to the terms of the DIP Loan and Interim Order:

| Subject Matter | Note Purchase Agreement (Exhibit 2 hereto) | Interim Order (Exhibit 1 hereto) |
|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | § 3 | ¶¶ 5, 6 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | N/A | N/A |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | N/A | N/A |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | N/A | ¶¶ 12, 13 |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | N/A | N/A |

| | | |
|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | § 5.3 | N/A |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | § 3.2 | ¶ 12 |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | N/A | N/A |
| The indemnification of an entity | N/A | N/A |
| A release, waiver, or limitation of any right under Section 506(c) | N/A | ¶ 9 |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | N/A | N/A |
| Provisions that grant cross-collateralization protection to the prepetition secured creditors | N/A | N/A |
| Provisions that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against a secured creditor | N/A | N/A |

4840-1133-6507.10

| Provisions that provide carveouts for administrative expenses that do not treat all professionals equally or on a pro rata basis | N/A | N/A |
|---|---|---|
| Provisions that operate, as a practical matter, to divest the debtor-in-possession of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law | N/A | N/A |

This Motion is based on the accompanying Memorandum of Points and Authorities, the Spring Decl., the First Day Declaration of Thomas Watlington in Support of the Chapter 11 Petitions and the First Day Motions [Dkt. No. 11] ("First Day Decl."), the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**WHEREFORE,** the Debtor respectfully requests that the Court:

1.     hold an interim hearing on the Motion no later than December 1, 2016;

2.     grant the relief requested in the Motion on an interim basis;

3.     enter an Interim Order in substantially the same form as the order attached hereto as **Exhibit 1**;

///

///

7

4.    schedule a final hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis for no later than January 7, 2017; and

5.    grant such further relief as the Court deems just and proper.

DATE: NOVEMBER 29, 2016                    FOLEY & LARDNER LLP

BY: /s/ VICTOR A. VILAPLANA
          VICTOR A. VILAPLANA
          ATTORNEYS FOR DEBTORS AND
          DEBTORS-IN-POSSESSION

4840-1133-6507.10

# **TABLE OF CONTENTS**

**PAGE**

I.      JURISDICTION AND VENUE ...................................................................1

II.     STATEMENT OF FACTS...........................................................................1

    A.      The Bankruptcy Case. .................................................................1

    B.      The Debtors' Secured Prepetition Loan.......................................1

    C.      The Debtors' Need for Post-Petition Financing on an
            Emergency Interim Basis..............................................................2

    D.      The DIP Loan................................................................................4

III.    RELIEF REQUESTED ..............................................................................4

IV.     LEGAL ANALYSIS ...................................................................................5

    A.      The Debtors Should Be Authorized to Enter Into the DIP Loan..........5

    B.      The Debtors are Unable to Obtain Unsecured Credit. ........................7

    C.      The Terms of the Proposed DIP Loan From the DIP Lenders
            Are Fair, Reasonable, And Adequate. ........................................8

    D.      The Scope of the Carve-Out is Appropriate. .............................9

    E.      The DIP Lenders Should be Entitled to the Protections
            Afforded to Good Faith Lenders Under Section 364(e). .....................9

    F.      The Debtors Should Be Authorized to Use the Cash Collateral
            Which is Security for the DIP Loans and No Other Loans. ...............11

    G.      Approval of the Interim Order Should be Granted, and a Final
            Hearing Set on Approval of the Final Order. ....................................11

    H.      Waiver of Any Applicable Stay Is Appropriate. ..............................12

V.      NOTICE .................................................................................................12

VI.     CONCLUSION ........................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Ames Dept. Stores*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................ 5, 7, 8, 9

*In re Aqua Assoc.*,
    123 B.R. 192 (Bankr. E. D. Pa. 1991) ....................................... 6

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*,
    789 F.2d 1085 (4th Cir. 1986) ................................................. 8

*In re Crouse Group, Inc.*,
    71 B.R. 544 (Bankr. E. D. Pa. 1987) ......................................... 6

*In re McCombs Properties VI, Ltd.*,
    88 B.R. 261 (Bankr. C.D. Cal. 1988) ........................................ 11

*In re Mellor*,
    734 F.2d 1396 (9th Cir. 1984) ................................................. 11

*In re O'Connor*,
    808 F.2d 1393 (10th Cir. 1987) ............................................... 11

*In re Photo Promotion Associates, Inc.*,
    87 B.R. 835 (Bankr. S.D.N.Y. 1988),
    aff'd, 881 F.2d 6 (2d. Cir. 1989) ............................................. 6

*In re Simasko Production Co.*,
    47 B.R. 444 (D. Colo. 1985) .................................................. 5, 8

*In re T.M. Sweeney & Sons LTL Services, Inc.*,
    131 B.R. 984 (Bankr. N. D. Ill. 1991) ....................................... 6

*Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*,
    424 F.3d 963 (9th Cir. 2005) ................................................. 10

**Federal Statutes**

11 U.S.C. § 105 ....................................................................... 4

11 U.S.C. § 363 ....................................................................... 4

4840-1133-6507.10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

11 U.S.C. § 363(c)(2) ............................................................................................................ 11

11 U.S.C. § 364 ......................................................................................................... 4, 6, 8

11 U.S.C. § 364(a) ................................................................................................................ 7

11 U.S.C. § 364(b) ................................................................................................................ 6

11 U.S.C. § 364(b)(1)(A) ...................................................................................................... 6

11 U.S.C. § 364(c) ............................................................................................................ 5, 7

11 U.S.C. § 364(c)(1) ........................................................................................................ 6, 7

11 U.S.C. § 364(c)(2) ........................................................................................................ 5, 6

11 U.S.C. § 364(c)(3) ........................................................................................................ 5, 6

11 U.S.C. § 364(e) ...................................................................................................... 4, 9, 10

11 U.S.C. § 364(2) ................................................................................................................ 7

11 U.S.C. § 364 (3) ............................................................................................................... 7

11 U.S.C. § 503(b) ................................................................................................................ 7

11 U.S.C. § 503(b)(1) ........................................................................................................... 7

11 U.S.C. § 1107(a) .............................................................................................................. 1

11 U.S.C. § 1108 ................................................................................................................... 1

28 U.S.C. §  157 ................................................................................................................... 1

28 U.S.C. § 157(b)(2)(D) ..................................................................................................... 1

28 U.S.C. § 157(b)(2)(M) ..................................................................................................... 1

28 U.S.C. § 1334 .................................................................................................................. 1

28 U.S.C. § 1408 .................................................................................................................. 1

28 U.S.C. § 1409 .................................................................................................................. 1

4840-1133-6507.10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

**Rules**

Fed R. Bankr. P. 2002 ................................................................ 13

Fed R. Bankr. P. 4001 ................................................................. 4

Fed R. Bankr. P. 4001(b) .......................................................... 11

Fed R. Bankr. P. 4001(b)(2) ...................................................... 11

Fed R. Bankr. P. 4001 (c) .......................................................... 11

Fed R. Bankr. P. 4001(c)(2) ...................................................... 11

Fed R. Bankr. P. 6004 ............................................................... 12

Fed R. Bankr. P. 6004(h) ............................................................ 5

Local Rule 9013-9 .................................................................... 12

4840-1133-6507.10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    JURISDICTION AND VENUE

This Court has jurisdiction to consider this Motion under 28 U.S.C. 1334 and 157. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(D) and (M). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### II.    STATEMENT OF FACTS

#### A.    The Bankruptcy Case.

On September 30, 2016, (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (the "Court").  The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Cases").  On September 30, 2016, the Court entered an order providing that the Cases would be jointly administered [Dkt. No. 5] (the "Joint Administration Order").  On October 20, 2016, the Committee was appointed.  Dkt. No. 95.

Further information regarding the Debtors' business, capital structure, and the circumstances leading to these Cases is set forth in the First Day Declaration [Dkt. No. 11], which is incorporated herein by reference.

#### B.    The Debtors' Secured Prepetition Loan.

On September 12, 2014, the Debtors entered into an amended and restated loan and security agreement (the "Prepetition Loan Agreement") with Silicon Valley Bank and Oxford Finance LLC (collectively, the "Senior Lenders") and borrowed $20 million in exchange for a security interest in certain collateral (the "Prepetition Liens").  The collateral securing the Prepetition Liens is summarized as follows (the full description of the collateral is set forth on Exhibit A to the Prepetition Loan Agreement, which is filed on the docket at Dkt. No. 103-1 at 44): substantially all assets of the Debtors' *except* the collateral does not include any of

the Debtors' intellectual property (but does include, however, all accounts and proceeds of the intellectual property).  As of the Petition Date, the principal amount outstanding under the Prepetition Loan Agreement was just under $13.1 million.

The Senior Lenders consented to the Debtors' use of cash collateral securing the Prepetition Liens on a temporary basis in exchange for, among other things, (i) replacement liens in the prepetition collateral (the "<u>Priority Replacement Liens</u>") and (ii) a valid, first priority additional lien on the Debtors' intellectual property, but only in an amount equal to the total diminution in the value of cash collateral following the petition date (the "<u>Priority IP Lien</u>," together with the Prepetition Liens and the Priority Replacement Liens, the "<u>Priority Liens</u>").  *See* Dkt. No. 134 (the "<u>Cash Collateral Order</u>").  For the avoidance of doubt, the DIP Lien (as defined below) on the Debtors' assets, including all intellectual property, proposed in this Motion will be subject to the Priority Liens (as well as the Carve Out and the Senior Loan Position (as defined in the Interim Order)).

C.      **The Debtors' Need for Post-Petition Financing on an Emergency Interim Basis.**

The Debtors have an immediate need to obtain the DIP Loan and use the cash proceeds of the DIP Loan in which the DIP Lenders will have a security interest (the "<u>Cash Collateral</u>"[2]) in order to continue to operate their business, to manage and preserve their assets and property, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs and generally to maintain the going concern value of the Debtors' business.  The Debtors' authorization to use the cash collateral of the Senior Lenders pursuant to the Cash Collateral Order expires on November 29, 2016 at 5:00 p.m.  In negotiating the Cash Collateral Order, the Senior Lenders

---

[2] For the avoidance of doubt, "Cash Collateral" is defined in this Motion to refer to the cash proceeds of the DIP Loan in which the DIP Lenders will have a security interest and not to the cash collateral of the Senior Lenders.

