ERIC GOLDBERG (157544)
eric.goldberg@dlapiper.com
TROY ZANDER (167823)
troy.zander@dlapiper.com
**DLA PIPER LLP (US)**
2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER
LOS ANGELES, CA 90067-4704
TELEPHONE:  310.595.3000
FACSIMILE:  310.595.3300
COUNSEL TO OXFORD FINANCE LLC
AND SILICON VALLEY BANK

UNITED STATES BANKRUPTCY COURT

Southern District of California

| | |
|---|---|
| In re | Lead Case No.  16-05968-LT11 |
| SOTERA WIRELESS, INC., | Chapter 11 |
| Debtor. | (Joint Administration Requested) |
| SOTERA WIRELESS, INC., | **OBJECTION OF OXFORD FINANCE LLC AND SILICON VALLEY BANK TO THE DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER AUTHORIZING DIP FINANCING** |
| CASE NO. 16-05968-11 | |
| SOTERA RESEARCH, INC., | |
| CASE NO. 16-05968-11 | **HEARING** |
| | Date:    January 5, 2017<br>Time:    2:00 p.m.<br>Place:   Dept. 3, Room 129 |

Secured Creditors Oxford Finance LLC and Silicon Valley Bank (collectively, the "Lenders") file this Objection to the *Motion for Interim and Final Orders Approving Post-Petition Financing, etc.* ("DIP Motion") [D.E. 172] filed by the Debtors.  Pursuant to the DIP Motion, the Debtors now seek final approval of a $10 million DIP loan ("DIP Loan") to be provided by a group of insiders, including affiliates of shareholders Sanderling Ventures Partners and Regain Biotech Corp. ("Insiders").  There are at least three reasons why the DIP Motion should be denied.

First, the Debtors have failed to meet their evidentiary burden to show that the DIP Loan is necessary, and that its terms are reasonable. Second, the Debtors' own financials show that the amount of the DIP Loan -- $10 million – is twice what they reasonably need. Third, approval of the DIP Loan is wholly inconsistent with the Debtors' fiduciary duties, as its real purpose is to allow the Insiders to maintain control over the Debtors, and to pre-empt any chapter 11 plan that would challenge that control.

## I.
## The Debtors Have Failed To Meet Their Burden To Show That The DIP Loan Is Necessary And That Its Terms Are Reasonable

On a motion for approval of DIP financing, the Debtor has the burden of proof to establish that the financing is necessary, and that its terms are fair and reasonable. In re Acqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (requests for post-petition financing must show that the funds are 'necessary to preserve the assets of the estate'); In re Los Angeles Dodgers LLC, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). Here, the Debtors have failed to meet their burden of proof.

The only evidence offered in support of the DIP Motion is the *Declaration Of Mark Spring* ("Spring Decl.") [D.E. 172-1]. The Spring Decl., however, fails to offer any explanation of why the Debtors need $10 million, when the Debtors propose to draw down this financing, or how the proceeds will be used. Indeed, the Spring Decl. only purports to justify the Debtors' need for $1 million of interim DIP financing, all of which will have been drawn down by the time of the final hearing on the DIP Motion.

Similarly, despite the fact that the DIP Loan is to be provided by related parties, i.e., the Insiders, the Spring Decl. is utterly devoid of any explanation as to how it came to be that the Debtors ended up agreeing to a DIP loan from their controlling shareholders. Nowhere do the Debtors explain what alternatives were considered, why any such alternatives were rejected, how the terms of the DIP loan were "negotiated" with the Insiders, or whether the decision to proceed with the Insider DIP Loan was

approved by a disinterested Board committee not controlled by the Insiders.

Instead, all that appears in the Spring Decl. are vague statements like, "Also, I believe the terms of the DIP Loan are the best possible terms under the circumstances." Spring Decl., ¶5.  Given the heightened level of scrutiny applicable to situations like this, where the Debtors propose to engage in significant financial transactions with related parties,[1] this evidentiary showing is insufficient to satisfy the Debtors' burden of proof.[2]

## II.
## The Debtors Do Not Need $10 Million Of DIP Financing

The Debtors' own financials show that they do not need a $10 million DIP Loan. Attached to the DIP Motion as an exhibit (but unauthenticated by any witness) is a cash flow budget ("Budget") which purports to justify the DIP Loan. But that Budget only runs through the end of January 2017, at which point borrowings under the DIP Loan are projected to be $1.5 million. Assuming that the Debtors' 'Net Operational Burn' (as they refer to it in the Budget) continues at the historical rate of no more than $1.5 million per month, then the Debtors would need at most $5 million of financing (rather than $10 million) to carry them through the end of the first quarter of 2017, when the terms of the DIP Loan require them to have confirmed a plan.[3]

