VICTOR A. VILAPLANA (CA BAR NO. 58535)
vavilaplana@foley.com
MARSHALL J. HOGAN (CA BAR NO. 286147)
mhogan@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>SOTERA WIRELESS, INC.,<br><br>DEBTOR.<br><br>———————————————<br><br>SOTERA WIRELESS, INC.,<br><br>CASE NO. 16-05968-LT11<br><br>SOTERA RESEARCH, INC.,<br><br>CASE NO. 16-05969-LT11 | LEAD CASE NO. 16-05968-LT11<br><br>CHAPTER 11<br><br>(JOINTLY ADMINISTERED)<br><br>**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE DEBTORS' THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION** |

## DISCLAIMER

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR SOTERA WIRELESS, INC. ("WIRELESS") AND SOTERA RESEARCH, INC. ("RESEARCH," TOGETHER, "SOTERA" OR "DEBTORS"), DATED MARCH 10, 2017 (AS MAY BE AMENDED, THE "PLAN") PROPOSED BY SOTERA.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN AND APPLICABLE STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID IN AND TO SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS EXHIBIT A).  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.  SOTERA DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 4:00 P.M. (PACIFIC TIME) ON APRIL 4, 2017 (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY SOTERA ON OR BEFORE THE VOTING DEADLINE.  PLEASE SEE SECTION I.C OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS.  BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY

THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF SOTERA SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR ACCEPTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

4825-8353-8240.17

# I.    INTRODUCTION

## A.    General

On September 30, 2016, (the "Petition Date"), Sotera commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court").  Sotera continues to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Sotera submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as Exhibit A.  This Disclosure Statement sets forth certain information regarding Sotera's pre-petition and post-petition operations and finances and Sotera's need to seek chapter 11 protection.  This Disclosure Statement also describes the terms and conditions of the Plan, Sotera's projections after the Effective Date of the Plan, potential alternatives to the Plan, certain effects of confirmation of the Plan and a description of the distributions proposed to be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that the holders of Claims and Interests entitled to vote must follow for their votes to be counted.

Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Plan unless the context requires otherwise.

## B.    Brief Summary of Plan[1]

The Plan provides for the reorganization of Sotera through equity financing of $30 million (including conversion of the DIP Loan Obligation) in which the Reorganized Debtor[2] will issue new common and preferred stock in accordance with the Plan and the Exit Financing Agreement.  The Reorganized Debtor will also enter into the Reorganized Term Loan, providing the Reorganized Debtor with up to $20 million in funds as a secured loan.

Pursuant to the Plan, all Allowed Claims in Classes 1 (Priority Claims), 2 (Secured Pre-Petition Loan Claim), 3 (Secured Tax Claims), and 4 (Other Secured Claims) will be paid in full (subject to some delay plus interest for holders of Secured Tax Claims).  Holders of Claims in Class 5 (Trade Claims) will be paid an amount equal to ninety percent (90%) of their Allowed Claim with the balance of ten percent (10%) due with interest at eight percent (8%), one hundred either (180) days from the Effective Date.

The treatment of certain Claims and Interests under the Plan will depend on whether the Class 6 Pool is sufficient to pay all Claims in Class 6.  Such treatment is summarized as follows.

---

[1] This summary is intended to provide only a brief overview of the Plan.  The terms of the Plan shall control over any description in this summary.

[2] On the Effective Date of the Plan, Wireless and Research will be substantively consolidated as a single entity referred to in the Plan as the "Reorganized Debtor."

As to Class 6 (Other Unsecured Claims), under a Reorganization Plan Event #1, on the Effective Date, all Allowed Claims in Class 6 will be paid in full (with interest at the federal judgment rate) from the Class 6 Pool. Under a Reorganization Plan Event #2, all Allowed Claims in Class 6 will be paid pro rata from the Class 6 Pool on the Effective Date.

As to Class 7 (Convertible Preferred Interests) (including all subclasses), under a Reorganization Plan Event #1, Interests in Class 7 will be converted to New Common Stock, New Junior Preferred Stock, or New Series A Preferred Stock in accordance with the Exit Financing Agreement.  Under a Reorganization Plan Event #2, holders of Convertible Preferred Interests will receiving nothing on account of such Interests.

Holders of Interests in Class 8 (Common Stock in Wireless) will retain their Interests in Wireless (which will be the Reorganized Debtor) under a Reorganization Plan Event #1 and will receive nothing on account of their Interests under a Reorganization Plan Event #2.

Finally, holders of certain Claims and Interests will receive nothing under the Plan. Wireless is the only holder of common stock of Research, and it will receive nothing on account of its interest in Research (Class 9). Such common stock of Research will be cancelled upon substantive consolidation of Wireless and Research.  Holders of Claims in Class 10 (Claims of Interest Holders) shall receive nothing on account of such claims. On the Effective Date or as soon thereafter as is practicable, the DIP Loan Obligation will be converted to New Series A Preferred Stock as provided in the Note Purchase Agreement (including, without limitation, warrants to be issued thereunder) and the Exit Financing Agreement.

The Plan will be funded through the Exit Financing Agreement and the Reorganization Term Loan.  The Exit Financing Agreement provides for the sale and issuance of New Series A Preferred Stock in the aggregate amount of $30 million to certain existing and new investors, including conversion of any DIP Loan Obligation held by such parties.  In addition, those holders of Convertible Preferred Interests of Wireless that purchase a specified percentage of the total number of shares of New Series A Preferred Stock sold pursuant to the Exit Financing Agreement, including the shares of New Series A Preferred Stock issued upon conversion of any DIP Loan Obligation, shall be issued two (2.0) shares of Junior Preferred Stock for each share of Common Stock and Convertible Preferred Interests it formerly held in Wireless.  The Exit Financing Agreement also provides that each DIP Lender shall receive warrants exercisable for that number of shares of New Series A Preferred Stock equal to 25% of the aggregate amount invested by such DIP Lender in the New Series A Preferred Stock, including conversion of any DIP Loan Obligation, divided by the issuance price of the New Series A Preferred Stock.  The New Series A Preferred Stock and Junior Preferred Stock shall have certain rights, preferences and privileges, including with respect to dividends, liquidation preference, conversion, anti-dilution, voting, board designation rights, information rights, registration rights and preemptive rights, as described in the Memorandum of Terms annexed to the Plan as Exhibit A.

In addition, the Exit Financing Agreement provides that concurrently with the first private equity financing of the Reorganized Debtor that is completed within five years following the Effective Date (or, if an initial public offering or certain acquisition transactions involving the Reorganized Debtor are completed prior to any such private equity financing of the Reorganized Debtor, then immediately prior to such initial public offering or acquisition transaction), (i) entities associated with Sanderling Ventures would have the right, but not the

2

obligation, to purchase $5 million of additional New Series A Preferred Stock and (ii) each holder of Convertible Preferred Interests of Wireless, other than entities associated with Foxconn, entities associated with Sanderling Ventures, and Ken Buechler, would have the right, but not the obligation, to purchase its *pro rata* share of $5 million of additional New Series A Preferred Stock. This New Series A Preferred Stock would have the same rights, preferences and privileges as the New Series A Preferred Stock issued on the Effective Date. In addition, an existing holder of Convertible Preferred Interests of Wireless, other than those excluded above, that purchases at least 2/3 of its *pro rata* share of $5 million of additional New Series A Preferred Stock pursuant to subsection (ii) above would be issued two (2.0) shares of Junior Preferred Stock for each share of Common Stock and Convertible Preferred Interests it formerly held in Wireless.

## C.    Voting Instructions and Procedures

### 1.    Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Interests that are Impaired under the Plan, each holder of an Allowed Claim or Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan). Each Ballot is designated by Class number and such designation will indicate to holders of Claim(s) and Interest(s) the Class(es) in which they are entitled to vote.

Under the Plan, all holders of Claims or Interests in Classes 5, 6, 7, and 8 (the "Voting Classes") are Impaired and entitled to vote on the Plan. Holders of Claims in Classes 1, 2, 3, and 4 (the "Non-Voting Classes") are Unimpaired under the Plan and are deemed to have accepted the Plan. Accordingly, holders of Claims in Classes 1, 2, 3, and 4 are not entitled to vote on the Plan. Holders of Interests in Class 9 and Claims in Class 10 are not receiving or retaining any property under the Plan on account of such Interests and, therefore are deemed to have rejected the Plan. Accordingly, they will not be entitled to vote on the Plan.

Only persons who hold Claims or Interests on the Record Date (defined in the Plan and summarized below) are entitled to receive a copy of this Disclosure Statement. Only persons who hold Claims or Interests in the Voting Classes on the Record Date are entitled to vote on whether to accept or reject the Plan.

Separate pre-addressed return envelopes have been supplied for the Ballots. Holders of Allowed Claims or Interests in the Voting Classes should take care to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT. In order for a Ballot to be counted, it must be completed, signed and sent to Sotera **so as to be received by the Voting Deadline (4:00 p.m. Pacific Time on April 4, 2017)** at the following address:

3

Foley & Lardner LLP
3579 Valley Centre Dr., Suite 300
San Diego, CA 92130
Attn: Vicki Goldsmith
Telephone: (858) 847-6700

If you are a holder of a Claim or Interest in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

Foley & Lardner LLP
3579 Valley Centre Dr., Suite 300
San Diego, CA 92130
Attn: Vicki Goldsmith
Telephone: (858) 847-6700

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY SOTERA PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN.  ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL BE COUNTED.  Sotera will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed and satisfied.  *See* Section VI.D.4, *infra* ("Cram Down").

## 2. Voting Record Date

The record date for voting on the Plan is the date the Bankruptcy Court enters an order approving this Disclosure Statement.