2

required as a condition for their consent to the Debtors' use of their cash collateral, that the Debtors not file this Motion until November 29, 2016 or later.  Dkt. No. 134 ¶ 3(b)(5)(a).  To avoid having to file this Motion on such short, emergency notice, the Debtors requested of the Senior Lenders that they extend the deadline for the Debtors' use of their cash collateral until December 8, 2016, when the Court could more conveniently hear this Motion.  The Senior Lenders refused and offered only a 48 hour extension.  Were it not for these actions and demands by the Senior Lenders, the Debtors likely could have avoided filing the Motion on an emergency basis.

After November 29, 2016 at 5:00 p.m., the Debtors will not have access to cash, which is necessary for continuing the operations of the Debtors' business.  Entry of the Interim Order and interim approval of $1 million of the DIP Loan will allow the Debtors to continue to operate their business until the Final Order is entered.  Once the Final Order is entered and the Debtors are authorized to receive the balance of the DIP Loan proceeds, the Debtors will have sufficient funds to operate their business well into next year when the Debtors expect to have secured the path for their reorganization.

The Debtors have sought post-petition financing from a number of sources and the DIP Loan represents the best financing option for the Debtors under the current circumstances.  For instance, pursuant to the terms of the Cash Collateral Order the Senior Lenders had a right of first refusal to offer an alternative debtor-in-possession financing transaction on equal or better terms.  The Senior Lenders did not exercise such right.  In addition, the terms of the DIP Loan were heavily negotiated over the course of several weeks between Sotera Wireless and affiliates of two of its major investors.

///

### D.    The DIP Loan.

In order to provide the Debtors with the funds they need to continue to operate their business and administer the Cases, the DIP Lenders have agreed to extend the DIP Loan an aggregate amount of up to $10 million, and $1 million of that amount on an interim basis.  The DIP Lenders are comprised of Sanderling and Yonglin, with other possible parties who purchase secured notes pursuant to the Note Purchase Agreement ("Note").  Each Note accrues simple interest on the outstanding principal amount of the note at the rate of 10% per annum.  Each Note is convertible into shares of equity securities of Sotera Wireless[3] according to the terms and provisions contained in each Note and the Note Purchase Agreement. The form of each individual Note is attached as Exhibit A to the Note Purchase Agreement.  Each Note is guaranteed by Sotera Research according to the terms set forth in the form of guaranty attached as Exhibit B to the Note Purchase Agreement.

## III.    RELIEF REQUESTED

By this Motion, the Debtors seek entry of the Interim Order pursuant to section 105, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001 for the following:

- Authorize the DIP Loan on an interim basis in the amount of $1 million pursuant to the Note Purchase Agreement;

- Find that the terms of the DIP Loan are fair, reasonable, reflect the reasonable exercise of the Debtors' business judgment, and were extended in good faith pursuant to section 364(e) of the Bankruptcy Code;

- Authorize the use of the proceeds of the DIP Loan for operating expenses, general corporate expenses, and administrative expenses as

---

[3] While not certain it is anticipated that Sotera Research will be consolidated into Sotera Wireless as part of a plan of reorganization.

allowed by this Court pursuant to the Budget;

- Authorize the Debtors to grant the DIP Lenders pursuant to sections 364(c)(2) and (3) the DIP Lien, which shall be subject to the Priority Liens, the Senior Loan Position (as defined in the Interim Order) and the Carve Out; and

- Waiver of the stay provision of Rule 6004(h).

## IV.    LEGAL ANALYSIS

### A.    The Debtors Should Be Authorized to Enter Into the DIP Loan.

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

> (c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

5

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. *In re Photo Promotion Associates, Inc.,* 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain proscribed conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr. N. D. Ill. 1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are permitted, with court approval after notice and a hearing, including, without limitation, secured liens on unencumbered property pursuant to section 364(c)(2). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per Section 364(b) (i.e., by allowing a lender only an administrative claim per Section 364(b)(1)(A)); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E. D. Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E. D. Pa. 1991). The Debtors submit that these standards have been satisfied in this case.

Subject to the approval of the Court, and in order to obtain the necessary DIP Loan, the Debtors have agreed to provide the DIP Lenders with the following liens and priority, all subject to the Carve-Out and the Priority Liens, for all amounts owed by the Debtors under the Note Purchase Agreement: (i) the Super-Priority Claims pursuant to section 364(c)(1) of the Bankruptcy Code; (ii) the DIP Lien pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code; and (ii) other protections and inclusions in the Note Purchase Agreement and Financing Orders.

///

6

1    For the reasons explained herein, the Debtors believe that granting the DIP

2  Lenders the Super-Priority Claims and the DIP Lien (as well as all other

3  protections provided under the Note Purchase Agreement) is warranted,

4  appropriate and necessary given the circumstances of this case where the DIP

5  Lenders have agreed to provide the Debtors with critically necessary emergency

6  DIP Loan, without which the Debtors would be forced to shut down their

7  operations and liquidate.

8    **B.    The Debtors are Unable to Obtain Unsecured Credit.**

9    As discussed above and in the Spring  Decl., despite the efforts of the

10  Debtors and their professionals, the Debtors have been unable to (i) procure

11  sufficient financing (a) in the form of unsecured credit allowable under section

12  503(b)(1), (b) as an administrative expense under section 364(a) or (b), (c) in

13  exchange for the grant of a superpriority administrative expense claim pursuant to

14  section 364(c)(1), or (d) without granting liens pursuant to section 364(2) and (3),

15  or (ii) obtain postpetition financing or other financial accommodations from any

16  alternative prospective lender or group of lenders on more favorable terms and

17  conditions than those for which approval is sought herein.

18    Having determined that financing is available only under sections 364(c) of

19  the Bankruptcy Code, the Debtors commenced arms'-length negotiations with the

20  DIP Lenders over the DIP Loan. The DIP Lenders were willing to provide the DIP

21  Loan only on the condition that the Debtors, among other things, grant DIP

22  Lenders the DIP Lien and the Super-Priority Claims.

23    Due to the Debtors' failed efforts to obtain financing in some other form, the

24  Debtors believe it was necessary to obtain financing under sections 364(c) of the

25  Bankruptcy Code and, accordingly, the DIP Loan reflects the exercise of the

26  Debtor's sound business judgment. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at

27  40. The DIP Lenders were unwilling to extend financing on terms more favorable

28  to the Debtors, and the Debtors were not able to obtain alternative sources of

7

1  financing upon more favorable terms. The Debtors' ability to continue to operate

2  their business throughout the reorganization process and to maximize value to all

3  stakeholders depends upon their ability to obtain the DIP Loan. Without approval

4  of the proposed financing, the Debtors will not have funds to operate, which will

5  prevent the Debtors' successful reorganization and destroy the value of the Estates.

6       **C.**    **The Terms of the Proposed DIP Loan From the DIP Lenders Are**

7           **Fair, Reasonable, And Adequate.**

8       Courts grant debtors-in-possession considerable deference in acting in

9  accordance with their business judgment. *See, e.g., In re Ames Dep't Stores, Inc.*,

10  115 B.R. at 40 ("Cases consistently reflect that the court's discretion under section

11  364 is to be utilized on grounds that permit reasonable business judgment to be

12  exercised so long as the financing agreement does not contain terms that leverage

13  the bankruptcy process and powers or its purpose is not so much to benefit the

14  estate as it is to benefit parties in interest.") ; *In re Simasko Production Co.*, 47

15  B.R. at 448-49 (authorizing interim financing agreement where debtor's best

16  business judgment indicated financing was necessary and reasonable for benefit of

17  estate). Section 364 of the Bankruptcy Code does not require that a debtor seek

18  alternative financing from every possible lender; rather, the debtor simply must

19  demonstrate sufficient efforts to obtain financing without the need to grant a senior

20  lien. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d

21  1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the

22  senior lien by establishment of unsuccessful contact with other financial

23  institutions in the geographic area).

24       The Debtors submit that the terms of the proposed DIP Loan from the DIP

25  Lenders are fair, reasonable and adequate. As noted above, the terms and

26  conditions set forth in the Note Purchase Agreement were negotiated extensively

27  over a several-week process, in good faith and at arms' length, by the parties. The

28  DIP Lenders have agreed to provide the DIP Loan to the Debtors in an effort to

assist the Debtors in preserving the going-concern value of the Debtors' business and to facilitate the successful reorganization of the Debtor's business. Further, the DIP Lenders are not seeking to prime the Priority Liens, and have expressly agreed that the DIP Lien and Super-Priority Claims shall be subordinate to such liens. The Debtors submit in their business judgment that the benefits afforded to the Debtors by the DIP Loan offers the Debtors their best and, to date, only opportunity to maintain and preserve the value of their assets while pursuing the reorganization of their business, which will benefit all creditors and parties in interest in these Cases.

### D.     The Scope of the Carve-Out is Appropriate.

The proposed DIP Loan subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel throughout the debtor's reorganization. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Subject to the Budget, the Carve-Out ensures that proceeds of the DIP Loan may be used for the payment of U.S. Trustee fees and professional fees of the Debtor and the Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Loan.

### E.     The DIP Lenders Should be Entitled to the Protections Afforded to Good Faith Lenders Under Section 364(e).

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

In this case, the Note Purchase Agreement and the Financing Orders are the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders have offered the most favorable terms available for obtaining critical postpetition financing, and (ii) are the product of extended arm's-length, good faith negotiations between and among the Debtors and the DIP Lenders. The terms and conditions of the Note Purchase Agreement are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtors, their estates and creditors. The proceeds under the DIP Loan will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the Budget. No consideration is being provided to any party to the Note Purchase Agreement other than as described herein and the DIP Lenders extended the DIP Loan in reliance upon the protections offered by section 364(e) of the Bankruptcy Code. Section 364(e) provides a lender with a presumption of good faith. *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005). Accordingly, the Debtors request that the Court find that the DIP Lenders have acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

///

4840-1133-6507.10

**F.      The Debtors Should Be Authorized to Use the Cash Collateral Which is Security for the DIP Loans and No Other Loans.**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *see also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Here, the DIP Agent (as defined in the Note Purchase Agreement) has consented to the Debtors' use of Cash Collateral to pay the expenses set forth in the Budget in accordance with the provisions of the Note Purchase Agreement. Accordingly, the Debtor should be authorized to use its Cash Collateral pursuant to Section 363(c)(2).