Why then, are the Debtors seeking approval of a $10 million DIP Loan? First, the Debtors may argue that they need the "extra" $5 million to fund their litigation with Masimo, but that assertion is unsupported by evidence, and contradicted by the facts. As the Court is aware, the Debtors now are proposing to address the Masimo litigation through a motion to estimate Masimo's claim under Bankruptcy Code section 502(c); this is not a $5 million process. Moreover, in the application to employ the Cooley firm that

---

[1] See, e.g., In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547 (Bankr. S.D. N.Y. 1997).
[2] While a debtor is not required to show that it sought credit from every possible source, it must demonstrate that it made a reasonable effort to seek credit from other sources. In re Ames Dept. Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).
[3] See Budget at p. 2 (January 27 DIP Loan balance of $1,500,000, plus estimated February Net Operational Burn of $1,500,000, plus estimated March Net Operational Burn of $1,500,000, totals only $4,500,000, plus a contingency of $500,000, equals $5,000,000, which is only half of the requested DIP Loan of $10,000,000.

was filed with this Court, Cooley makes it abundantly clear that it has not signed on to represent the Debtors in post-petition litigation with Masimo.[4]

Second, the Debtors may argue that they need the "extra" $5 million to fund their money-losing operations after the first quarter of 2017. Indeed, while Mr. Spring does not say so in his declaration, the DIP Motion suggests as much when it states that "Once the Final Order is entered and the Debtors are authorized to receive the balance of the DIP Loan proceeds, the Debtors will have sufficient funds to operate their business well into next year, when the Debtors expect to have secured the path for their reorganization." DIP Motion at 3.

Unfortunately, the DIP Loan will not give the Debtors until "well into next year" to "secure the path for their reorganization." This is because the terms of the DIP Loan the Debtors are asking the Court to approve require the Debtors to confirm a plan by March 20, 2017, and have it go effective by April 5, 2017. See DIP Motion at 4. If the Debtors fail to achieve either of these "Milestones," then they will be in default, the entire DIP Loan will come due, and the Insiders will be able to foreclose on their collateral. DIP Motion, Exhibit 2, at Sections 5.3, 8.1 and 8.2.

The Debtors thus should not be borrowing the "extra" $5 million to fund their operations "well into next year," because the DIP Loan they agreed to does not allow them to keep operating in chapter 11 after April 5, 2017. In sum, the Debtors have provided no coherent explanation for why they need a $10 million DIP.

**III.
The Real Purpose Of The $10 Million DIP Loan Is To Allow The Insiders To Maintain Control Over The Debtors, And To Pre-empt Any Competing Plan**

The real reason why the Debtors are seeking approval of a $10 million DIP Loan, rather than a $5 million DIP Loan, is that the Insiders want them to. The Insiders know

---

[4] See *Motion of Debtor Sotera Wireless, Inc., etc., to Employ and Retain Cooley LLP* (D.E. 167] at 5 ("Cooley has not agreed to resume its lead counsel role or appear further on behalf of Sotera Wireless with regard to the Stayed State Court Matter, and Cooley has not agreed to appear on behalf of Sotera Wireless or undertake any formal litigation counsel role with regard to the Adversary Proceeding.")

that, as an administrative priority loan, the DIP Loan must be paid in full, in cash, on the effective date of a chapter 11 plan, in order for the Debtors to emerge from bankruptcy. Accordingly, by imposing on the Debtors a DIP Loan obligation that is twice the size it should be, the Insiders are attempting to make it as difficult as possible for anybody else to propose a plan.  In other words, this is a "pre-emptive DIP."

As the Court is aware, the Lenders and the Official Creditors Committee ("Committee") disagree with the Debtors' strategy for this case.  Rather than pursue a standalone plan based on preserving the Insiders' equity interests, the Lenders and the Committee believe that the Debtors business should be sold.  In this manner, the "plan value" of the Debtors' business would be subject to a 'market test,' and each constituency would receive exactly what it is legally entitled to.

Based on Masimo's recent offer to acquire the Debtors' business and settle the litigation, at a price that would pay off all known creditors, this sale strategy is a viable option that protects the interests of all constituencies.  This would also give Insiders the opportunity to protect their interests by topping the Masimo bid, and thereby ensure that the Insiders pay fair value for any retained equity interests.