## 3. Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

## 4. Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by Sotera in its sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, Sotera may reject such Ballot as invalid and, therefore,

decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise. Sotera reserves the right to reject any and all Ballots not in proper form. Sotera further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by Sotera, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as Sotera (or the Bankruptcy Court) determines. Neither Sotera nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failing to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 5.    Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline except as may be otherwise ordered by the Bankruptcy Court. Prior to the Voting Deadline, any holder of a Claim or Interest who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to Sotera so as to be received by Vicki Goldsmith at the address specified above before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the Claim and/or Interest to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by Sotera, Attn: Vicki Goldsmith, by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the foregoing procedure. Prior to the Voting Deadline, any holder of a Claim and/or Interest who has delivered a valid Ballot may change its vote by delivering to Sotera a properly completed substitute Ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed Ballot for the same Claim(s) and/or Interests (as applicable) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted. After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

### D.    Confirmation Hearing

**The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at 9:00 a.m. Pacific time on April 13, 2017, before the Honorable Laura S. Taylor, United States Bankruptcy Judge for the Southern District of California, 325 West F Street, Courtroom 129 (Dept. 3), San Diego, CA 92101, subject to further order of the Bankruptcy Court.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

4825-8353-8240.17

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

## II.    CERTAIN EVENTS PRECEDING SOTERA'S CHAPTER 11 FILINGS

### A.    Sotera's Business

Sotera is a pioneering medical technology company founded in 2002.  Sotera has developed innovative technology for vital signs surveillance monitoring via a proprietary technology platform, which it sells to hospitals and other medical care providers.  Sotera's new generation technology platform, ViSi, which is patented and FDA 501(k)-cleared, significantly improves patient safety and satisfaction and simplifies care teams' workflows because, unlike other vital signs monitoring systems, ViSi offers continuous, wireless monitoring of vital signs as opposed to "spot check" monitoring.  Sotera's customer base and the ViSi platform can now be found in hospitals all over the world.

### B.    Summary of Prepetition Indebtedness

On September 12, 2014, Sotera entered into an amended and restated loan and security agreement (the "Pre-Petition Loan Agreement") with Silicon Valley Bank and Oxford Finance LLC (collectively, the "Pre-Petition Lenders") and borrowed $20 million in exchange for a security interest in certain collateral (the "Pre-Petition Liens").  The collateral securing the Pre-Petition Liens is summarized as follows[3]: substantially all of Sotera's assets except the collateral does not include any of Sotera's intellectual property (and the Pre-Petition Lenders contend that their collateral does include all accounts and proceeds of the intellectual property).  As of the Petition Date, the principal amount outstanding under the Prepetition Loan Agreement was just under $13.1 million.

### C.    Events Leading to Chapter 11 Filing

Commercializing products in the medical device industry requires significant resources.  Before a device can even be submitted for the rigorous process of regulatory review and approval, a medical device company must undergo a number of time-consuming, expensive, and financially risky activities, including accurately identifying unmet clinical/medical needs, designing and manufacturing an accurate and dependable device, developing system and embedded software to support the function of the device, and conducting clinical studies to demonstrate the device's performance. Once a company's medical device is approved, commercializing the device requires significant resources invested in each stage of bringing the device to market, including marketing, manufacturing, customer support and training, and continued product development and support.

---

[3] The precise description of the collateral is set forth on Exhibit A to the Prepetition Loan Agreement, which is filed on the docket at Dkt. No. 103-1 at 44.

6

Sotera began fully commercializing the ViSi in the second half of 2014 after a period in 2013 and early 2014 of installing ViSi in several hospitals as development sites. As with many hi-tech medical devices, the ViSi experienced technical and performance issues that required Sotera to redirect resources and resulted in delays of new product features and enhancements and ultimately in the reduction of revenue. In spite of these delays, as of August 31, 2016, 45 hospitals (40 in the United States) had adopted the ViSi platform.

During early 2015 Sotera's Board of Directors formed a Strategy Committee to identify sources to refinance the Pre-Petition Loans and to work with Sotera's management to secure sufficient funding for Sotera's commercial expansion. During 2015 and early 2016 a total of $13.6 million of additional equity capital was raised, but this amount was not sufficient for either Sotera's long-term needs or to obtain refinancing of the Pre-Petition Loans. Under the terms of the Pre-Petition Loan Agreement, beginning in November 2015, Sotera began to make required monthly principal repayments of approximately $630,000 per month. The required repayments of the Prepetition Loans further accelerated the cash consumption of Sotera.

Concurrently in 2015 and early 2016, Sotera began to incur significant legal costs associated with a civil lawsuit filed in state court in which its competitor Masimo alleged that Sotera, one current employee, and one former employee misappropriated trade secrets. In September 2016 Sotera determined it could no longer afford to pay the monthly principal repayments, fund the Masimo litigation, and continue operations, and so on September 30, 2016, it filed for protection under chapter 11 of the Bankruptcy Code.

### III.    EVENTS DURING THE CHAPTER 11 CASE

No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. On September 30, 2016, the Bankruptcy Court entered an order providing that the cases filed by Wireless and Research would be jointly administered. Dkt. No. 5.

The following is a brief description of some of the major events during the Chapter 11 Case:

### A.    First Day Orders

To minimize disruption of its business, immediately upon filing the petitions, Sotera sought various forms of relief from this Bankruptcy Court through "first day" motions. These orders made it possible for Sotera's business to continue in the ordinary manner without significant disruption. The Bankruptcy Court issued first day orders preventing utility companies from terminating service [Dkt. No. 35] and authorizing Sotera to do the following: continue to honor its warranty program (including honoring prepetition obligations) [Dkt. No. 36]; maintain its insurance policies [Dkt. No. 37]; pay certain pre-petition taxes [Dkt. No. 38]; to continue to pay employee wages, salaries, and benefits [Dkt. Nos. 66, 250]; to continue to pay the salaries (in one case, the voluntary reduced salary) of its insiders [Dkt. Nos. 126, 345]; and to use cash collateral pursuant to section 363 of the Bankruptcy Code [Dkt. Nos. 53, 134] (collectively, the "Cash Collateral Order").

7

4825-8353-8240.17

1.      **The Use of Cash Collateral**

In connection with the Cash Collateral Order, the Prepetition Lenders consented to Sotera's use of cash collateral securing the Pre-Petition Liens on a temporary basis in exchange for, among other things, (i) replacement liens in the prepetition collateral and (ii) a valid, first priority additional lien on Sotera's intellectual property, but only in an amount equal to the total diminution in the value of cash collateral following the petition date. Sotera's authorization to use the Prepetition Lenders' cash collateral expired on November 29, 2016 at 5:00 p.m. Sotera did not seek to extend its authorization beyond this date but instead, as discussed below, sought and obtained Bankruptcy Court approval of the DIP Loan.

**B.      Appointment of the Committee**

On October 20, 2016, the Office of the United States Trustee appointed the Committee. Dkt. No. 95. The current membership of the Committee and its professional advisors are as follows:

**Committee Members**

| | |
|---|---|
| ZhongHuan Hi-Tech Corp. | Custom Converting, Inc. |
| 2901 Tasman Dr., Suite 107 | 2625 Temple Heights Dr., Suite C |
| Santa Clara, CA 92054 | Oceanside, CA 92056 |

Nortech Systems, Inc. NW
7550 Meridian Circle N. #150
Maple Grove, MN 55369

**Committee Counsel**

Sullivan Hill Lewin Rez & Engel
Christopher V. Hawkins
550 West C Street, 15th Floor
San Diego, CA 92101

**C.      Masimo Litigation**

On May 10, 2013, Masimo filed an action in the Superior Court of the State of California, County of Orange (Case No. 30-2013-00649172-CU-IP-CJC) against Wireless, a current employee, and a former employee based on allegations that the individual defendants misappropriated trade secrets of Masimo and shared them with Sotera to Sotera's benefit. On December 10, 2013, Masimo filed an amended complaint. Dkt. No. 86-3.

Masimo's amended complaint in the state court litigation alleges, *inter alia*, that Sotera misappropriated Masimo's trade secrets (i) by acquiring them from sources that had obtained them from wrongful means; (ii) by disclosing them to Sotera employees to solicit customers; and (iii) by using them to improperly solicit customers. *See* Dkt. No. 86-3 ¶¶ 26-27, 43-45. As of the Petition Date, all activity in the state court as to Sotera has been stayed pursuant to the automatic stay in section 362 of the Bankruptcy Code.

On October 16, 2016, Masimo filed a motion for relief from the automatic stay to continue the state court litigation against Wireless, which request was denied and the stay remains in effect as to Sotera.  Dkt. No. 84.  On January 3, 2017, Sotera filed a motion to estimate the claims of Masimo for purposes of allowance and distribution pursuant to section 502 of the Bankruptcy Code.  Dkt. No. 271.  On January 12, 2017, the Bankruptcy Court directed Masimo and Wireless to continue conducting discovery on Masimo's claims and provided that all such discovery could be used in any proceeding in any court, subject to evidentiary objections.  Dkt. No. 318; *see also* Dkt. No. 332. On February 6, 2017, after Masimo filed its proof of claim (as discussed below) Sotera filed an objection to Masimo's claim.  Dkt. No. 403.

On October 7, 2016, Masimo filed a complaint in the Bankruptcy Court and commenced an adversary proceeding against Wireless.  *See* Dkt. No. 44 (*see also* Adv. Proc. 16-90154-LT). Masimo alleged that Wireless misappropriated its technical trade secrets by using them in its ViSi Mobile product. Dkt. No. 44 ¶ 44, 59.  Masimo contends that this use-based allegation was within the scope of its state court complaint.  Wireless disputes this point.  On December 21, 2016, Masimo purportedly voluntarily dismissed its adversary proceeding against Wireless.  *See* Dkt. No. 16 in Adv. Proc. 16-90154-LT.

On January 11, 2017, the Bankruptcy Court approved Wireless' retention of Cooley LLP as special litigation and corporate counsel.  Dkt. No. 311.  Cooley represented Wireless prior to the Petition Date in the state court litigation against Masimo and was retained for the purpose, in part, to continue to represent Wireless in litigation matters against Masimo, including Sotera's objection to Masimo's claim.  A claims allowance trial is currently set in the Bankruptcy Court for April 3 to 12, 2017.