**G.      Approval of the Interim Order Should be Granted, and a Final Hearing Set on Approval of the Final Order.**

Bankruptcy Rules 4001(b)(2) and (c)(2) provide that a final hearing on motions to use cash collateral or obtain credit may not be held earlier than fourteen (14) days after the service of such motions.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and/or use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

In this case, pursuant to Bankruptcy Rules 4001(b) and (c), and through a separate ex parte application for an order shortening time, the Debtors request that the Court conduct an expedited preliminary hearing on this Motion on or before December 1, 2016 and (i) authorize the Debtors to borrow $1 million of the DIP Loan and use Cash Collateral pursuant to the Interim Order in order to maintain the ongoing business operations of the Debtors and avoid immediate and irreparable

harm and prejudice to the Estates and all parties in interest, and (ii) schedule the Final Hearing, at which time approval of the DIP Loan and use of Cash Collateral pursuant to the Final Order will be sought.

Absent authorization from the Court to enter into the DIP Loan, as authorized in the Interim Order, on a short-term basis pending approval of the Final Order, the Debtors will be immediately and irreparably harmed. At the time of the interim hearing on this Motion, the Debtors will no longer have authorization to use cash. Accordingly, the relief requested is critical to preserving and maintaining the value of the Debtors' estates and facilitating their sale efforts.

### H. Waiver of Any Applicable Stay Is Appropriate.

For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtors request the terms of the Interim Order to become immediately effective to ensure that the Debtors will be able to obtain the proposed DIP Loan from the DIP Lenders and use the Cash Collateral to pay such critical expenses. Based on the foregoing, the Debtors request that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow the Interim Order to become immediately effective.

### V. <u>NOTICE</u>

In accordance with Local Rule 9013-9 governing emergency motions, the Debtors will provide telephonic notice of this Motion to: (a) the Office of the United States Trustee, (b) counsel for the DIP Agent pursuant to the Note Purchase Agreement; (c) counsel to the Senior Lenders; and (d) counsel to the Committee. The details of such notice are provided in the accompanying Declaration of Melissa Yusko in Support of the Motion (the "<u>Yusko Decl.</u>"). In addition, the Debtors will serve a copy of this Motion on the following parties as set forth in the Yusko Decl.: (a) the Office of the United States Trustee, (b) counsel for the DIP Agent pursuant to the Note Purchase Agreement; (c) counsel to the Senior

Lenders; (d) counsel to the Committee; (e) the Internal Revenue Service; and (f) any parties requesting special notice in accordance with Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of entry of the order granting such relief upon each of the foregoing parties and any other parties-in-interest as the Court directs.  The Debtor submits that such notice is sufficient and that no other or further notice be given.

## VI.    CONCLUSION

WHEREFORE, for all of the foregoing reasons the Debtors respectfully request that the Court (a) grant the relief requested in the Motion on an interim basis; (b) enter an Interim Order in substantially the same form as the order attached hereto as Exhibit 1; (c) schedule a final hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and (d) grant such further relief as the Court deems just and proper.

DATE: NOVEMBER 29, 2016                    FOLEY & LARDNER LLP


BY: /s/ VICTOR A. VILAPLANA
    VICTOR A. VILAPLANA
    ATTORNEYS FOR DEBTORS AND
    DEBTORS-IN-POSSESSION

4840-1133-6507.10

Exhibit 1

# EXHIBIT 1

Exhibit 1

000014

Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Chapter 11 |
| Sotera Wireless, Inc., et al., | Case Nos. 16-05968-LT11 *et seq.* |
| Debtors. | (Jointly Administered) |

### INTERIM ORDER (I) AUTHORIZING AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING

This matter coming before this Court on the above captioned Debtors' *Motion for Entry and Approval of Interim and Final Orders: (A) Authorizing and Approving Postpetition Financing; (B) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying Automatic Stay; and (E) Scheduling Final Hearing, Pursuant to 11 U.S.C. Sections 105, 362, 363, and 364 and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d)* (the "Motion") at an interim hearing on December __, 2016 (the "Interim Hearing"), the *Declaration of* _____ (the "_____ Declaration").  The Motion requests the entry of an interim order (the "Interim Order"):

(a)       authorizing and approving, pursuant to sections 105, 361, 362, 363, and 364 of the United States Bankruptcy Code, 11 U.S.C. sections 101, et seq. (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), postpetition financing (the "DIP Facility"), from Sanderling Ventures Partners VI, L.P.,

Exhibit 1

as agent (the "DIP Agent"), and the lenders party thereto (collectively with the DIP Agent and

their respective successors, assigns and transferees, the "Lenders");

(b)        authorizing the Debtors to enter into and comply in all respects with the DIP

Facility and the other Loan Documents[1];

(c)        requesting that the financing (inclusive of fees and costs) under the DIP Facility,

(collectively, the "DIP Facility Obligations"), subject only to the Senior Loan Position and the

Carve Out (as such terms are defined below):  (i) have priority, pursuant to Bankruptcy Code

section 364(c)(1), over any and all administrative expenses, and (ii) pursuant to Bankruptcy

Code sections 364(c)(2) and (c)(3), be deemed to be secured by valid, binding, continuing,

enforceable, fully perfected and unavoidable first priority senior security interests in, and liens

upon (all such liens and security interests granted to the DIP Agent for the benefit of the Lender,

pursuant to this Interim Order and the Loan Documents, the "DIP Facility Liens"), all current

and future assets, properties and rights of the Debtors, and all products and proceeds of any of

the foregoing (the "Collateral"), but specifically receiving a junior lien on all Collateral

encumbered by the Senior Loan Position, pursuant to Bankruptcy Code section 364(c)(2) below;

(d)        authorizing the Debtors' use of cash collateral securing the DIP Facility;

(e)        requesting that a final hearing (the "Final Hearing") be held before this Court to

consider entry of order granting the relief requested in the Motion on a final basis (the "Final

Order"); and

(f)        granting of certain related relief.

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan
Documents.

P001A.DOCX

000016

Exhibit 1

The Court having found that due and appropriate notice, under the circumstances, of the Motion, the relief requested therein, the material terms of this Interim Order and the Interim Hearing was provided by the Debtors pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), on the parties as reflected in the proof of service of the Motion.  The Court having held the Interim Hearing; having considered all the pleadings filed with this Court; and having overruled all unresolved objections to the relief requested in the Motion; and upon the record made by the Debtors at the Interim Hearing, including the Motion and other filings and pleadings in the Debtors' chapter 11 cases, and after due deliberation and consideration, and good and sufficient cause appearing therefore;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     Petition Date.  On September 30, 2016 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court" or this "Court").  The Debtors continue to operate their businesses and manage their properties debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

B.     Jurisdiction and Venue.  This Court has core jurisdiction over the Debtors' chapter 11 cases, this Motion and the parties and property affected hereby pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.

C.     Notice.  Notice of the Interim Hearing, the Motion and proposed entry of this Interim Order has been appropriate.  Upon the record presented to the Court at the Interim Hearing, and under the exigent circumstances set forth therein, requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with

3

Exhibit 1

P001A.DOCX

000017

Exhibit 1

Bankruptcy Rules 4001(b) and (c) and 9014, which notice is sufficient for this Motion, and the entry of the Interim Order, and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required.

        D.     <u>Creditors' Committee</u>.  On October 20, 2016, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed a Creditors' Committee in accordance with Bankruptcy Code section 1102.

        E.     <u>Findings Regarding Postpetition Financing.</u>

        (a)  <u>Debtors' Request</u>.  The Debtors have requested from the Lenders, and the Lenders are willing to extend, certain loans, advances and other financial accommodations, as more particularly described and on the terms and conditions set forth in this Interim Order and the Loan Documents.

        (b)  <u>Need for Postpetition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use the Cash Collateral (as defined herein), in order to permit, among other things, the orderly continuation of the operation of its business, the management and preservation of Debtors' assets and property as further described in the _____ Declaration, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs and maintain the going concern value of the Debtors' estates.  Without such cash and credit, the Debtors' estates would be irreparably harmed.

        (c)  <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to obtain sufficient financing from sources other than the Lenders on terms more favorable than under the Loan Documents and are not able to obtain sufficient unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1).  The Debtors are also unable

P001A.DOCX

Exhibit 1

000018

Exhibit 1

to obtain unsecured credit with the enhanced priority afforded by Bankruptcy Code section 364(c)(1).  New credit is unavailable to the Debtors without providing the Lenders with (a) the Super-Priority Claims and (b) the DIP Facility Liens as provided herein and in the Loan Documents.

   (d) <u>Budget</u>.  The Debtors have prepared and delivered the Budget to the Lender, a copy of which Budget is attached hereto as <u>Exhibit 1</u>.  The Debtors represent that they believe the Budget to be achievable and will allow the Debtors to operate their business and otherwise conduct their chapter 11 cases.

   (e) <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  Based on the record of the Interim Hearing, the terms of the Loan Documents and this Interim Order are fair, just and reasonable under the circumstances, ordinary and appropriate for secured financing to a debtor-in-possession, reflect the Debtors' reasonable exercise of their business judgment, and constitute reasonably equivalent value and fair consideration.  The terms of the Note Purchase Agreement and the other Loan Documents have been negotiated in good faith and at arm's length among the Debtors, DIP Agent, and the Lenders, with all parties represented by counsel, and any credit extended, loans made, and other financial accommodations extended to the Debtors by Lenders shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections afforded by Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

   (f) <u>Good Cause, Immediate Entry</u>.  The relief requested by the Motion is necessary, essential and appropriate and is in the best interests of and will benefit the Debtors, their estates, their creditors, and their shareholders, as its implementation will, among other

Exhibit 1

P001A.DOCX

000019

things, provide the Debtors with the necessary liquidity to (i) minimize disruption to the Debtors'

businesses and on-going operations, (ii) preserve and maximize the value of the Debtors' estates

for the benefit of all of the Debtors' creditors and shareholders, and (iii) avoid immediate and

irreparable harm to the Debtors, their creditors and shareholders, their business, their employees,

and assets.  Thus, good cause has been shown for the immediate entry of this Interim Order

pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based upon the foregoing, and after due consideration and good cause appearing

therefor:

IT IS ORDERED, ADJUDGED AND DECREED, that:

1. <u>Motion Granted</u>.  The Motion is granted, on an interim basis, in accordance with

Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  This Interim Order

shall immediately become effective upon its entry.