The Debtors, meanwhile (perhaps at the insistence of the Insiders that control them), insist on a "shoot the moon" strategy.  Rather than proceed with the Masimo bid, or settle the Masimo litigation now, before more value is consumed by operational losses and litigation, the Debtors want to borrow twice as much money as they need under the DIP Loan, and possibly stay in bankruptcy longer than they need, all in the hope that by doing so, they can protect equity by scoring a "knockout blow" in the Masimo litigation, something that has eluded them for several years thus far.  The problem with the Debtors'/Insiders' approach, of course, is that if it works, the Debtors and Insiders win, while if it fails, the creditors lose.  For this reason, the Lenders believe that by failing to pursue a sale, and by pursuing the Insider DIP Loan, the Debtors are disregarding their fiduciary duties.

Under these circumstances, the Lenders and the Committee intend to pursue a sale strategy. To do this, they will seek to terminate the Debtors' exclusivity, and thereafter file a joint plan that would provide for the Debtors to be sold, after a brief marketing period, to the highest bidder ("Sale Plan"). Since the Debtors have not yet filed their own plan, the Lenders and the Committee believe that the Sale Plan could proceed on the same timeline as the Debtors' anticipated plan, so as to avoid any unnecessary delay. The Sale Plan, unlike the Debtors' plan, would have the added advantage of being supported by substantially all of the creditors in these cases.

The DIP Loan, however, presents an obstacle to the Sale Plan. If approved in its current form, the DIP Loan would effectively pre-empt the Sale Plan, or any competing plan. This is so not only because of the excessive size of the DIP Loan, as discussed above, but also due to various "control" provisions included in the documentation.

Courts recognize that in connection with DIP financing, lenders often try to exact favorable terms that may have the effect of causing harm to the estate and creditors. In re Defender Drug Stores, Inc., 145 B.R. 312, 217 (9th Cir. BAP 1992); In re Tenney Village Co., Inc., 104 B.R. 562, 567-70 (Bankr. D.N.H. 1989). As the court in Defender Drug observed:

> [w]hile certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender. Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confer for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.

Defender Drug Stores, 145 B.R. at 317 (emphasis added).

The DIP Loan here exemplifies the type of financing that the Defender Drug court warned against, i.e., one that is designed to benefit the lender, rather the estate and its creditors. For example, the Insiders' proposed DIP Loan documents require not only

that the Debtors file a plan, obtain Court approval of a disclosure statement, and confirm a plan, all by specified "Milestone" dates, but also require that the terms of the plan must be acceptable to the Insiders "in their sole discretion." DIP Motion, Exhibit 2, Section 5.3. Provisions like this subvert the bankruptcy process, constitute an improper delegation of the Debtors' fiduciary duties, and should not be approved.[5]

In addition, the DIP Loan documents also would make it an event of default if the Debtors' exclusivity were to be terminated. Id., Sections 5.3, 8.1 and 8.2. Again, the purpose of these provisions is to pre-empt any competing plan. Approving the DIP Loan with these conditions would convert "the bankruptcy process from one designed to benefit all creditors, to one designed for the unwarranted benefit of the postpetition lender." In re Mid-State Raceway, Inc., 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005).[6]

The law is clear that the "debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries." In re Tenney Village Co., Inc., 104 B.R. 562, 569 (Bankr. D. N.H. 1989). Notwithstanding this obligation, the Debtors here have negotiated a DIP Loan that would require them to essentially abandon their fiduciary duties, all to the detriment of the creditors. The Court should not approve the DIP Loan to the extent it includes such improper provisions.

---

[5] See, e.g., In re Tamarack Resort, LLC, 2010 WL 4117459, *13 (Bankr. D. Idaho Oct. 19, 2010) (denying request for postpetition financing when default was likely due to short milestones, and the financing imposed time-sensitive obligations that were all subject to the approval of the lender); Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.), 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988 (rejecting post-petition financing agreement where lenders acted as "the puppeteer of a marionette-debtor").

[6] See also, In re Acqua Assocs., 123 B.R. at 195-98 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.")

**IV.**
**CONCLUSION**

For all the foregoing reasons, the Lenders respectfully request that the Court deny the DIP Motion unless (a) the maximum amount of borrowing thereunder is limited to $5 million; and (b) all "plan control" milestones and events of default contained in the DIP Loan documents, i.e., any provisions that require the Debtors to file any particular plan, or that create an event of default if any other party files a plan, are stricken.

Date:  December 19, 2016         DLA PIPER LLP (US)

By:  */s/ Eric Goldberg*
　　　TROY ZANDER
　　　AND ERIC GOLDBERG

**DLA PIPER LLP (US)**
2000 AVENUE OF THE STARS
SUITE 400 NORTH TOWER
LOS ANGELES, CA 90067-4704
TELEPHONE:  310.595.3000
FACSIMILE:  310.595.3300

COUNSEL TO OXFORD FINANCE LLC
AND SILICON VALLEY BANK