D.      **DIP Financing Order**

On November 29, 2016, Sotera filed a motion for interim and final orders approving post-petition financing pursuant to section 364(c) of the Bankruptcy Code.  Dkt. No. 172.  Sotera sought DIP financing in exchange for granting the DIP Lenders security interests in and liens on all assets of Sotera subordinate only to pre-existing, unavoidable security interests in the collateral prior to the date of the Note Purchase Agreement.  Amounts borrowed under the DIP Loan were also accorded superpriority administrative expense treatment subject to the superpriority status afforded the Pre-Petition Lenders under the Cash Collateral Order.  The DIP Loan was approved on an interim basis on December 6, 2016 [Dkt. No. 196] (approving borrowing up to $1.25 million) and on a final basis on January 11, 2017 [Dkt. No. 301] (approving borrowing of up to $5 million total).  At a continued hearing on February 2, 2017, the Bankruptcy Court approved borrowing pursuant to the DIP Loan of up to $10 million total.

E.      **Claims Bar Date, the Masimo Claim, and Claim Asserted by Insider**

On October 25, 2016, Sotera filed its schedules and statement of financial affairs, identifying the assets and liabilities of the estates.  Dkt. No. 107.  On November 21, 2016, the Bankruptcy Court entered an order setting the general claims bar date for December 30, 2016 (the "General Bar Date") and the governmental claims bar date for March 29, 2017.  Dkt. No. 155.

On December 16, 2016, Masimo requested an extension of the General Bar Date solely as to its claim.  Dkt. No. 237.  The Bankruptcy Court extended the General Bar Date as to Masimo

9

conditioned upon Masimo filing on the General Bar Date an informal proof of claim specifying a claim amount and a setting out a detailed outline of the bases for each category of damages. Dkt. No. 245. Masimo filed its informal proof of claim on December 30, 2016. Dkt. No. 266. The Bankruptcy Court ultimately extended the claims bar date as to Masimo's claim to, effectively, January 18, 2017. Dkt. No. 290. On January 18, 2017 Masimo filed a proof of claim in the amount of $15,500,000 based on its allegations of trade secret misappropriation.

On December 29, 2016, Timothy Wollaeger, Director of Sotera Wireless, filed a proof of claim against Sotera in the amount of $1.00 for "Indemnity of Director."

## F.   Retention of Piper & Jaffray Co. and Its Marketing Efforts

Piper Jaffray & Co. ("Piper Jaffray") was engaged on a sale process for the company in April, 2016. As part of the process, Piper Jaffray reached out to over 65 companies in the medical technology, healthcare IT, technology and wearable technology industries in addition to select large healthcare consolidators. While these efforts resulted in two offers, these offers were at valuation levels not acceptable to the board.

Following the filing for bankruptcy, Piper Jaffray reached out to a shortlist of parties with the most likely strategic fit with Sotera to gauge interest in participating in a 363 sale process. None of the parties expressed an interest in a stalking horse bid particularly in light of the ongoing Masimo litigation. Piper Jaffray's retention was approved by the Bankruptcy Court on December 21, 2016 *nunc pro tunc* to October 26, 2016. Dkt. No. 249.

Once Masimo filed its adversary proceeding against Sotera on October 7, 2016, and after Piper Jaffray had been retained, Piper Jaffray launched a broad outreach to over 30 potential buyers to further test interest in a 363 sale process. Two parties expressed an interest in learning more about the process. As of this date, Piper Jaffray has had calls with both parties, however, neither has expressed an interest to engage in a potential acquisition.

## IV.   SUMMARY OF THE PLAN

### A.   Introduction

Set forth in this Article is a description of the basic terms of the Plan. This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as Exhibit A.

### B.   Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim. Sotera believes that the Plan complies with this standard. The Plan divides Claims against and Interests in Sotera into the following Classes:

10

4825-8353-8240.17

**Class 1 (Priority Claims)** shall consist of all Priority Claims.

**Class 2 (Secured Pre-Petition Loan Claim)** shall consist of the claims of the Pre-Petition Lenders under the Pre-Petition Loan Agreement, which are fully Secured.

**Class 3 (Secured Tax Claims)** shall consist of all Secured Tax Claims.

**Class 4 (Other Secured Claims)** shall consist of all other Secured Claims.

**Class 5 (Trade and Service Provider Unsecured Claims (the "Trade Claims"))** shall consist of all unsecured Claims for goods and services provided to Sotera prepetition in the ordinary course of business designated as a Class 5 Claim on Schedule "A" to this Disclosure Statement, the holder of which agrees to provide such goods or services on substantially the same terms and conditions.

**Class 6 (Other Unsecured Claims)** shall consist of all unsecured Claims against Sotera that are not Administrative Claims, Priority Claims, Priority Tax Claims, and Trade Claims, and including, without limitation, the Masimo Claim.  Claims in Class 6 are all unsecured Claims that do not qualify as Trade Claims under the above definition or are unliquidated, disputed, or contingent.

**Class 7 (Convertible Preferred)** shall consist of the following subclasses of Convertible Preferred Stock, Series A, B, C, D, D-1, and E.

a.      Subclass 7A shall consist of the holders on the Record Date Series A Convertible Preferred Stock issued by Wireless during 2005, 2006 and 2007.

b.      Subclass 7B shall consist of the holders on the Record Date of Series B Convertible Preferred Stock issued by Wireless during 2008, 2009 and 2010.

c.      Subclass 7C shall consist of the holders on the Record Date of Series C Convertible Preferred Stock issued by Wireless on March 29, 2010.

d.      Subclass 7D shall consist of the holders on the Record Date of Series D Convertible Preferred Stock issued by Wireless during 2011 and 2012.

e.      Subclass 7D-1 shall consist of the holders on the Record Date of Series D-1 Convertible Preferred Stock issued by Wireless during 2013.

f.      Subclass 7E shall consist of the holders on the Record Date of Series E Convertible Preferred Stock issued by Wireless during 2014 and 2016.

**Class 8 (Common Stock in Wireless)** shall consist of all the common stock of Wireless issued and outstanding.

**Class 9 (Common Stock in Research)** shall consist of all of the common stock of Research issued and outstanding.

**Class 10 (Claims of Interest holders)** shall consist of all Claims arising from rescission of a purchase or sale of a security of Wireless or of an affiliate of Wireless, for damages arising

11

from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a Claim.

For a description of the treatment of the Claims and Interests under the Plan, see Article V of the Plan, "Treatment of Claims and Interests."

A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is a Claim or Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

### C. Treatment of Claims and Interests and Summary of Distributions under the Plan

The Confirmation Order shall provide for the vesting of Sotera's assets in the Reorganized Debtor. Pursuant to the terms of the Plan, the Reorganized Debtor, either itself or through a Disbursing Agent, will, among other things, calculate and pay all distributions required or permitted under the Plan.

#### 1. Administrative Claims

##### a. Allowed Administrative Expense Claims

Subject to the provisions contained in Section 2.2 of the Plan, unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Administrative Expense Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and (c) the date the Reorganized Debtor is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto. Ordinary Course Administrative Expense Claims shall be paid when such Claims are due and payable in the ordinary course of Sotera's business without the need for further Bankruptcy Court approval.

##### b. Requests for Allowance of Administrative Expense Claims

Except as expressly set forth to the contrary in the Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following Subsections:

(1) **Professionals**. All Professionals shall file a final application for the allowance of a Fee Claim on or before forty (40) days following the Effective Date. Objections to any Fee Claim must be filed and served on the Reorganized Debtor, counsel for the Committee, the UST and the requesting Professional no later than twenty (20) days after

12

the filing of the applicable application for allowance of the Fee Claim, provided, however, that with respect to Piper Jaffray fees and expenses, the procedures described herein are subject to the provisions in the order authorizing the employment of Piper Jaffray.  As of January 24, 2017, the Professionals include Foley & Lardner LLP (bankruptcy counsel to Sotera), Cooley LLP (corporate and litigation counsel to Sotera Wireless), Piper Jaffray (investment banker for Sotera), and Sullivan Hill Lewin Rez & Engel (counsel to Committee).

(2)    **Other Administrative Expense Claimants**.  All holders of Administrative Expense Claims other than Professionals and holders of Ordinary Course Administrative Expense Claims shall file a request for payment of an Administrative Expense Claim with the Bankruptcy Court on or before forty (40) days following the Effective Date. Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request for payment by such deadline shall be forever barred from asserting such Claims against Sotera, the Reorganized Debtor or their respective property.

## 2.    Allowed Priority Tax Claims

Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Priority Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall be paid a value, as of the Effective Date, equal to the unpaid portion of such Allowed Priority Tax Claim in quarterly cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.  As of January 24, 2017, Priority Tax Claims in the amount of approximately $21,000 have been filed on the claims register in the Chapter 11 Case.

### a.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 2.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code.  Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to treatment in Class 6 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

## 3.    Summary of Classification and Treatment of Holders of Allowed Claims and Interests that are Placed in Classes

The following table sets forth a brief summary of the classification and treatment of Claims and Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan.  The information set forth in the tables is for convenience of reference only.  Each holder of a Claim or Interest should refer to Article V of the Plan, "Treatment of Classes of Claims and Interests," for a full understanding of the classification and treatment of Claims and Interests provided under the Plan.  The estimates set forth in the table below are based on the stated amount of such Claims and Interests on proofs off claims filed in the Chapter 11 Case and as reflected in the Schedules. Sotera continues to analyze and

13

investigate all Claims asserted against it and reserves all rights to object to any Claim, including the amount of any Claim. As a result, the estimates below may differ from actual distributions due to, among other things, variations in the amount of Allowed Claims, the existence and resolution of Disputed Claims and certain risk factors potentially impacting recoveries under the Plan, including those described in Section VII below. Unless otherwise noted, these estimates are as of January 24, 2017. The estimated percentage recoveries below are further detailed in the Liquidation Analysis attached hereto as Exhibit D.