2. <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are withdrawn

or resolved by the terms hereof or, to the extent not resolved, are overruled.

3. <u>Authorization of the DIP Financing Documents</u>.  Upon finalizing and executing that

certain Sotera Wireless, Inc. Secured Note Purchase Agreement (the "<u>Note Purchase</u>

<u>Agreement</u>") by and between the Debtors, DIP Agent and the Lenders (subject only to non-

material modifications as may be agreed to by the parties thereto), and provided that the Debtors

are not in default under the terms of this Interim Order and the Loan Documents, the Debtors are

immediately authorized to borrow under the DIP Facility from the Lenders in an interim amount

not to exceed [$_____].  The terms of this Interim Order, the Note Purchase Agreement,

and the Loan Documents are hereby deemed to be legal, valid, and binding obligations of the

Debtors and the Debtors' estates.  Until the Final Hearing on the Motion, financing and advances

6

Exhibit 1

P001A.DOCX

000020

under the Note Purchase Agreement, and Cash Collateral derived therefrom, will be used or made only in accordance with the Budget.

4.    _Execution and Compliance with Loan Documents_.  The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and covenants of the Note Purchase Agreement and Loan Documents, each of which, without limitation, constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during the Debtors' chapter 11 cases, any subsequently converted case of the Debtors under chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of the Debtors' chapter 11 cases.

5.    _Super-Priority Claims_.  As security for the DIP Facility Obligations now existing or hereafter arising pursuant to the DIP Facility, the Loan Documents and this Interim Order, to the extent the DIP Facility Liens do not satisfy the DIP Facility Obligations, the DIP Agent and Lenders are granted allowed super-priority administrative claims pursuant to Bankruptcy Code section 364(c)(1), which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, _inter alia_, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) (the "_Super-Priority Claims_"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, _provided_, _however_, that the Super-Priority Claims shall be subordinate to the Senior Loan Position and to the Carve Out to the extent specifically provided for in paragraph 8 of this Interim Order.

7

Exhibit 1

P001A.DOCX

000021

6.  <u>DIP Facility Liens</u>.  As security for the DIP Facility, pursuant to Bankruptcy Code sections 364(c)(2) and (c)(3), the DIP Agent shall have for the benefit of the Lender, and is hereby granted the DIP Facility Liens, which liens are effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, control agreements, pledge agreements, lock box agreements, financing statements, or otherwise:

(a)      pursuant to Bankruptcy Code section 364(c)(2), valid, perfected, enforceable and non-avoidable first priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date; and

(b)  pursuant to Bankruptcy Code section 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to the Senior Loan Position, the Carve Out and any other valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date.

7.  <u>Cash Collateral</u>.  To the extent that proceeds of the DIP Facility or proceeds of the Collateral constitute cash collateral (as such term is defined in section 363(c) of the Bankruptcy Code in which the Lenders have an interest (hereafter, "<u>Cash Collateral</u>"), the Debtors are authorized to use the Cash Collateral if and to the same extent that the Debtors are authorized to use proceeds of the DIP Facility; *provided* however upon the occurrence of an Event of Default, the Lenders may and are hereby authorized to give the Debtors written notice withdrawing their consent to the Debtors' use of Cash Collateral, in which case the Debtors shall be prohibited from using any cash collateral forty-eight (48) hours after their receipt of such notice.

8

Exhibit 1

P001A.DOCX

000022

Exhibit 1

Notwithstanding the foregoing, the Debtors may seek an order from the Bankruptcy Court approving the continued use of Cash Collateral only after an actual hearing on no less than two (2) business days' prior written notice to the Lenders.

8.  Subordination.

(a)  Nothing contained herein is intended to limit or otherwise affect the rights of Silicon Valley Bank and Oxford Finance, LLC (together, the "Senior Lenders") as set forth in the Agreed Final Order Authorizing Use of Cash Collateral dated October 20, 2016 [Docket No. 100] (the "Cash Collateral Order").  Without limiting the foregoing, and notwithstanding anything to the contrary herein, the Lender's rights hereunder are subordinated to the Senior Lender's rights in the "Collateral", the "Replacement Collateral", "IP" (as each of such terms are used in the Cash Collateral Order and, collectively, the "Senior Loan Position").

(b)  Notwithstanding anything to the contrary herein, the Lender's rights hereunder, including its rights in the Collateral and its proceeds, are subordinated to the Carve Out.  As used herein, "Carve Out" means: the (a) unpaid fees of the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. 1930(a), (b) unpaid and allowed fees and expenses of Debtors' attorneys, Debtors' financial advisor, and attorneys for the official committee of creditors ("OCC")  (collectively the "Estate Professionals") but only to the extent approved by the Purchasers in the Budget and only if incurred before the delivery of a Carve Out Termination Notice (as defined below), and (c) unpaid and allowed fees and expenses of Estate Professionals in an aggregate amount not to exceed $200,000 (the "Estate Professionals' Fee Cap") incurred after delivery of the notice by the Purchasers to the Debtors (and its bankruptcy counsel), the U.S. Trustee and counsel to the OCC, that an Event of Default (as defined in the Secured Note Purchase Agreement) has occurred and is continuing (a "Carve

9

Exhibit 1

Out Termination Notice"). For avoidance of doubt, the Estate Professionals' Fee Cap applies only after delivery of the Carve Out Termination Notice.

(c)   Notwithstanding anything to the contrary contained herein or in the Loan Documents, all claims and liens granted by this Interim Order shall be subject to the payment of collectively, the sum of (i) all fees required to be paid to the clerk of the Court and all statutory fees payable to the U.S. Trustee under section 1930(a)(6) of title 28 of the United States Code, together with the statutory rate of interest under and 31 U.S.C. section 3717, and (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $15,000,

9.   Waiver of 506(c) Claims Against the Lenders.  No costs or expenses of administration which already have been, or may hereafter be, incurred in the Debtors' chapter 11 cases or in any subsequently converted case under chapter 7 of the Bankruptcy Code shall be charged or asserted by the Debtors against the DIP Agent or the Lenders, their claims or the Collateral, pursuant to Bankruptcy Code sections 105 or 506(c) or otherwise.

10. Restrictions on Use of Proceeds.  No proceeds of the DIP Facility or the DIP Collateral shall be made available to pay for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or the Lenders or in connection with any adversary proceeding or contested matter challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the Lender's liens, claims, interests and adequate protection.

11. Termination Date.  The DIP Facility Obligations shall be due and payable, without notice or demand, on the Maturity Date.

10

P001A.DOCX

Exhibit 1

000024

Exhibit 1

12. <u>Lien Perfection</u>. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the liens and security interests in and upon the Collateral granted pursuant to this Interim Order and/or the Loan Documents, without the necessity of (a) filing, recording or serving any financing statements, mortgages, deeds of trust or other agreements, documents or instruments which may otherwise be required under federal or state law in any jurisdiction (collectively, the "<u>Lien Recording Documents</u>"), (b) taking possession of Collateral or evidence thereof (provided, that, without limiting the foregoing, any third party in possession of any Collateral is hereby deemed a bailee for the benefit of and on behalf of the DIP Agents and/or Lenders) or (c) taking any other action to validate or perfect the liens and security interests granted in this Interim Order and/or the Loan Documents. If the DIP Agent and/or Lenders shall, in their discretion, elect for any reason to file any such Lien Recording Documents with respect to such liens and security interests, the Debtors are authorized and directed to execute, or cause to be executed, all such Lien Recording Documents upon the DIP Agent and/or Lender's request and the filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall be deemed to have been made at the time of and on the Petition Date. The DIP Agent and/or Lenders may, in their discretion, without seeking modification of the automatic stay under Bankruptcy Code section 362, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have an interest in real or personal property and, in such event, the subject filing or recording officer is authorized to file or record such certified copy of this Interim Order.

13. <u>Modification of Automatic Stay</u>. Subject only to the provisions of the Loan Documents and without further order from this Court, the automatic stay provisions of Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the

11

Exhibit 1

P001A.DOCX

000025

Exhibit 1

Lenders to implement the provisions of the Loan Documents and this Interim Order including exercising, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the Loan Documents; provided, however, that the automatic stay shall not be deemed vacated and modified with respect to the exercise by the Lenders of any rights or remedies with respect to the Collateral following an Event of Default unless and until the Lenders has given the Debtors five (5) business days' prior notice of the Lender's intention to exercise such remedies.  Notwithstanding the occurrence of an Event of Default or the Termination Date or anything herein, all of the rights, remedies, benefits, and protections provided to the Lenders under the Loan Documents and this Interim Order shall survive the Maturity Date.

14. Binding Effect of Interim Order and Loan Documents.

(a) The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered converting these chapter 11 cases to a chapter 7 case or cases, dismissing the Debtors' bankruptcy cases (or either of them) or any order which may be entered confirming or consummating any plan of reorganization of the Debtors; and the terms and provisions of this Interim Order as well as the priorities of payment, liens, and security interests granted pursuant to this Interim Order and the Loan Documents shall continue in this or any superseding chapter 7 case under the Bankruptcy Code, and such priorities of payment, liens and security interests shall maintain their priority as provided by this Interim Order until all Obligations are indefeasibly paid and satisfied in full.

(b) The provisions of this Interim Order and the Loan Documents shall be binding upon all parties-in-interest in this case, including, without limitation, the Debtors, the DIP Agent, the Lenders, the Senior Lenders, and the Creditors' Committee, and their respective successors

P001A.DOCX

Exhibit 1

000026

Exhibit 1

and assigns (including, to the fullest extent permitted by applicable law, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtors' estates, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the Debtors' estates).