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
| --- | --- |
| **Class 1 (Priority Claims)**: Consists of all Priority Claims.<br><br>Estimated Aggregate Claims Amount: $122,793.44 | Unimpaired. Unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Priority Claim, the Reorganized Debtor subject to payment to Classes 2 and 3, shall pay to each holder of an Allowed Priority Claim an amount equal to its Allowed Priority Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Priority Claim becomes an Allowed Priority Claim by the entry of a Final Order, and (c) the date the Reorganized Debtor is otherwise obligated to pay such Allowed Priority Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of this Plan and any orders of the Bankruptcy Court relating thereto.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2 (Secured Pre-Petition Loan Claim)**: Consists of the Secured Pre-Petition Loan Claim.<br><br>Estimated Aggregate Claims Amount: $15,540,155.09 as of March 1, 2017 (inclusive of any attorneys' fees owed) | Unimpaired. On the Effective Date or as soon thereafter as is practicable, the allowed Pre-Petition Loan Claim shall be treated as fully Secured without regard to § 506(a)(1) of the Bankruptcy Code and paid in full in cash. Sotera believes the Pre-Petition Loan Claim is Secured in full subject to the Committee's right to challenge any security interest of the Pre-Petition Lenders.<br><br>Estimated Percentage Recovery: 100% |
| **Class 3 (Secured Tax Claims)** Consists of all Secured Tax Claims.<br><br>Estimated Aggregate Claims Amount: $0 | Unimpaired. Pursuant to § 1129(a)(9)(D) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Secured Tax Claim and the Reorganized Debtor, each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim and shall be paid a value as of the Effective Date equal to the unpaid portion of such Allowed Secured Tax Claim in quarterly Cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.<br><br>Estimated Percentage Recovery: 100% |

14

| | |
|---|---|
| **Class 4 (Other Secured Claims)**:  Consists of all Other Secured Claims.<br><br>Estimated Aggregate Claims Amount:  $89,162.90 | Unimpaired. On the Effective Date, unless otherwise agreed in writing by a Claimant and the Reorganized Debtor, each holder of an Allowed Other Secured Claim will be paid as of the Effective Date, an amount equal to the amount of such allowed Other Secured Claims.<br><br>Estimated Percentage Recovery:  100% |
| **Class 5 (Trade and Services Provider Claims)**: Consists of all Trade and Services Provider Claims.<br><br>Estimated Aggregate Claims Amount:  $2,565,364.49 | Impaired. Holders of an allowed Class 5 Claim shall receive on the Effective Date or as soon thereafter as practicable an amount equal to ninety percent (90 %) of their Allowed Claim with the balance of ten percent (10%) due with interest at eight percent (8%), one hundred eighty (180) days from the Effective Date.<br><br>Estimated Percentage Recovery:  100% |
| **Class 6 (Other Unsecured Claims)**:  Consists of all Other Unsecured Claims.<br><br>Estimated Aggregate Claims Amount:  $19,583,707.97 | Impaired.  Allowed Other Unsecured Claims shall be paid as follows:<br><br>a.      In the event of a Reorganization Plan Event #1. On the Effective Date or as soon thereafter as practicable, each holder of an allowed Class 6 Claim shall be paid in full from the Class 6 Pool as of the Effective Date an amount equal to the amount of its Allowed Claim with interest at a rate equal to the federal judgment rate in effect as of the Petition Date from the Petition Date through the Effective Date.  Unexpended amounts in the Class 6 Pool, after reconciliation of all Class 6 Claims, will be paid to the Reorganized Debtor.<br><br>Estimated Percentage Recovery:  100%<br><br>b.      In the Event of a Reorganization Plan Event #2.  On the Effective Date or as soon thereafter as practicable, each holder of an allowed Class 6 Claim shall receive a pro rata share of the Class 6 Pool.<br><br>Estimated Percentage Recovery:  17-99% |
| **Class 7 (Convertible Preferred Interests)**: Consists of all Convertible Preferred Interests. | Impaired.<br>a.      In the event of a Reorganization Plan Event #1. Each holder of an allowed Class 7 Interest shall receive on account of and in exchange for their Interest property as specified in the Exit Financing Agreement.<br><br>b.      In the Event of a Reorganization Plan Event #2. Holders of Class 7 Interests shall receive nothing on account of and in exchange for such Interests. |

15

| Class 8 (Common Stock in Wireless): Consists of all common stock in Wireless. | Impaired.<br><br>a.    In the event of a Reorganization Plan Event #1. Holders of Common Stock in Wireless shall retain their Interests in Wireless which shall be the Reorganized Debtor upon substantive consolidation with Research as described below.<br><br>b.    In the Event of a Reorganization Plan Event #2. Holders of Class 8 Interests shall receive nothing on account of such Interests. |
| --- | --- |
| Class 9 (Common Stock in Research): Consists of all common stock in Research. | Holders of Common Stock in Research shall receive nothing on account of such Interest. |
| Class 10 (Claims of Interest holders): Consists of all Claims of Interest holders. | Holders of Claims arising out of or which otherwise relate to an Interest in Classes 7 (including all subclasses), 8, and 9 shall receive nothing on account of such Claims. |

### 4.    Reservation of Claim Objections

Unless any objection to a Claim is expressly waived, relinquished, released, compromised or settled in this Plan or a Final Order, Sotera and the Reorganized Debtor specifically reserve all such objections, including without limitation objections to the amount or validity of any Claim, and, specifically including without limitation objections to the Claims asserted by Zoll Medical Corporation ("Zoll") (to the extent the currently proposed settlement of such Claim is not approved by this Court), Masimo, James Welch, and Tim Wollaeger. As discussed above, Sotera has not yet completed its analysis into and investigation of the Claims and objections thereto.  Accordingly, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any objection to any Claim upon, after or as a consequence of the confirmation, the Effective Date or consummation of this Plan.

### D.    Distribution Provisions

#### 1.    Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Disbursing Agent pursuant to the terms and conditions contained in the Plan; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under § 502(d) of the Bankruptcy Code.

#### 2.    Distributions of Cash

All distributions of Cash to be made by the Disbursing Agent pursuant to the Plan shall be made by a check or wire transfer from the Disbursing Agent's account maintained in accordance with the Plan.

4825-8353-8240.17

### 3.    Effective Date Payments

As soon as is practicable after the Effective Date, the Disbursing Agent shall make the initial distributions (the "Initial Distribution Date") to those entitled to distribution in accordance with the terms and provisions of the Plan.

### 4.    Distributions on a Subsequent Distribution Date

Pursuant to the terms of provisions of the Plan, the Disbursing Agent shall, on a subsequent date in accordance with the terms and provisions of the Plan (a "Subsequent Distribution Date") upon which the Disbursing Agent shall distribute such Cash or other assets to the holders of Claims or Interests entitled to distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims or Interests.

### 5.    Distributions on the Final Distribution Date

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall establish a final distribution date (the "Final Distribution Date") upon which the Disbursing Agent shall distribute such Cash or other assets to the holders of Claims or Interests entitled to distributions under the Plan that were not Allowed on the Effective Date but have become Allowed Claims or Interests on or before the Final Distribution Date in accordance with the treatment of established by the Plan.

### 6.    Delivery of Distributions and Undeliverable Distributions

Distributions to the holder of an Allowed Claim or Interest shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing within six months of the distribution date of such holder's then current address, at which time all distributions shall be made to such holder, without interest. All claims for undeliverable distributions shall be made within six months after the date such undeliverable distribution was initially made. If any claim for an undeliverable distribution is not timely made as provided herein, such claim shall be forever barred with prejudice. After such date, (a) all unclaimed property shall be applied first to satisfy the costs of administering and fully consummating this Plan, then shall be transferred to the Reorganized Debtor and available to be used for general corporate purposes, including working capital, and (b) the holder of any such Claim or Interest shall not be entitled to any other or further distribution under this Plan on account of such undeliverable distribution or such Claim or Interest.

### 7.    Time Bar to Cash Payments and Disallowances

Checks issued by the Disbursing Agent in respect of Allowed Clams shall be void if not negotiated within six months after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of six months following the date of issuance of such check. After such date, (a) all funds held on account of such void check shall

4825-8353-8240.17

be applied first to satisfy the costs of administering and fully consummating this Plan, then will be available to the Reorganized Debtor to be used for general corporate purposes, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further distribution on account of such Claim.

### 8.    Minimum Distributions

If a distribution to be made to a holder of an Allowed Claim on any Distribution Date, including the Final Distribution Date, would be $10.00 or less, notwithstanding any contrary provision of this Plan, no distribution will be made to such Claimant.

### 9.    Transactions on Business Days

If the Effective Date or any other date on which a transaction, event or act may occur or arise under this Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by this Plan to occur on such day shall instead occur on the next day which is a Business Day.

### 10.    Distributions after Allowance

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed or estimated for distribution purposes, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

### 11.    Disputed Payments

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Disbursing Agent may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 12.    No Distributions in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

### E.    Means for Execution of the Plan

### 1.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor

As of the Effective Date, the Reorganized Debtor shall continue to exist as a corporate entity in accordance with applicable law pursuant to its Amended Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date and amended as necessary to reflect the substantive consolidation of Wireless and Research.  Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estate, including all claims, rights and Causes of Action, shall vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, other

18

encumbrances, and Interests. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of Property and compromise or settle any Claims without supervision of or approval of the Bankruptcy Court free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

### 2.    Corporate Action

Each of the matters provided for under this Plan involving the corporate structure of Sotera or corporate action to be taken by or required of Sotera, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of Sotera or the Reorganized Debtor.

### 3.    Certificate of Incorporation and Bylaws

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtor shall file with the Secretary of State of the State of California, in accordance with the California Corporation Code, the Amended Certificate of Incorporation and Bylaws. The Amended Certificate of Incorporation and Bylaws shall become the Amended Certificate of Incorporation and Bylaws of the Reorganized Debtor. The Amended Certificate of Incorporation and Bylaws for the Reorganized Debtor shall be included in the Plan Supplement.