15. <u>Survival</u>.  The rights of the DIP Agent and Lenders under the Loan Documents or this Interim Order, the provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming a plan or plans of reorganization in this case (and, to the extent not satisfied in full in cash, the DIP Facility Obligations shall not be discharged by the entry of any such order, or pursuant to Bankruptcy Code section 1141(d)(4), the Debtors having hereby waived such discharge); (ii) converting these chapter 11 cases, or either of them, to a chapter 7 case; or (iii) dismissing these chapter 11 cases, and the terms and provisions of this Interim Order and the DIP Facility Liens granted to and conferred upon the Lenders and the protection afforded to the DIP Agent and Lenders pursuant to this Interim Order.   The Loan Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order and the Loan Documents and to the maximum extent permitted by law until all of the obligation under the Loan Document shall have been paid and satisfied in full in accordance with their provisions.

16. <u>Amendment to Loan Documents</u>.  The DIP Agent and Lenders, with the consent of the Debtors, are authorized to amend and/or modify the Note Purchase Agreement or any other Loan Documents without further order of the Court; *provided* that any such amendments or modifications must be in writing and served upon counsel for the Senior Lenders, the Creditors' Committee, and the U.S. Trustee and shall be filed with the Court; *provided, further* that any amendments or modifications that would have the effect of shortening the Termination Date of

13

Exhibit 1

P001A.DOCX

000027

the DIP Facility or modifying (i) the aggregate amount of borrowings permitted, (ii) the

aggregate fees payable, or (iii) the rate or amount of interest payable, under the Loan Documents,

or which are otherwise materially adverse to the Debtors, shall be done only pursuant to further

order of the Court upon a motion on notice.

17. <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agent and Lenders

shall be, and shall be deemed to be, without any further action or notice, named as an additional

insured and loss payee on each insurance policy maintained by the Debtors which in any way

relates to the Collateral.  The Debtors shall request that the holders of all property policies

pursuant to which the Debtor is an additional named insured, if any, name the DIP Agent and

Lenders as an additional insured or loss payee of the insured parties, in case of loss.

18. <u>Remedies upon Occurrence of Event of Default</u>.  In the event of any Event of Default

under the Note Purchase Agreement or the other Loan Document, then the DIP Agent may take

any or all of the following actions, without prejudice to the rights of the DIP Agent or any

Lenders to enforce their claims against the Debtors:  (i) terminate advances under the Note

Purchase Agreement, (ii) prohibit further use of Cash Collateral, subject to the provisions of

paragraph 7 hereof, (iii) declare the DIP Facility then outstanding to be due and payable,

whereupon all of the aggregate principal of such DIP Facility, all accrued and unpaid interest

thereon, all fees and all other amounts payable under Loan Documents and all other DIP

Obligations shall become immediately due and payable, without presentment, demand, protest or

further notice of any kind, all of which are hereby expressly waived by the Debtor, and

(iv) exercise any and all of its other rights and remedies hereunder, under the Loan Documents,

under applicable law and otherwise; *provided, however*, notwithstanding anything to the contrary

contained herein, the DIP Agent and/or Lenders shall be permitted to exercise any remedy in the

14

P001A.DOCX

Exhibit 1

000028

Exhibit 1

nature of a liquidation of, or foreclosure on, any interest of Debtor in the Collateral only upon three (3) Business Days' prior notice to the Debtors, the U.S. Trustee, and any counsel for the Creditors' Committee of the DIP Agents' and/or Lenders' intention to exercise such remedies.

19. <u>No Modification or Stay of Interim Order</u>.  If any or all of the provisions of this Interim Order or the Loan Documents are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtor to the DIP Agents and/or Lenders prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the Loan Documents, as applicable.

20. <u>Good Faith</u>.  The terms of the financing arrangements among the Debtors, DIP Agent and Lenders have been negotiated in good faith and at arms' length among the Debtors, DIP Agent and the Lenders and any loans, advances or other financial accommodations which are made are deemed to have been made and provided in good faith, as the term "good faith" is used in Bankruptcy Code section 364(e), and shall be entitled to the full protection of Bankruptcy Code section 364(e).

21. <u>No Marshaling</u>.  The DIP Agent and/or Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

22. <u>DIP Agent's and Lenders' Fees and Expenses</u>.  The Debtors are hereby authorized and directed to pay to the Lenders all present and future costs, fees, charges and expenses of the Lenders payable under the Loan Documents following receipt of all invoices relating to the same (which may be summary in form and redacted for privilege), including all reasonable fees and expenses of consultants, advisors, professionals and attorneys (the "<u>Lender Costs</u>").  None of

15

such Lender Costs shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute relating to the Lender Costs.

23. <u>Final Hearing and Objection Date</u>.  This matter is set for a Final Hearing at _____ on December ___, 2016, in the United States Bankruptcy Court for the Southern District of California.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before [_____], at 4:00 p.m., with a copy served upon: (i) counsel for the Debtors:  Foley Lardner, _____, Attn: Victor A. Viliplana, Esq.; (ii) counsel for the Senior Lenders:  DLA Piper, _____, Attn: Eric Goldberg, Esq.; (iii) counsel for the Creditors' Committee:  Sullivan Hill [et al], _____, Attn: _____; (iv) counsel for the DIP Agent:  Keller & Benvenutti LLP, 650 California Street, Suite 1900, San Francisco, CA  94108, Attn:  Tobias S. Keller, Esq.; and (v) the Office of the U.S. Trustee for the Southern District of California, _____, Attn: _____.

24. <u>Conflicting Provisions</u>.    To the extent the terms and conditions of the Loan Documents are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

Exhibit 1

25. <u>Effectiveness</u>.  Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Interim Order shall (a) be immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8007 after a hearing upon notice to the Debtors and the Lenders.

Dated: San Diego, California
       December _____, 2016

_____
United States Bankruptcy Judge

17

Exhibit 1

P001A.DOCX

000031

# EXHIBIT 1

Budget

P001A.DOCX

000032

Exhibit 2

# EXHIBIT 2

Exhibit 2

000033

# SOTERA WIRELESS, INC.
## SECURED NOTE PURCHASE AGREEMENT

**THIS SECURED NOTE PURCHASE AGREEMENT** (the "Agreement") is made as of _____ by and among **SOTERA WIRELESS, INC.**, a California corporation (the "Company"), the "DIP Agents" appointed under Section 7.1 of this Agreement and the persons and entities named on the Schedule of Purchasers attached hereto (individually, a "Purchaser" and collectively, the "Purchasers").

## RECITALS

WHEREAS, on September 30, 2016, the Company and its subsidiary, Sotera Research, Inc. (its "Subsidiary" and, with the Company, the "Debtors"), filed chapter 11 cases now pending in the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"), Case Nos. 16-05968-LT11 *et seq.* (collectively, the "Bankruptcy Case"); and

WHEREAS, the Debtors require financing to continue their business operations and pay the costs associated with the Bankruptcy Case; and

WHEREAS, the Purchasers are willing to loan to the Company up to an aggregate amount of Ten Million Dollars ($10,000,000) (the "Maximum Amount"), subject to the conditions specified herein; and

WHEREAS, this Agreement shall become effective on the date (the "Effective Date") that the Bankruptcy Court enters an Interim Order, as hereafter defined.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company, the DIP Agents, and each Purchaser, intending to be legally bound, hereby agree as follows:

1.  **AMOUNT AND TERMS OF THE LOANS**

    1.1    **The Notes**. Subject to the terms of this Agreement, each Purchaser agrees severally and not jointly to lend to the Company an amount set forth opposite each such Purchaser's name on Schedule I hereto (each amount actually advanced thereunder is hereafter described as the "Loan" and, collectively, the "Loans") against the issuance and delivery by the Company of a secured convertible promissory note for such amount, in substantially the form attached hereto as Exhibit A (each, a "Note" and collectively, the "Notes"), which can only be assigned by Purchaser (and any subsequent holder) with the prior written consent of the DIP Agents. Schedule I hereto may be revised by agreement of the DIP Agents, any Purchaser affected thereby, and the Company, provide that in no event will the aggregate amount advanced or to be advanced under the Notes exceed the Maximum Amount.

A004D.DOCX

000034

**1.2** **Conversion of the Notes**.  Each Note shall be convertible into shares of equity securities according to the provisions and the terms contained in such Note; provided, however, that in order to induce the Purchasers to purchase the Notes, immediately prior to conversion each Purchaser shall be offered warrants to purchase, for nominal value, additional equity securities equal in value to twenty-five percent (25%) of the principal amount of each such Note.

## 2. THE CLOSINGS

2.1 **The Closings**.  The initial closing of the sale and purchase of the Notes (the "Initial Closing") shall be held on or immediately after the Effective Date.  Each Purchaser's obligation to purchase a Note thereafter, and the date upon which such obligation will first be enforceable (subject to the terms of this Agreement), is set forth on Schedule I hereto (such dates each constituting a "Subsequent Closing" and, collectively with the Initial Closing, the "Closings").

2.2 **Delivery**. At each Closing (a) each Purchaser shall deliver to the Company by wire transfer funds in the amount of such Purchaser's Loan to be funded by such Purchaser; and (b) the Company shall issue and deliver to each Purchaser (i) a Note in favor of such Purchaser payable in the principal amount of such Purchaser's Loan, (ii) a certificate executed by a duly-authorized officer of the Company attesting to the Company's compliance with Section 2.3 hereof, and (iii) for the Initial Closing only, a continuing guaranty from the Subsidiary in the form of Exhibit B hereto (the "Guaranty").

2.3 **Conditions to Closing.**  Notwithstanding anything to the contrary in this Article 2, Purchasers shall have no obligation to purchase a Note hereunder unless (a) no Event of Default exists and is continuing hereunder, (b) an unstayed Financing Order authorizing the Closing is in full force and effect and shall have been entered on or before December 2, 2016, and (c) the Company has tendered each of the documents described in Section 2.2(b) above.  As used herein, "Financing Order" shall mean, as applicable, either (i) an interim order authorizing the borrowings and other transactions contemplated herein in substantially the form of Exhibit C hereto ("Interim Order") or (ii) a final order (the "Final Order") in substantially similar form to the Interim Order, except with the authority to borrow increased to the Maximum Amount, or with such changes as are otherwise acceptable to the Purchasers in their sole discretion.