### 4.    Substantive Consolidation of Wireless and Research

Under the Plan, Wireless and Research shall be substantively consolidated for all purposes. The Debtors are of the opinion that such consolidation is appropriate for a number of reasons. First, Wireless owns 100% (one hundred percent) of Research. Second, Wireless and Research have always maintained consolidated financial statements. Research has never had its own bank account and opened one in this Chapter 11 Case to comply with the US Trustee's directive. The space occupied by Research is pursuant to a lease executed by Wireless. Research has only four creditors, the Pre-Petition Lenders, which are dealt with under the Plan, Wireless, which inter-company debt will be extinguished under the Plan, Reflectance, which has not filed a proof of claim and therefore any claim is barred, and Zoll, who filed the same claim against Research and Wireless, the settlement of which is pending to be heard on March 17, 2017. In addition, Research is selling substantially all of its assets to Zoll pursuant a motion to be heard on March 17, 2017. All of the assets being sold are collateral or claimed collateral of the Pre-Petition Lenders and all of the net proceeds from the sale will either be paid to the Pre-Petition Lenders or held by the Pre-Petition Lenders until any issue regarding the secured status of the Pre-Petition Loan Claim is resolved with the Committee. Under these circumstances, substantive consolidation is amply justified.

The result of such substantive consolidation is that the creditors of Research shall be treated as creditors of Wireless under the Plan, the Interests in Research shall be cancelled, the inter-company debt owed by Wireless to Research will be cancelled, and Research shall be

19

wound up and dissolved as soon as practicable after the Effective Date.  The Plan shall serve as, and shall be deemed to be, a motion for substantive consolidated to be approved by the Confirmation Order.

**5.      Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and upon payment as provided in this Plan, all mortgages, deeds of trust, Liens or other security interests against the property of the Estate vesting in the Reorganized Debtor will be fully released and discharged.  The Reorganized Debtor shall be authorized to file or record on behalf of creditors such Uniform Commercial Code termination statements, real property releases or reconveyances, or other documents or instruments as may be necessary to implement the provisions of Section 6.5 of the Plan.

**6.      Investors' Fees and Expenses.**

At or immediately after the Closing of the exit financing under the Exit Financing Agreement, Sotera shall pay the reasonable fees and expenses (including attorneys' fees) incurred by Sanderling  Venture Partners VI, L.P. ("Sanderling") (or its affiliate) and Regain Biotech Corp. ("Regain") (or its affiliate) in connection with the negotiation and documentation of the Plan and any other documents contemplated herein, and related activities (including, without limitation, appearances before the Bankruptcy Court).  Sanderling and Regain have represented and constitute the majority of the investments pursuant to the Exit Financing Agreement.  Their fees will be paid from the proceeds of the Exit Financing Agreement and are not subject to Court approval.  The Debtors have not obtained an estimate of such fees.

**7.      Cancellation of Interests and Authorization and Issuance of New Stock**

**a.**      As set forth in the Exit Financing Agreement, as of the Effective Date, the Old Preferred Stock shall be, (i) under a Reorganization Plan Event #1, converted to New Common Stock and New Junior Preferred Stock and New Series A Preferred Stock shall be issued as provided under the Exit Financing Agreement, or (ii) under a Reorganization Plan Event #2, cancelled.

**b.**      On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New Common Stock to be distributed pursuant to the Plan without any further act or action by any other party under applicable law, regulation, order or rule.  The issuance of the New Common Stock and the distribution thereof under the Plan shall be exempt from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws.  All documents, agreements and instruments entered into, on or as of the Effective Date contemplated by or in furtherance of the Plan, including the Exit Financing Agreement and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

4825-8353-8240.17

c.    All of the shares of New Common Stock, the New Junior Preferred Stock and the New Series A Preferred Stock issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

**8.    The Exit Financing Agreement**

On the Effective Date and simultaneously with the vesting of Sotera's assets in the Reorganized Debtor, the Reorganized Debtor shall enter into the Exit Financing Agreement with the Investors.  As of the date of this Disclosure Statement, Sotera has secured $30 million (inclusive of the conversion of the DIP Loan Obligation) in committed financing to be provided pursuant to the Exit Financing Agreement.

**9.    The Reorganization Term Loan**

a.    On the Effective Date, the Reorganized Debtor shall enter into the Reorganization Term Loan, in the amount of up to $20,000,000:

b.    The Reorganization Term Loan shall mature no earlier than 24 months from the Effective Date.

c.    The Reorganization Term Loan shall be secured by a first-priority Lien on substantially all of the tangible, real and personal, assets of Reorganized Debtor, except its intellectual property.

**10.    Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor**

a.    **Board of Directors**.    As of the Effective Date, the Board of Directors shall be the governing body of the Reorganized Debtor for one year or such later time when a shareholders' meeting is scheduled pursuant to the Organizational Documents or applicable non-bankruptcy law, whichever is longer, and shall assume the governance of the Reorganized Debtor including, but not limited to, determining who shall serve as the Reorganized Debtor's Officers, supervisors, managers and executive employees.

b.    **Identity of Board of Directors**.    On the Effective Date, the term of the current members of the board of directors of Sotera, if any, will expire.  The identity of the initial members of the Board of Directors shall be included in the Plan Supplement.

c.    **Other Provisions**.    Other provisions governing the service, term and continuance in office of the members of the Board of Directors shall be designated pursuant to the Exit Financing Agreement and set forth in the Organizational Documents of the Reorganized Debtor.

**11.    Disbursing Agent**

On the Effective Date, the Reorganized Debtor shall have the authority to serve as, or appoint, the Disbursing Agent to carry out the duties set forth in this Plan.  The Reorganized Debtor shall have the authority to replace the Disbursing Agent at any time, with or without cause, subject to the terms of any agreement between the Reorganized Debtor and the Disbursing

Agent.  The Reorganized Debtor shall file any agreement with the Disbursing Agent with the Bankruptcy Court and serve such agreement on the United States Trustee, the Committee, and Masimo.

### 12.    Closing of Case

If, after the Effective Date, the Chapter 11 Case is closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of this Plan, (b) shall not affect any rights of Sotera, the holders of Claims or Interests or the treatment of any other Person under this Plan, (c) shall continue to cause the terms of this Plan to remain binding on all Persons, (d) shall cause all orders of the Bankruptcy Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article XII of the Plan.

### 13.    Effectuating Documents; Further Transactions

The chief executive officer, the chief financial officer, chairman of Sotera's board of directors or any other executive officer of Sotera shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The secretary or assistant secretary of Sotera shall be authorized to certify or attest to any of the foregoing actions.

### 14.    Withholding and Reporting Requirements

In connection with this Plan, the Reorganized Debtor shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) continue to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to this Plan.

### 15.    Quarterly Reports and United States Trustee's Fees

Sotera's obligation of filing monthly financial reports with the United States Trustee shall pass to and become the obligation of the Reorganized Debtor and such obligation shall continue following the Confirmation Date until the obligation to pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) which obligation shall end upon entry of Order Closing the case which shall be entered as soon as practicable after the Confirmation Order is entered and the Reorganization Plan Event occurs.

### 16.    Preservation of Causes of Action

a.    **Vesting of Causes of Action.**  In accordance with § 1123(b) of the Bankruptcy Code, except as otherwise provided in this Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all claims and Causes of Action held by Sotera and/or the Estate, whether arising before or after the Petition Date.  All such claims and Causes of Action, along with all rights, interests and defenses related thereto, shall vest with the Reorganized Debtor.

22

**b.      Reservation of Causes of Action.**  Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, and except as to Pre-Petition Lenders, Sotera and the Reorganized Debtor specifically reserve all Causes of Action, specifically including Avoidance Actions, for later adjudication.  Therefore, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the Causes of Action upon, after or as a consequence of the confirmation, the Effective Date or consummation of this Plan.

Sotera has until August 31, 2018 to file any action to avoid transfers under various provisions of the Bankruptcy Code.  Key such provisions are dealing with preferential transfers made during the ninety (90) days before Petition Date, with preferential transfers to insiders made during the one (1) year before the Petition Date, and transfers which are fraudulent, actually or constructively.

In its Statement of Financial Affairs ("SOFA") filed on October 25, 2016, Sotera disclosed all known transfers during the ninety (90) days from the Petition Date (Category I transfers described in detail in Attachment 2.3 to SOFA), all transfers to insiders during the period one year before the Petition Date, (Category 2 described in detail in part of 2.4 of SOFA), and other transfers made during the two years before bankruptcy (Category 3 described in detail in Part 6.13 of the SOFA).

While Foley has not completed its review of all of these transfers it does appear that the vast majority of the transfers in Categories 1, 2 and 3 of the SOFA were made in the ordinary course of business or otherwise protected from being avoided or set aside.  In addition, Sotera is not aware of any claim or Cause of Action for any conduct of the Pre-Petition Lenders in the post-petition period.  Notwithstanding all of the above, Sotera reserves its right to assert any and all Causes of Action belonging to it, including Avoidance Actions.

**c.      Preservation of Defensive Use of Causes of Action.**  Whether or not any Cause of Action is pursued or abandoned, Sotera and the Reorganized Debtor reserve their rights to use any such Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.  Sotera reserves its rights to use any such Assigned Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.

**d.      Discretion to Pursue or Settle and Immunity of the Parties.**  The Reorganized Debtor shall have discretion to pursue or not to pursue, to settle or not to settle, to try or not to try, and/or to appeal or not to appeal all Causes of Action.