## 3. CREATION OF SECURITY INTEREST AND PRIORITY

3.1 **Grant of Security Interest**. To secure payment of obligations under the Notes, the Company grants to the DIP Agents, for the benefit of the DIP Agents and Lenders,  a security interest in all of the Company's property, now existing or hereafter arising the "Collateral") as follows: (a) a security interest in the Company's intellectual property including all patents, copyrights, trademarks, trade names, service marks, trade secrets and applications for any of the foregoing (as applicable); (b) a security interest in all of the Company's other property, now existing or hereafter arising, including without limitation, all goods, accounts, inventory, equipment, contract rights, commercial tort claims, fixtures, general intangibles, deposit accounts, financial assets, securities, instruments, and books and records; and (c) all proceeds of each of the foregoing (a) and (b), whether now existing or hereafter arising.  The DIP Agents and

A004D.DOCX

000035

Purchasers' interest in the Collateral shall be subject only to pre-existing, unavoidable security interests in the Collateral as of the Effective Date.  Notwithstanding the foregoing, in the event that a pledge of more than sixty five percent (65.00%) of the Company's interest in Sotera Wireless Singapore Pte. Ltd., a Singaporean private limited company ("Sotera Singapore"), creates an adverse tax consequence to the Company under the U.S. Internal Revenue Code, the security interest in Sotera Singapore shall be limited to sixty-five percent (65.00%) of the issued and outstanding equity interest therefor.

3.2    **Perfection of Purchasers' Interest in Collateral**.  The DIP Agents' interests in the Collateral shall be perfected by operation of the Financing Order.  Should the DIP Agents elect to do so in their sole and absolute discretion, the Company authorizes the DIP Agents to file such financing statements and take such other actions as the DIP Agents deem appropriate to perfect their security interests.

3.3    **Liabilities Unconditional**. The Company is and shall remain absolutely and unconditionally liable for the performance of its obligations under the Loan Documents (as defined herein), including without limitation any deficiency by reason of the failure of the Collateral to satisfy all amounts due to the Purchaser under the Loan Documents.

3.4    **Carve-Out**.  The Purchasers and the DIP Agents agree and acknowledge that their rights in the Collateral shall be subject to the Carve-Out, as such term is defined in the Interim Order, to the extent and on the terms set forth in the Interim Order.

**4.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY**

The Company hereby represents to each Purchaser as follows:

4.1    **Organization, Good Standing and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business.

4.2    **Corporate Power**. The Company will have at the Effective Date all requisite corporate power to execute and deliver this Agreement and to issue each Note (collectively with the Agreement and the Guaranty, the "Loan Documents") and to carry out and perform its obligations under the terms of this Agreement and under the terms of each Note.

4.3    **Authorization**. The Company has taken all corporate action necessary for the authorization, execution, delivery and performance of this Agreement and the performance of the Company's obligations hereunder, including the issuance and delivery of the Notes. This Agreement and the Notes, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company enforceable in accordance with their terms.

3

Exhibit 2

A004D.DOCX

000036

Exhibit 2

4.4    **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any other governmental authority, required on the part of the Company necessary for the valid execution and delivery of the Loan Documents or the consummation of any transaction contemplated hereby shall have been obtained and will be effective at the Initial Closing. A Financing Order shall have been entered and has not been stayed or modified, except to the extent the Purchasers have consented in writing to such modification.

4.5    **Compliance with Laws**. The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

4.6    **Compliance with Other Instruments**. The Company is not in violation of or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a material adverse effect on the Company. For the avoidance of doubt, the Company may be in violation of certain pre-petition obligations to third parties, and the issuance of the Notes and entry into this Agreement may constitute a violation of the Company's obligations to its prepetition secured creditor; provided, however, that such violations are not expected to have a material adverse effect on the Company, its operations, or its ability to perform its obligations under this Agreement and in the Bankruptcy Case. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

## 5.    COVENANTS OF THE COMPANY

5.1    **Use of Proceeds; Budget**. The Company shall use the proceeds of the Loan solely as permitted under, and in the amounts provided for in, the Financing Order. Without limiting the generality of the foregoing, expenditures shall be limited to those set forth in the Budget (as defined in the Agreed Final Order Authorizing Use of Cash Collateral dated October 20, 2016 (Docket No. 100) (the "Cash Collateral Order")), and the Budget taken as a whole shall be subject to a variance of no more than 15%, cumulatively for the preceding 4-week period. The Budget may be modified only with the consent of the DIP Agents; provided that the budgeted expenditures for the month of December 2016 contained in the Budget, attached hereto as Exhibit D, are acceptable to the DIP Agents s and shall be the approved Budget only for the purposes of the Interim Order (i.e., the Company must obtain approval of the Budget for any

4

Exhibit 2

A004D.DOCX

000037

period of time after December 31, 2016, or a revision thereof, prior to entry of any subsequent Financing Order).

5.2     **Reporting**.  No later than the third business day after the 15th and last day of each month, the Debtors shall deliver to the DIP Agents and Purchasers a rolling 13-week cash flow projection, which projection shall indicate for each line item in the prior week's projection the extent to which each projected amount varied from the actual amount and from the Budget.  The Debtors also shall provide to the DIP Agents and Purchasers, within 24 hours of their receipt thereof, copies of any offers, term sheets, expressions of interest, letters of intent, etc., relating to any potential DIP financing, and/or sale or refinancing transaction for their businesses.

5.3     **Bankruptcy Case Milestones.**  The Debtors shall have (i) on or before January 16, 2017, filed a plan of reorganization (a "Plan") that provides for (x) the conversion of the Loans into equity of the Company, with warrants, on terms acceptable to the Purchasers in their sole discretion, (y) payment in full of the Loans, in cash, in accordance with the terms of the Notes or (z) such other treatment of the Loans as agreed by the Purchasers in their sole discretion; (ii) on or before February 20, 2017, obtained approval of a form of disclosure statement of the Plan; (iii) on or before March 20, 2017, obtained Bankruptcy Court approval of the Plan; and (iv) on or before April 5, 2017, caused the Plan to become effective.

## 6.     REPRESENTATIONS OF THE PURCHASERS

6.1     **Organization and Good Standing**. Each Purchaser signatory hereto is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation. Each Purchaser signatory hereto is duly qualified and is authorized to do business and is in good standing.

6.2     **Corporate Power**. Each Purchaser signatory hereto will have at the Effective Date all requisite corporate power to execute and deliver this Agreement and to carry out and perform its obligations under the terms of this Agreement.

6.3     **Authorization**. All corporate action on the part of each Purchaser signatory hereto, as well as its directors, partners, agents, and stockholders, necessary for the authorization, execution, delivery and performance of this Agreement and the performance of its obligations hereunder. This Agreement, when executed and delivered by each Purchaser signatory hereto, shall constitute valid and binding obligations of such Purchaser enforceable in accordance with its terms.

## 7.     THE DIP AGENTS

7.1     **Appointment of the Agent.**  Pursuant to agreement by and among the Purchasers (as such agreement may hereafter be memorialized, the "Agency Agreement"), the Purchasers have designated and appointed Sanderling Venture Partners VI, L.P. and Yonglin Biotech Corp. (the "DIP Agents") as their agents under this Agreement and the other Loan Documents and the Purchasers have authorized the DIP Agents to take action on their behalf under the provisions of this Agreement and each other Loan Document, as more fully set forth below.

A004D.DOCX

000038

7.2    **Authority of the DIP Agents**.  The DIP Agents, or either of them (with the consent of the other), are authorized to act as the secured party under each of the Loan Documents that create a lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, the DIP Agents have and may use their sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that DIP Agents expressly are entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to the DIP Agents, the DIP Agents shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Company's obligations under the Loan Documents, the Collateral, collections, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) exclusively receive, apply, and distribute the collections, (d) open and maintain such bank accounts and cash management arrangements as DIP Agents deem necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and collections, (e) perform, exercise, and enforce any and all other rights and remedies of the Purchaser with respect to the Company or its subsidiaries, the obligations, the Collateral, collections, or otherwise related to any of same as provided in the Loan Documents, and (f) incur and pay such expenses as DIP Agents may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

7.3.    **Succession of DIP Agent; Modification and Termination of Authority**.  The Debtors may rely on the authority granted to the DIP Agents in this Article 7 absent a written notice from the DIP Agents jointly advising the Debtors that they have been replaced under the Agency Agreement.  In the event that such notice is delivered, the notice shall identify the replacement DIP Agents, if applicable, and the extent or limits of the DIP Agents' authority if modified or terminated.

8.    **DEFAULT AND TERMINATION**

8.1.    **Events of Default.**  Each of the following shall constitute an "Event of Default" hereunder:

(a)    the breach of any covenant contained in Article 5 of this Agreement, provided that DIP Agents shall give the Company five (5) days' notice and opportunity to cure any such breach, but only to the extent that such breach is curable;

(b)    any representation contained in Article 4 hereof is or becomes untrue, provided that DIP Agents shall give the Company five (5) days' notice and opportunity to cure any such untrue representation, but only to the extent that such representation can be rendered true;

A004D.DOCX

000039

(c) the conversion of the Bankruptcy Case, or either of them, to liquidation under chapter 7 of the Bankruptcy Code;

(d) the appointment of a trustee or an examiner with expanded powers in any of these cases;

(e) the granting of relief from the automatic stay to any of the Lenders (as such term is defined in the Cash Collateral Order), the Purchasers, or any creditor for whom the relief granted thereby could reasonably be expected to have a material adverse impact on the Bankruptcy Case;

(f) the dissolution of the Debtors or the cessation of substantially all of their businesses;

(g) any request, filing of a motion, or other attempt to prime any of the security interests and liens granted hereunder, or to create a priority claim with superpriority over the claims of the Purchasers under Section 507(b) of the Bankruptcy Code, except for those claims granted to the Lenders prior to the Effective Date;

(h) the termination or expiration of the Debtors' exclusive periods to file a plan of reorganization or to seek acceptance thereof;

(i) the security interests or liens granted hereby or in the Financing Order cease or fail to be valid, binding and enforceable first priority security interests and liens;

(j) the dismissal of the Bankruptcy Case, or either of them;

(k) any stay, reversal, vacation, modification or other amendment in any respect concerning the Financing Order (except to the extent consented to in writing by the Purchasers); or

(l) an Event of Default occurs under the Note, the Guaranty, or the LSA (as such term is defined in the Cash Collateral Order), except for those Events of Default under the LSA that existed and had been noticed by the Lenders on the Effective Date.