### 17.    No Liability for Solicitation or Participation

As specified in § 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sales, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

23

### F.      Conditions Precedent to Effectiveness of the Plan

#### 1.      Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.1 of the Plan:

**a.**      The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to Sotera, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, Section 10.1(a) of the Plan shall be deemed satisfied;

**b.**      All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Investors and Sotera and shall have been effected or executed as applicable;

**c.**      The Investors shall have executed the Exit Financing Agreement; and

**d.**      Sotera shall have entered into the Reorganization Term Loan.

#### 2.      Waiver of Conditions

The conditions set forth in Section 10.1(a), (b) and (d) of the Plan may be waived by Sotera, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### G.      Releases and Related Matters

#### 1.      Releases by Holders of Claims for Post-Petition Conduct

As of the Effective Date, in consideration for the obligations of Sotera and the Reorganized Debtor under the Plan and the cash and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest, and any of their respective agents, employees, representatives, financial advisors, attorneys, or any of their successors or assigns, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce obligations under or reserved by the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder and the right to contest Fee Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place after the Petition Date and through the Effective Date, other than for gross negligence or willful misconduct, in any way relating to Sotera, the Chapter 11 Case or the Plan that such Person has, had or may have against (i) Sotera, (ii) Sotera's directors, officers, employees, agents and attorneys, (iii) the Committee and its agents,

24

attorneys, and other professionals; (iv) the Pre-Petition Lenders and their agents, attorneys, and other professionals; (v) the DIP Agents and DIP Lenders and their employees, agents, attorneys and other professionals; and (vi) the Investors and their employees, agents, attorneys and other professionals; and Sotera and the Committee remain subject to the Barton Doctrine (*Barton v. Barbour*, 104 U.S. 126 (1881)). Sotera, the Reorganized Debtor, the Committee, the Pre-Petition Lenders, the DIP Agents, and DIP Lenders, and each of their respective agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts, and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided, however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

## 2.     Releases by Sotera

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Sotera and the Reorganized Debtor and any and all Persons claiming through or on behalf of Sotera or the Reorganized Debtor including, without limitation, the Committee, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever in connection with or related to Sotera, the Chapter 11 Case or the Plan (other than the rights of Sotera or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to Sotera, the Reorganized Debtor, the Chapter 11 Case or the Plan, and that may be asserted by Sotera or its Estate or the Reorganized Debtor against (i) Sotera's directors, officers, employees, agents and attorneys, (ii) the Committee and its agents, attorneys, and other professionals; (iii) the Pre-Petition Lenders and their agents, attorneys, and other professionals (iv) the DIP Agents and DIP Lenders and their employees, agents, attorneys and other professionals, and (v) the Investors and their employees, agents, attorneys and other professionals.

Foley has reviewed all pertinent facts and knows of no viable claims or Causes of Action exist as to Sotera's officers, directors, employees, agents and attorneys. The Committee has not yet completed its investigation and has not yet reached the same conclusion as Foley. Therefore, as to the Committee and any third party with standing, the right to assert any such claim or Cause of Action is reserved subject to the Confirmation Order.

## 3.     Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including pursuant to the releases in Section 13.3 of the Plan. FOR THE AVOIDANCE OF ANY DOUBT, THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN MASIMO FROM COMMENCING OR PROSECUTING ANY CAUSES OF ACTION AND OTHERWISE PERMANENTLY ENJOIN MASIMO FROM EXERCISING AND

25

ENFORCING ANY AND ALL OTHER EQUITABLE RIGHTS AND REMEDIES ON ACCOUNT OF THE MASIMO CLAIMS AS PROVIDED BY THE PLAN, INCLUDING SECTION 13.3, AND/OR ANY AND ALL CAUSES OF ACTION ARISING THEREFROM. THE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF CONFIRMATION OF THE PLAN PROVIDES THAT ANY AND ALL PRE- AND POST-PETITION CLAIMS AND CAUSES OF ACTION OF MASIMO AGAINST SOTERA OR THE REORGANIZED DEBTOR INCLUDING ANY AND ALL EQUITABLE RIGHTS AND REMEDIES ARISING THEREFROM (INCLUDING ANY INJUNCTIVE RELIEF) QUALIFY AND ARE TREATED AS A DISCHARGEABLE "CLAIM", AS SUCH TERM IS DEFINED IN BANKRUPTCY CODE SECTION 101(5)(a)&(b).

### H.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases that exist between Sotera and any Person shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed (including a motion seeking an order authorizing, but not directing, Sotera to assume, assume and assign, or reject such Executory Contract or Unexpired Lease) prior to the Effective Date, or (iii) pursuant to stipulation with Sotera or the Reorganized Debtor. Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("Rejection Claims") shall be classified in Class 6 under the Plan.

#### 2.    Bar Date for Filing Rejection Claims

A Proof of Claim asserting a Rejection Claim shall be filed with the Bankruptcy Court on or before the fortieth (40th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Reorganized Debtor.

### I.    Modification of the Plan

Sotera may propose amendments to or modifications of this Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order. After the Confirmation Date, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in this Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of this Plan so long as the interests of Claimants are not materially and adversely affected.

### J.    Dissolution of the Committee

Upon payment in full of all Class 5 Claims, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Fee Claims. The Professionals retained by the Committee shall be entitled to compensation and reimbursement of (i) fees and expenses for services rendered through and

26

including the date it is dissolved, and (ii) fees and expenses for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 2.2 of the Plan or any objections thereto.

### K.    Default

In the event Sotera fails to perform a material obligation of the Plan (a "Default"), the US Trustee, the Committee, or any unpaid holder of an Allowed Claim may (i) provide Sotera written notice of the Default, and (ii) if the Default is not cured within ten (10) days after receipt of the written notice, seek conversion of the Chapter 11 Case or dismissal of the Chapter 11 Case or relief in state court as appropriate.

## V.    THE REORGANIZED DEBTOR

### A.    The Exit Financing Agreement

Pursuant to the Exit Financing Agreement, the Reorganized Debtor shall sell and issue shares of New Series A Preferred Stock in the aggregate amount of $30 million at a purchase price of $0.01 per share (the "New Series A Issuance Price"). Entities associated with Foxconn would invest approximately $19.81 million, including conversion of their DIP Loan Obligation; entities associated with Sanderling Ventures would invest approximately $4.81 million, including conversion of their DIP Loan Obligation; Lanhai would invest approximately $4.34 million; Ken Buechler would invest approximately $0.54 million, including conversion of his DIP Loan Obligation; and entities associated with Intermountain Health would invest $0.5 million.

Those holders of Convertible Preferred Interests of Wireless that purchase a percentage of the total number of shares of New Series A Preferred Stock sold in this financing, including the shares of New Series A Preferred Stock issued upon conversion of any DIP Loan Obligation, equal to at least 2/3 of such shareholder's *pro rata* percentage ownership stake in Wireless prior to the conversion of the Convertible Preferred Interests in connection with the Plan and the issuance of such New Series A Preferred Stock (such *pro rata* share shall be equal to the ratio of (i) the number of shares of outstanding Common Stock and Convertible Preferred Interests of Wireless held by such shareholder or its affiliates to (ii) the total number of shares of outstanding Common Stock and Convertible Preferred Interests of Wireless), such shareholder shall be issued two (2.0) shares of Junior Preferred Stock for each share of Common Stock and Convertible Preferred Interests it formerly held in Wireless.

Each DIP Lender shall receive a warrant exercisable for that number of shares of New Series A Preferred Stock equal to 25% of the aggregate amount invested by such DIP Lender in the New Series A Preferred Stock, including conversion of any DIP Loan Obligation, divided by the New Series A Issuance Price. The exercise price of the warrants shall be equal to $0.01 per share. Each warrant shall have a five year term.

The New Series A Preferred Stock and Junior Preferred Stock shall have certain rights, preferences and privileges, including with respect to dividends, liquidation preference, conversion, anti-dilution, voting, board designation rights, information rights, registration rights

27

and preemptive rights, as described in the Memorandum of Terms annexed to the Plan as Exhibit A.

Concurrently with the first private equity financing of the Reorganized Debtor that is completed within five years following the Effective Date (or, if an initial public offering, acquisition or Asset Transfer (as defined below) of the Reorganized Debtor is completed prior to any such private equity financing of the Reorganized Debtor, then immediately prior to such initial public offering, acquisition or Asset Transfer), entities associated with Sanderling Ventures would have the right, but not the obligation, to purchase $5 million of additional New Series A Preferred Stock. "Asset Transfer" shall mean a sale, lease or other disposition of all or substantially all of the assets of the Reorganized Debtor or a license of all or substantially all of the intellectual property of the Reorganized Debtor in all or substantially all fields of use.

In addition, concurrently with the first private equity financing of the Reorganized Debtor that is completed within five years following the Effective Date (or, if an initial public offering, acquisition or Asset Transfer of the Reorganized Debtor is completed prior to any such private equity financing of the Reorganized Debtor, then immediately prior to such initial public offering, acquisition or Asset Transfer), each holder of Convertible Preferred Interests of Wireless, other than entities associated with Foxconn, entities associated with Sanderling Ventures, and Ken Buechler, would have the right, but not the obligation, to purchase its *pro rata* share of $5 million of additional New Series A Preferred Stock (such *pro rata* share shall be equal to the ratio of (i) the number of shares of outstanding Common Stock and Convertible Preferred Interests of Wireless currently held by such holder of Convertible Preferred Interests to (ii) the total number of shares of outstanding Common Stock and Convertible Preferred Interests of Wireless currently held by all holders of Convertible Preferred Interests of Wireless, other than those excluded above).  Existing holders of Convertible Preferred Interests of Wireless, other than those excluded above, that subscribe for their *pro rata* share of the $5 million of additional New Series A Preferred Stock shall be given a *pro rata* right of oversubscription for any unsubscribed portion of the $5 million amount.

The New Series A Preferred Stock issued pursuant to the two preceding paragraphs would have the same rights, preferences and privileges as the New Series A Preferred Stock issued on the Effective Date.  In addition, an existing holder of Convertible Preferred Interests, other than those excluded above, that purchases at least 2/3 of its *pro rata* share of $5 million of additional New Series A Preferred Stock pursuant to the immediately preceding paragraph would be issued two (2.0) shares of Junior Preferred Stock for each share of Common Stock and Convertible Preferred Interests it formerly held in Wireless.