8.2    **Remedies.**  Upon the occurrence of an Event of Default, the DIP Agents may do any or all of the following:

(a) upon giving written notice to the Company, immediately terminate their obligations to purchase Notes under this Agreement;

(b) declare all obligations under the Notes and otherwise relating to the Loans immediately due and payable;

(c) give the Debtors written notice withdrawing their consent to the Debtors' use of cash collateral under the Financing Order, in which case the Debtors shall be prohibited

7

Exhibit 2

A004D.DOCX

000040

Exhibit 2

from using any cash collateral except as otherwise permitted under the Financing Order; and

(d) exercise such other rights and remedies as are otherwise available at law, including the exercise of remedies under Article 9 of the Uniform Commercial Code (as applied), subject to obtaining relief from stay under the terms of the Financing Order.

## 9.    MISCELLANEOUS

9.1    **Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

9.2    **Governing Law**. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.

9.3    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.4    **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

9.5    **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex, electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the Company and the DIP Agents at the addresses set forth on the signature page hereto, and to Purchaser at the address(es) set forth on the Schedule Ior at such other address(es) as the Company, DIP Agents or Purchaser (as applicable) may designate by ten (10) days advance written notice to the other parties hereto.

9.6    **Modification; Waiver**. No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing and approved by the Company and the DIP Agents.  Any matter requiring the consent of the Purchasers hereunder shall be conclusively determined by a writing executed jointly by the DIP Agents.

9.7    **Expenses**. At the Initial Closing and each Subsequent Closing thereafter, the Company shall reimburse the DIP Agents for their legal fees and expenses incurred in connection with the transactions contemplated hereby, or a reasonable estimate thereof (any

A004D.DOCX

000041

Exhibit 2

amounts in excess to be applied against future fees of the Purchasers), from the proceeds of the Notes financing.  The Company shall further reimburse the DIP Agents for their reasonable legal fees and expenses incurred in monitoring and enforcing their rights in the Bankruptcy Case.

A004D.DOCX

000042

Exhibit 2

9.8 **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the DIP Agents and each Purchaser, upon any breach or default of the Company under this Agreement or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by the DIP Agents  of any breach or default under this Agreement, or any waiver by DIP Agents  of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the DIP Agents, shall be cumulative and not alternative.

9.9 **Entire Agreement**. This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

IN WITNESS WHEREOF, the parties have executed this SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT as of the date first written above.

**SOTERA WIRELESS, INC.**

By: _____

Print Name:_____

Title: _____

Contact information for notice:

**DIP AGENTS:**

Sanderling Venture Partners VI, L.P.
By: Middleton, McNeil, Mills & Associates VI,
LLC, on behalf of itself and its affiliated entities

By: _____

Print Name:_____

Title: _____

Contact information for notice:

A004F.DOCX

Exhibit 2

000043

Exhibit 2

Yonglin Biotech Corp.

By: _____
Print Name:_____
Title: _____

Contact information for notice:

Exhibit 2

A004D.DOCX

000044

Exhibit 2

PURCHASER:

_____

By: _____
Print Name:_____
Title: _____

Contact information for notice:

A004D.DOCX

Exhibit 2

000045

Exhibit 2

SCHEDULE I

Loan Schedule

| Purchaser | Draw Date | | Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

A004D.DOCX

Exhibit 2

000046

Exhibit 2

## EXHIBIT A

Form of Secured Convertible Promissory Note

A004D.DOCX

Exhibit 2

000047

Exhibit 2

**THIS SECURED CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE HOLDER SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.**

**SECURED CONVERTIBLE PROMISSORY NOTE**

$_____

December [__], 2016

San Diego, California

For value received **SOTERA WIRELESS, INC.**, a California corporation (the "Company"), promises to pay to **[HOLDER]** or its assigns ("Holder") the principal sum of $_____, with simple interest on the outstanding principal amount at the rate of Ten Percent (10%) per annum. Interest shall commence with the date hereof and shall continue on the outstanding principal until paid in full or converted. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed.

1. This convertible promissory note (this "Note") is issued as part of a series of similar notes (collectively, the "Notes") to be issued pursuant to the terms of that certain Secured Convertible Note Purchase Agreement (the "Agreement') dated as of _____ to the persons and entities listed on Schedule I thereof (collectively, the "Holders"). Any capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

2. All payments of interest and principal shall be made on the Maturity Date in lawful money of the United States of America. All payments shall be applied first to accrued interest, and thereafter to principal. This Note shall be due and payable on the date (the "Maturity Date") that is the earliest to occur of (a) after the occurrence of an Event of Default, the date that Holder gives written notice to the Company of such Event of Default and fixing of the Maturity Date; and (b) December 31, 2017.

Exhibit 2

3.      This Note shall be convertible and/or payable as set forth in this Section 3.

(a)      If the Company issues and sells shares of its equity to investors (the "Investors") in connection with a plan of reorganization approved by the Bankruptcy Court then, at the option and upon the joint consent of the DIP Agents (as defined in the Agreement), the outstanding principal balance of the Notes and any interest due hereon shall convert into such equity at a conversion price equal to the price per share paid by the Investors purchasing the equity on the same terms and conditions as given to the Investors, plus additional warrants as provided in the Agreement.

(b)      If, prior to any conversion of the Notes pursuant to Section 3(a), the Company enters into any transaction or series of related transactions that would constitute a sale of substantially all of the Company's assets, then the Note shall either, at the option of the each Holder, be repaid in full satisfaction in an amount equal to 100% of the outstanding principal amount of the Note, together with all unpaid interest accrued under the Note plus 20% of any proceeds remaining after repayment of the Company's secured and unsecured creditors.

4.      Unless this Note has been converted in accordance with the terms of Section 3(a), the entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on the Maturity Date.

5.      The Company's performance of its obligations hereunder is secured by a security interest in the collateral specified in the Agreement.

6.      If an Event of Default occurs hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by Holder in enforcing and collecting this Note.

7.      The occurrence of either of the following shall constitute an Event of Default:

(a)      The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable; or

(b)      An Event of Default occurs under the terms of the Agreement.

Exhibit 2

8.    The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

9.    This Note shall be governed by construed and under the laws of the State of California, as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.

10.    Any term of this Note may be amended or waived with the written consent of the Company and the DIP Agents.  Upon the effectuation of such waiver or amendment in conformance with this Section 10, the Company shall promptly give written notice thereof to the record Holders of the Notes who have not previously consented thereto in writing.

11.    This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

SOTERA WIRELESS, INC.

By: _____
Print Name:_____
Title: _____

Exhibit 2

# EXHIBIT B

Form of Guaranty

Exhibit 2

A004D.DOCX

Exhibit 2

# CONTINUING GUARANTY

December [__], 2016

San Diego, California

In consideration of and in order to induce the DIP Agents and Purchasers, as such terms are defined in the Secured Note Purchase Agreement (the "Agreement') dated as of _____, to enter into the Agreement and to purchase the Notes, the undersigned (the "Guarantor") provides this Continuing Guaranty (this "Guaranty") and hereby:

1. Unconditionally and absolutely guarantees to the DIP Agents and Purchasers, and each of them, the Company's full and prompt payment and performance of the Notes and all of the Company's obligations under the Agreement and the Notes.

2. Waives (i) presentment, demand, notice of nonpayment, protest and notice of protest and dishonor on the Notes; (ii) notice of acceptance of this Guaranty by the DIP Agents and Purchasers; and (iii) notice of the creation or incurrence of the Notes by the Company.

3. Agrees that the DIP Agents and/or Purchasers, jointly or severally, may from time to time, without notice to Guarantor, which notice is hereby waived by Guarantor, extend, waive, renew or compromise the Notes, in whole or in part, without releasing, extinguishing or affecting in any manner whatsoever the liability of Guarantor hereunder, the foregoing acts being hereby consented to by Guarantor.

4. Agrees that this Guaranty shall remain in full force and effect and be binding upon Guarantor until the Notes are paid and the Company's obligations under the Agreement and the Notes are performed in full.

5. Agrees that so long as any portion of the obligations guaranteed hereby are due and owing or to become due and owing by the Company to the DIP Agents and Purchasers, the Guarantor shall not, without the prior written consent of the DIP Agents , collect or seek to collect from the Company a claim, if any, by subrogation or otherwise, acquired by the Guarantor or through payment of any part or all of the Notes.

6. Agrees that the possession of this instrument of guaranty by the DIP Agents and/or the Purchasers shall be conclusive evidence of due execution and delivery hereof by Guarantor.

7.      Agrees that this Guaranty shall be binding upon the legal representatives, successors and assigns of Guarantor, and shall inure to the benefit of the the DIP Agents, the Purchasers and their successors, assigns and legal representatives.

8.      To secure its obligations hereunder, grants to the DIP Agents, for the benefit of the DIP Agents and the Purchasers, a security interest in all of the Guarantor's property, now existing or hereafter arising the "Collateral") as follows: (a) a security interest in the Guarantor's intellectual property including all patents, copyrights, trademarks, trade names, service marks, trade secrets and applications for any of the foregoing (as applicable); (b) a priority security interest in all of the Guarantor's other property, now existing or hereafter arising, including without limitation, all accounts, inventory, equipment, intellectual property, general intangibles, deposit accounts, financial assets, securities, instruments; and (c) all proceeds of each of the foregoing (a) and (b), whether now existing or hereafter arising.  The DIP Agents and Purchasers' interest in the Collateral shall be subject only to pre-existing, unavoidable security interests in the Collateral as of the Effective Date.  The DIP Agents and Purchasers' interests in the Collateral shall be perfected by operation of the Order.  Should the DIP Agents elect to do so in their sole and absolute discretion, the Guarantor authorizes the DIP Agents to file such financing statements and take such other actions as the Purchasers deem appropriate to perfect their security interests.

Terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

SOTERA RESEARCH, INC.