### B.    Business and Property of the Reorganized Debtor

The Reorganized Debtor intends to continue to operate Sotera's  business in substantially the same form as operated prior to the Petition Date.

### C.    Management of the Reorganized Debtor

The Reorganized Debtor will initially be managed by the below individuals.  Pursuant to the US Trustee's Guidelines, also disclosed below is the respective annual compensation proposed to be paid to each individual and whether each individual is an "insider" as defined by 11 U.S.C. § 1129(a)(5).

28

- Chief Executive Officer: Thomas Watlington, insider ($325,000)
- Chief Financial Officer: To be determined.

The below individuals are proposed as of January 24, 2017 to serve as directors and/or officers of the Reorganized Debtor.  Additional directors may be added prior to the Effective Date.

- Thomas Watlington (Chief Executive Officer and Director)
- Leonard Wu (Director)
- One Director to be selected by Sanderling (as defined in the Exit Financing Agreement)
- One Director to be selected by Foxconn (as defined in the Exit Financing Agreement)
- One Director to be selected by Lanhai (as defined in the Exit Financing Agreement)

### D.    Selected Historical Financial Information

Attached hereto as <u>Exhibit B</u> is selected historical financial information on Sotera's operations.

### E.    Projected Financial Information

Attached hereto as <u>Exhibit C</u> are the financial projections prepared by Sotera for the Reorganized Debtor's operations through December 2018 (the "Projections").  These Projections support, among other things, Sotera's discussion of the feasibility of the Plan pursuant to § 1129(a)(11) of the Bankruptcy Code, discussed in Section VI.D.2 below.

## VI.    CONFIRMATION OF THE PLAN

### A.    Introduction

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed.  It requires further that a disclosure statement concerning such plan be adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met.  Thus, even if the requisite vote is achieved for the Voting Classes, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.    Voting

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan.  A holder of a Claim or Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in § 1124 of the Bankruptcy Code is considered Impaired.  Pursuant to § 1126(f) of the Bankruptcy Code, holders of Claims

that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.  Pursuant to § 1126(g) of the Bankruptcy Code, any holders of Claims or Interests that do not receive or retain any property under the Plan on account of such Claims or Interests are conclusively deemed to have rejected the Plan and are not entitled to vote.

Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Voting Classes or (ii) are otherwise permitted by the Bankruptcy Code to vote.

### C.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote.  The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote.  Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan.  Except in the context of a "cram down" pursuant to § 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accept the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Interests, Sotera has the right, assuming that at least one Class of Impaired Claims or Interests has accepted the Plan, to request confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes.  This procedure is commonly referred to in bankruptcy parlance as "cram down."  As such, if any Voting Class votes to reject the Plan, Sotera will request confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

### D.    Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after

30

confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

• The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider.

• With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

• Each class of claims has either accepted the plan or is not impaired under the plan, subject to Section VI.D.4, "Cram Down."

• Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expense claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief, of a value, as of the effective date, equal to the allowed amount of such claim.

• If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

• Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, Sotera believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) Sotera has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain of the relevant statutory confirmation requirements.

## 1.  Best Interests of Holders of Claims and Interests

The "best interests" test requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each

impaired class of claims and equity interests will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if Sotera were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Plan satisfies the best interests test as follows. Under the Reorganization Plan Event #1, all Allowed Claims (other than those in Class 10) will eventually be paid in full and holders of Interests will retain equity in the Reorganized Debtor. Under the Reorganization Plan Event #2, all Allowed Claims, except for Claims in Classes 6 and 10, will eventually be paid in full. Class 6 Claims will be paid pro rata from the Class 6 Pool. Holders of Interests will receive nothing on account of such Interests. This treatment under the Plan under either reorganization scenario is substantially better than liquidation under chapter 7 of the Bankruptcy Code. Attached hereto as <u>Exhibit D</u> is Sotera's analysis of the liquidation value of Sotera's assets prepared by Piper Jaffray after consultation with Sotera's Chief Financial Officer, its professionals, and, where appropriate, its own analyses.

In a chapter 7 liquidation, there are additional costs of converting the Chapter 11 Case to a chapter 7 case, appointing a trustee, and appointing new professionals for the trustee to assist in the liquidation and administration of the chapter 7 case. This process also requires time and the liquidation of the assets could be delayed while the trustee analyzes the assets and markets them for sale. Even without reflecting these costs, the Liquidation Analysis shows that reorganization under the Plan is in the best interests of holders of Claims and Interests. The Liquidation Analysis shows that under liquidation, except for the Secured Pre-Petition Loan Claim (which would be paid only partially, up to 53%, if allowed in full, and assuming the Pre-Petition Lenders have a valid, binding, and enforceable security interest in Sotera's intellectual property and its proceeds), all other Allowed Claims would be paid $0 from the proceeds of the sale of assets of Sotera. In addition, holders of Interests in the Wireless would receive nothing on account of such Interests. While the Plan allows for the possibility that holders of Interests in Wireless will receive nothing on account of such Interests if a Reorganization Plan Event #2 were to occur, it also provide for the opportunity for holders of such Interests to maintain their Interests in Wireless (which will be the Reorganized Debtor). Accordingly, reorganization under the Plan, providing for full payment of all Allowed Claims and the possibility for holders of Interests in Wireless to maintain such Interests is far superior to liquidation under chapter 7 and the best interests test is satisfied.

## 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Sotera or any successor to Sotera, unless such liquidation or reorganization is proposed in the Plan.

Under the Plan, Sotera will bear few future-looking obligations and can feasibly satisfy such obligations. In such case, holders of Allowed Claims will be paid in accordance with the Plan on or around the Effective Date or on such date as such Claims are allowed. Only allowed Secured Tax Claims and allowed Trade Claims will be paid by future payments by the Reorganized Debtor. The Reorganized Debtor will also have obligations under the Reorganization Term Loan.

4825-8353-8240.17

For purposes of determining whether the Plan satisfies the feasibility requirement, Sotera has analyzed its ability to meet its obligations under the Plan. As part of this analysis, Sotera has prepared the Projections attached hereto as <u>Exhibit C</u>.

The Projections provide that the Reorganized Debtor should be able to meet all of its obligations under the Plan and is not likely to be liquidated after the Effective Date. Among other things, the Projections provide that the Reorganized Debtor should have the wherewithal to make all payments required under the Plan including, but not limited to, any payments due to holders of Secured Tax Claims and allowed Trade and Services Provider Claims, as well as meet its obligations under the Reorganization Term Loan.

While there is no guarantee that the Reorganized Debtors' actual performance will mirror the Projections, Sotera believes, based on the Projections, that the Reorganized Debtor should be able to meet its obligations under the Plan.

### 3.    Acceptance by Impaired Classes

A class is impaired under a plan unless, with respect to each claim of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances to such class is not required.

With respect to the Plan, holders of Claims in Classes 1, 2, 3, and 4 are Unimpaired and are deemed to have accepted the Plan. Holders of Claims or Interests in Classes 5, 6, 7, and 8 are Impaired and entitled to vote on the Plan. Holders of Interests in Class 9 and Claims in Class 10 shall receive nothing on account of such interest and are therefore deemed to reject the Plan.

### 4.    Cram Down

A plan is accepted by an impaired class of claims or interests if holders of at least two-thirds in dollar amount and a majority in number of claims or interests in that class vote to accept the plan. Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in § 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of § 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims and Interests that is impaired under, and has not accepted, the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or interests receives full compensation for its allowed claims or interests, no holder of allowed claims or interests in any junior class may receive or retain any property on account of such claims or interests. The

33

requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank.

Sotera intends to seek "cram down" of the Plan on any Class rejecting the Plan.  Sotera submits that the Plan satisfies the absolute priority rule and does not unfairly discriminate against any Class that may not accept or consent to the Plan.

The Plan satisfies the absolute priority rule as it does not permit holders of allowed claims or interests in any junior class to receive or retain property on account of such claims or interests until senior classes are compensated in full for their allowed claims.

As to the "discriminate unfairly" test, under a Reorganization Plan Event, Sotera submits the Plan does not unfairly discriminate against any Class that may not accept or otherwise consent to the Plan.

### 5.    Classification of Claims

Sotera believes that the Plan meets the classification requirements of the Bankruptcy Code that require that a plan place each claim into a class with other claims that are "substantially similar."

### E.    Effect of Confirmation of the Plan

### 1.    Discharge of Sotera

PURSUANT TO § 1141(d) OF THE BANKRUPTCY CODE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, THE RIGHTS AFFORDED AND THE PAYMENTS AND DISTRIBUTIONS TO BE MADE AND THE TREATMENT UNDER THE PLAN SHALL BE IN COMPLETE EXCHANGE FOR, AND IN FULL AND UNCONDITIONAL SETTLEMENT, SATISFACTION, DISCHARGE, AND RELEASE OF ANY AND ALL EXISTING DEBTS AND CLAIMS AND TERMINATION OF ALL EQUITY INTERESTS OF ANY KIND, NATURE, OR DESCRIPTION WHATSOEVER AGAINST OR IN SOTERA, THE REORGANIZED DEBTOR, THEIR PROPERTY, SOTERA'S ASSETS, OR THE ESTATE, AND SHALL EFFECT A FULL AND COMPLETE RELEASE, DISCHARGE, AND TERMINATION OF ALL LIENS, SECURITY INTERESTS, OR OTHER CLAIMS, INTERESTS, OR ENCUMBRANCES UPON ALL OF SOTERA'S ASSETS AND PROPERTY.  FURTHER, ALL PERSONS ARE PRECLUDED FROM ASSERTING, AGAINST SOTERA OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS, OR ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR INTERESTS BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE, OTHER THAN AS EXPRESSLY PROVIDED FOR IN THE PLAN, OR THE CONFIRMATION ORDER, WHETHER OR NOT (A) A PROOF OF CLAIM BASED UPON SUCH DEBT IS FILED OR DEEMED FILED UNDER § 501 OF THE BANKRUPTCY CODE; (B) A CLAIM BASED UPON SUCH DEBT IS ALLOWED; OR (C) THE CLAIMANT BASED UPON SUCH DEBT HAS ACCEPTED THE PLAN.