By: _____
Print Name:_____
Title: _____

Exhibit 2

## EXHIBIT C

Form of Interim Order

```
[The Form of Interim Order is
 attached as Exhibit 1 to the
 Motion for the purposes of
 this filing only.]
```

A004D.DOCX

Exhibit 2

000054

Exhibit 2

# EXHIBIT D

Budget

Exhibit 2

**Detail Cash Flow**
2016 - 2018 Budget
Updated 11-29-2017

| | December Forecast | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Cash basis OPEX** | Wk end 12/2 | Wk end 12/9 | Wk end 12/16 | Wk end 12/23 | Wk end 12/30 | 5 wks end 12/30 |
| Employee expenses | $ - | $ - | $ 345,000 | $ - | $ 335,000 | $ 680,000 |
| Office and Supplies | $ 6,700 | $ 6,700 | $ 6,700 | $ 6,700 | $ 3,000 | $ 29,800 |
| Travel | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 5,000 | $ 41,000 |
| Legal Fees - IP/Gen. Corp. | $ - | $ - | $ - | $ 33,000 | $ - | $ 33,000 |
| Legal Fees - Litigation | $ - | $ - | $ - | $ - | $ 25,000 | $ 25,000 |
| Legal Fees - Bankruptcy counsel | $ - | $ - | $ - | $ - | $ 75,000 | $ 75,000 |
| Professional Fees - OCC counsel | $ - | $ - | $ - | $ - | $ 25,000 | $ 25,000 |
| Professional Fees - Piper Jaffray | $ 25,000 | $ - | $ - | $ - | $ - | $ 25,000 |
| U.S. Trustee Fees | $ - | $ - | $ - | $ - | $ 10,400 | $ 10,400 |
| Outside Services | $ 29,800 | $ 29,800 | $ 29,800 | $ 29,800 | $ 10,000 | $ 129,200 |
| Research & Development | $ 6,700 | $ 6,700 | $ 6,700 | $ 6,700 | $ 6,700 | $ 33,500 |
| Facilities & Equip., net of depreciation | $ - | $ - | $ 20,000 | $ 81,000 | $ - | $ 101,000 |
| APM contract billings | $ - | $ - | $ - | $ - | $ (35,000) | $ (35,000) |
| Employee retention program | $ - | $ - | $ - | $ - | $ - | $ - |
| Total OPEX | $ 77,200 | $ 52,200 | $ 417,200 | $ 131,200 | $ 495,100 | $ 1,172,900 |
| | | | | | | |
| **Inventory buys:** | | | | | | |
| Equipment | $ 49,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ - | $ 79,000 |
| Disposables | $ 160,000 | $ 52,224 | $ 52,224 | $ 52,224 | $ 20,000 | $ 336,673 |
| Cushion | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Inventory buys | $ 209,000 | $ 62,224 | $ 62,224 | $ 62,224 | $ 20,000 | $ 415,673 |
| | | | | | | |
| **CAPEX** | | | | | | |
| Capital purchases | $ - | $ - | $ - | $ - | $ - | $ - |
| Total CAPEX | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Gross Burn before Collections** | $ (286,200) | $ (114,424) | $ (479,424) | $ (193,424) | $ (515,100) | $ (1,588,573) |
| | | | | | | |
| **Collections** | $ 50,348 | $ 50,348 | $ 50,348 | $ 50,348 | $ 50,348 | $ 251,740 |
| | | | | | | |
| **Net Operational Burn (before financing)** | $ (235,852) | $ (64,076) | $ (429,076) | $ (143,076) | $ (464,752) | $ (1,336,833) |
| | | | | | | |
| **Debt Financing/Bankruptcy/Legal Activity** | | | | | | |
| Unsecured creditors settlement | $ - | $ - | $ - | $ - | $ - | $ - |
| Legal settlement | $ - | $ - | $ - | $ - | $ - | $ - |
| Refinancing costs/Commitment Fee/Legal | $ - | $ - | $ - | $ - | $ - | $ - |
| Investment bank fees (Piper Jaffray) | $ - | $ - | $ - | $ - | $ - | $ - |
| DIP legal fees | $ - | $ - | $ - | $ - | $ - | $ - |
| Debt repayments | $ - | $ - | $ - | $ - | $ - | $ - |
| Back-end Fee/Prepayment Fee/Legal Costs | $ - | $ - | $ - | $ - | $ - | $ - |
| Accrued/deferred interest | $ - | $ - | $ - | $ - | $ - | $ - |
| Debt borrowings, including DIP | $ 1,000,000 | $ - | $ - | $ - | $ - | $ 1,000,000 |
| DIP conversion | $ - | $ - | $ - | $ - | $ - | $ - |
| Net financing cash in (cash out) | $ 1,000,000 | $ - | $ - | $ - | $ - | $ 1,000,000 |
| | | | | | | |
| **Interest payments** | $ - | $ - | $ - | $ - | $ - | |
| | | | | | | |
| **Equity Funding** | | | | | | |
| Sale of preferred stock | $ - | $ - | $ - | $ - | $ - | $ - |
| DIP loan conversion | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Total Cash Use/Source** | $ 764,148 | $ (64,076) | $ (429,076) | $ (143,076) | $ (464,752) | $ (336,833) |
| | | | | | | |
| Beginning cash, including restricted cash | $ 816,128 | $ 1,580,276 | $ 1,516,200 | $ 1,087,124 | $ 944,047 | $ 816,128 |
| Less restricted cash | $ (414,244) | $ (414,244) | $ (414,244) | $ (414,244) | $ (414,244) | $ (414,244) |
| **Ending available cash** | $ 1,166,032 | $ 1,101,956 | $ 672,880 | $ 529,803 | $ 65,051 | $ 65,051 |

Exhibit 2

000056

Exhibit 2

**Detail Cash Flow**
2016 - 2018 Budget
Updated 11-29-2017

| Cash basis OPEX | 2017 Forecast - January by Week | | | | |
|---|---|---|---|---|---|
| | Wk end 1/6 | Wk end 1/13 | Wk end 1/20 | Wk end 1/27 | 4 wks end 1/27 |
| Employee expenses | $ - | $ 355,000 | $ - | $ 355,000 | $ 710,000 |
| Office and Supplies | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 35,000 |
| Travel | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 40,000 |
| Legal Fees - IP/Gen. Corp. | $ - | $ - | $ 33,000 | $ - | $ 33,000 |
| Legal Fees - Litigation | $ - | $ - | $ - | $ 25,000 | $ 25,000 |
| Legal Fees - Bankruptcy counsel | $ - | $ - | $ - | $ 75,000 | $ 75,000 |
| Professional Fees - OCC counsel | $ - | $ - | $ - | $ 25,000 | $ 25,000 |
| Professional Fees - Piper Jaffray | $ - | $ - | $ - | $ 25,000 | $ 25,000 |
| U.S. Trustee Fees | $ - | $ - | $ - | $ 10,400 | $ 10,400 |
| Outside Services | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 100,000 |
| Research & Development | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 18,000 |
| Facilities & Equip., net of depreciation | $ - | $ - | $ 20,000 | $ 81,000 | $ 101,000 |
| APM contract billings | $ - | $ - | $ - | $ (30,000) | $ (30,000) |
| Employee retention program | $ - | $ 280,000 | $ - | $ - | $ 280,000 |
| Total OPEX | $ 48,250 | $ 683,250 | $ 101,250 | $ 614,650 | $ 1,447,400 |
| | | | | | |
| **Inventory buys:** | | | | | |
| Equipment | $ 30,000 | $ 30,000 | $ 30,000 | $ 30,000 | $ 120,000 |
| Disposables | $ 38,640 | $ 38,640 | $ 38,640 | $ 38,640 | $ 154,560 |
| Cushion | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 40,000 |
| Total Inventory buys | $ 78,640 | $ 78,640 | $ 78,640 | $ 78,640 | $ 314,560 |
| | | | | | |
| **CAPEX** | | | | | |
| Capital purchases | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 25,000 |
| Total CAPEX | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 25,000 |
| | | | | | |
| **Gross Burn before Collections** | $ (133,140) | $ (768,140) | $ (186,140) | $ (699,540) | $ (1,786,960) |
| | | | | | |
| **Collections** | $ 84,769 | $ 84,769 | $ 84,769 | $ 84,769 | $ 339,078 |
| | | | | | |
| **Net Operational Burn (before financing)** | $ (48,371) | $ (683,371) | $ (101,371) | $ (614,771) | $ (1,447,882) |
| | | | | | |
| **Debt Financing/Bankruptcy/Legal Activity** | | | | | |
| Unsecured creditors settlement | $ - | $ - | $ - | $ - | $ - |
| Legal settlement | $ - | $ - | $ - | $ - | $ - |
| Refinancing costs/Commitment Fee/Legal | $ - | $ - | $ - | $ - | $ - |
| Investment bank fees (Piper Jaffray) | $ - | $ - | $ - | $ - | $ - |
| DIP legal fees | $ (50,000) | $ - | $ - | $ - | $ (50,000) |
| Debt repayments | $ - | $ - | $ - | $ - | $ - |
| Back-end Fee/Prepayment Fee/Legal Costs | $ - | $ - | $ - | $ - | $ - |
| Accrued/deferred interest | $ - | $ - | $ - | $ - | $ - |
| Debt borrowings, including DIP | $ 1,500,000 | $ - | $ - | $ - | $ 1,500,000 |
| DIP conversion | $ - | $ - | $ - | $ - | $ - |
| Net financing cash in (cash out) | $ 1,450,000 | $ - | $ - | $ - | $ 1,450,000 |
| | | | | | |
| **Interest payments** | $ - | $ - | $ - | $ - | $ - |
| | | | | | |
| **Equity Funding** | | | | | |
| Sale of preferred stock | $ - | $ - | $ - | $ - | $ - |
| DIP loan conversion | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - |
| | | | | | |
| **Total Cash Use/Source** | $ 1,401,629 | $ (683,371) | $ (101,371) | $ (614,771) | $ 2,118 |
| | | | | | |
| Beginning cash, including restricted cash | $ 479,295 | $ 1,880,925 | $ 1,197,554 | $ 1,096,184 | $ 479,295 |
| Less restricted cash | $ (414,244) | $ (414,244) | $ (414,244) | $ (414,244) | $ (414,244) |
| **Ending available cash** | $ 1,466,681 | $ 783,310 | $ 681,940 | $ 67,169 | $ 67,169 |

Exhibit 2