34

2.     **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL CLAIMANTS AND HOLDERS OF INTERESTS ARISING PRIOR TO THE EFFECTIVE DATE SHALL BE PERMANENTLY BARRED AND ENJOINED FROM ASSERTING AGAINST THE REORGANIZED DEBTOR OR SOTERA, OR THEIR SUCCESSORS OR PROPERTY, OR SOTERA'S ASSETS, ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH CLAIM OR INTEREST:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING ON ACCOUNT OF SUCH CLAIM OR EQUITY INTEREST AGAINST THE REORGANIZED DEBTOR, SOTERA, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN TO ENFORCE ANY RIGHT TO DISTRIBUTION WITH RESPECT TO SUCH PROPERTY UNDER THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTOR, SOTERA OR ANY OF THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN AS PERMITTED UNDER SUB-PARAGRAPH (I) ABOVE; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST PROPERTY OF THE REORGANIZED DEBTOR, SOTERA, OR ANY PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE SOTERA, THE REORGANIZED DEBTOR, THEIR ASSETS OR ANY OTHER PROPERTY OF SOTERA, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN.  THE FOREGOING DISCHARGE, RELEASE AND INJUNCTION ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.  SOTERA AND THE REORGANIZED DEBTOR SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK THE ENFORCEMENT OF THE DISCHARGE, RELEASE AND INJUNCTION SET FORTH IN ARTICLE XI OF THE PLAN.

3.     **No Waiver of Discharge**

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to Sotera upon confirmation of the Plan by § 1141 of the Bankruptcy Code.

4.     **Binding Effect**

As of the Effective Date, this Plan shall be binding upon and inure to the benefit of Sotera, the Reorganized Debtor, all Claimants and holders of Interests, other parties-in-interest and their respective heirs, successors, and assigns.

5.     **Term of Injunctions or Stays**

Unless otherwise provided in this Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in effect

35

on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time they are replaced with the injunction set forth in Section 11.1 of the Plan.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN SOTERA SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Financing Risks

Although Sotera projects that the Reorganized Debtor will have sufficient liquidity to operate its business through completion of all payments required to be made under a reorganization pursuant to the Plan, there is no assurance that the Reorganized Debtor will generate sufficient revenues in the upcoming months and years to cover all such payments along with all expenditures incurred in the Reorganized Debtor's business.

### B.    Risk of Non-Confirmation or Withdrawal of the Plan

If the Plan is not confirmed and consummated, there can be no assurance that Sotera's Chapter 11 Case will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims as the terms of the Plan.  In addition, if the Bankruptcy Court issues or determines that it would be appropriate for a court to issue a permanent injunction in connection with resolving the Masimo Claim that prevents or materially interferes with Sotera's making and selling of the ViSi Mobile, then the Exit Financing Agreement may not be consummated and, if not consummated, Sotera would have to withdraw the Plan.

### C.    Non-Consensual Confirmation of the Plan

Pursuant to the "cram down" provisions of § 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes of Claims, so long as at least one Impaired Class of Claims has accepted the Plan.  For a description of the "cram down" provisions of the Bankruptcy Code, see Section VI.D.4, "Cram Down."

### D.    Appeal of the Masimo Claim Order

If the order fixing the Masimo Claim is appealed and stayed, then a "Masimo Claim Order" has not yet been entered because that term is defined as an order that "has not been vacated, reversed, modified, amended, or stayed."  Accordingly, distribution of the Class 6 Pool to the holders of Claims in Class 6 would be temporarily halted until a Masimo Claim Order is entered (which would occur after the appeal is concluded and an order meeting the definition of "Masimo Claim Order" is entered).

36

4825-8353-8240.17

### E.    Alternatives to the Plan

If the Plan or any other chapter 11 plan for Sotera cannot be confirmed under §§ 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code.  After careful review of the estimated recoveries in a chapter 7 liquidation scenario and as set more in more detail in Section VI.D.1 above and on <u>Exhibit D</u> hereto, Sotera has concluded that recoveries to holders of Claims under the Plan will be higher than the recoveries in a chapter 7 case.  Should the Plan not be confirmed, it is likely that the distributions to holders of Claims would be reduced by the additional fees and other costs associated with a chapter 7 liquidation.

If the Plan is not confirmed, Sotera, or any other party-in-interest, may attempt to formulate an alternative chapter 11 plan, which might provide for a reorganization or for the liquidation of Sotera's assets other than as provided under the Plan.  Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay distributions to holders of Claims and may not result in the financing and concessions by certain of Sotera's creditors that made possible the formulation of the Plan and the distributions to creditors thereunder.  In addition, due to the incurrence of additional Administrative Expense Claims during the period of any delay in formulating an alternative Plan, distributions to holders of Claims could be adversely impacted.

Accordingly, Sotera believes that the Plan offers the best prospect of recovery for the holders of Claims against Sotera.

## VIII.    SECURITIES LAW MATTERS

### A.    General

The Plan provides for the Reorganized Debtor to issue New Common Stock, New Junior Preferred Stock, and New Series A Preferred Stock (collectively, "New Stock") pursuant to Sections 6.5 and 6.6 of the Plan.  Sotera believes that this new stock constitutes "securities," as defined in Section 2(a)(1) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a <u>et</u> <u>seq.</u> (the "Securities Act"), § 101(49) of the Bankruptcy Code and applicable state securities laws.

### B.    Issuance of New Stock

Sotera believes that the offer and sale of the New Stock pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security generally do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, Sotera, and (c) the securities are issued in exchange for such claim against, interest in, or claim for administrative expense against, Sotera or are issued principally in such exchange and partly for cash and property.  In reliance upon § 1145 of the Bankruptcy Code, the New Stock will not be registered under the Securities Act or any state securities laws.

C.      **Resale of New Stock**

Any subsequent transfers of the New Stock by the holder or holders thereof will need to be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws.    Sotera recommends that the recipient of the New Stock consult with his own legal advisors as to the availability of any such exemption from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws in any given instance and as to any applicable requirements or conditions to such availability.

## IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The Federal income tax consequences of the Plan are complex.  All Holders of Claims against and Interests in Sotera should consult with their tax advisors as to the particular tax consequences to them of the plan and the ownership and disposition of Claims including the applicability and effect of any state, local or foreign (non-us) tax laws and of any change in applicable tax laws.

A.      **United States Federal Income Tax Consequences to Sotera**

1.      **Cancellation of Indebtedness Income**

Under the U.S. Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year.  U.S. Code section 108 provides an exception to this general rule if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

U.S. Code section 108 of title 28 requires the amount of COD income so excluded from gross income to be applied to reduce the following tax attributes of the taxpayer in the following order: (a) any net operating loss ("NOL") for the taxable year of the discharge and any net operating loss carryforwards to such year; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of Sotera's depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards.  However, a debtor can elect under U.S. Code section 108(b)(5) of title 38 to apply the tax attribute reduction first to reduce the tax basis of its depreciable property (without regard to the amount of its liabilities) and then to reduce NOLs and other tax attributes.  A reduction in tax attributes under the foregoing rules does not occur until the end of the taxable year or, in the case of an asset basis reduction, the first day of the taxable year following the taxable year, in which the COD income is realized.  Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Under a  Reorganization Plan Event #2 pursuant to the Plan, holders of Claims may receive less than full payment on their Claims.  Sotera's liability to the holders of Claims in excess of the amount satisfied by distributions under the Plan will be discharged.  As a result of the discharge of Claims under a Reorganization Plan Event #2 pursuant to the Plan, Sotera is

38

expected to realize COD. Any COD income that Sotera realizes as a result of such discharge should be excluded from Sotera's gross income pursuant to the bankruptcy exception under Code section 108 described in the immediately preceding paragraph. The exclusion of COD income under this exception will result in a reduction of certain tax attributes of Sotera. Sotera has not determined whether it will make the election under Code section 108(b)(5) to apply the COD income to reduce the basis of depreciable property before reducing other tax attributes.

### 2.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards, in contrast to the regular tax which generally permits a corporation to offset all of its taxable income by NOL carryovers from prior years.

### B.    United States Federal Income Tax Consequences to Holders of Claims

### 1.    Distributions in Discharge of Accrued Interest

In general, to the extent that money or property received by a holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such a holder will recognize a deductible loss to the extent any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

### 2.    Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, whether the Claim constitutes a capital asset in the hands of the holder, the holder's holding period for the Claim, whether the Claim was acquired at a market discount, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. A holder of a Claim who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

39

### 3.    Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of payment of their Claims under the Plan will be subject to limits on their use of capital losses.  For noncorporate Claim holders, capital losses may be used each year to offset any capital gains (without regard to holding periods) plus the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  For corporate Claim holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Holders of Claims who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Noncorporate holders of Claims may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income (see described immediately above) for an unlimited number of years.  Corporate Claim holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 4.    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Under the U.S. Code's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

4825-8353-8240.17

## X.    CONCLUSION

Sotera urges holders of Claims in the Voting Classes to vote to accept the Plan and to evidence such acceptance by returning their completed and signed Ballots so they will be received by Sotera in accordance with the Voting Instructions no later than 4:00 p.m. (Pacific time) on April 4, 2017.

DATE: MARCH 10, 2017                                   FOLEY & LARDNER LLP

                                                      BY: /S/ VICTOR A. VILAPLANA
                                                      VICTOR A. VILAPLANA
                                                      ATTORNEYS FOR DEBTORS AND DEBTORS-IN-
                                                      POSSESSION

41

4825-8353-8240.17